IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ALICE MCCABE and )
CHRISTINE NELSON, )          No. 1:05-cv-73 LRR
                           )
        Plaintiffs,        )
                           )          **BRIEF IN SUPPORT OF RENEWED**
    vs.                    )          **MOTION FOR SUMMARY JUDGMENT**
                           )          **BY DEFENDANTS BRUCE**
BRUCE MACAULAY, MICHAEL    )          **MACAULAY, MICHAEL PARKER &**
PARKER, HOLLY MICHAEL, et al., )      **HOLLY MICHAEL**
                           )
        Defendants.        )
                           )

---

## TABLE OF CONTENTS

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.    QUALIFIED IMMUNITY BARS THE PLAINTIFFS' FIRST AMENDMENT
    CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.    Qualified immunity bars First Amendment claims against individual federal
        defendants who did not cause the purported First Amendment violations. 8

        B.    Qualified immunity bars the plaintiffs' First Amendment claims because the
        security measures the plaintiffs were arrested for violating were permissible
        limits on the time, place, and manner of expression. . . . . . . . . . . . . . . . . . 9

            1.    The security restrictions were viewpoint- and content-neutral. . . 10

            2.    The security restrictions were narrowly tailored to serve a substantial
            government interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            3.    The security restrictions left open ample alternative channels for
            expression . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

        C.    Qualified immunity bars the plaintiffs' First Amendment claims because the
        individual federal defendants' conduct was not clearly unconstitutional in the
        situation they confronted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II.   QUALIFIED IMMUNITY BARS THE PLAINTIFFS' ARREST-RELATED FOURTH AMENDMENT CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      A.   Qualified immunity bars the plaintiffs' arrest-related Fourth Amendment claims against individual federal defendants who did not cause the arrest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      B.   Qualified immunity bars the plaintiffs' arrest-related Fourth Amendment claims because the arrests were supported by at least arguable probable cause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

           1.   At least arguable probable cause supported arresting the plaintiffs for interference with official acts under Iowa law. . . . . . . . . . . . . . . 20

           2.   At least arguable probable cause supported arresting the plaintiffs for violating 18 U.S.C. § 1752. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

           3.   At least arguable probable cause supported arresting the plaintiffs for violating 18 U.S.C. § 3056. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III.  QUALIFIED IMMUNITY BARS THE PLAINTIFFS' SEARCH-RELATED FOURTH AMENDMENT CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

IV.   QUALIFIED IMMUNITY BARS THE PLAINTIFFS' EQUAL PROTECTION CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

V.    QUALIFIED IMMUNITY BARS THE PLAINTIFFS' CLAIMS UNDER 42 U.S.C. § 1985(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## BRIEF IN SUPPORT OF RENEWED MOTION FOR SUMMARY JUDGMENT
## BY DEFENDANTS BRUCE MACAULAY, MICHAEL PARKER & HOLLY MICHAEL

This motion renews the request by Secret Service Special Agents Bruce Macaulay, Michael Parker, and Holly Michael for summary judgment on qualified immunity grounds. Plaintiffs Alice McCabe and Christine Nelson have challenged as unlawful their arrest outside a campaign rally held at Noelridge Park in Cedar Rapids, Iowa. Following the dismissal of several of their claims, the plaintiffs now seek damages for alleged violations of their First, Fourth, and Fifth Amendment rights under a *Bivens*[1] theory of liability and for an alleged conspiracy to violate their constitutional rights under 42 U.S.C. § 1985(3). The limited discovery permitted by this Court on the plaintiffs' surviving claims has confirmed that Macaulay, Parker, and Michael are entitled to qualified immunity because their conduct did not violate any clearly established constitutional right. Therefore, this Court should enter summary judgment for Macaulay, Parker, and Michael.

## BACKGROUND

The events in this case revolve around a campaign rally held in an open-air park by a private political organization on September 3, 2004. App. at 16, 33-34, 40-41. President George W. Bush appeared at the rally, and over ten thousand ticket holders attended. *Id.* at 14-15, 33-34. Special Agents Bruce Macaulay, Michael Parker, and Holly Michael were temporarily assigned to assist with protective functions at the rally. *Id.* at 19, 24, 29. Like many of the other federal, state, and local law enforcement officers at the rally, Macaulay, Parker, and Michael were in plainclothes, i.e., not in uniform. *Id.*

Before the rally, all three agents were briefed on the security measures that had been designed

---

[1]    A tort claim for damages arising from a violation of the United States Constitution is known as a *Bivens* action. *See generally Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

to ensure the safety of the President and the general public.  *Id.* at 19-20, 25, 29-30.  Of particular relevance to this lawsuit were the security measures applicable to the sidewalks and grassy areas surrounding an entrance to the rally designated for both bus and pedestrian traffic (the "bus entrance").  *Id.* at 20, 25, 30, 35-37.  Macaulay, Parker, and Michael were briefed that members of the general public in and around the bus entrance were to keep moving and to refrain from stopping and standing in one place.  *Id.*  The reasons for this restriction were several.  *See id.* at 37, 43-44, 47-48, 51-52.  First, the proximity and position of the bus entrance relative to the rally stage necessitated close monitoring of the entrance, and close monitoring would have been complicated had members of the general public been allowed to stand and gather there.  *Id.*  Second, allowing members of the general public to stand and gather in or around the bus entrance would have hindered the flow of pedestrian and bus traffic into the park.  *Id.*  Third, allowing members of the general public to stand and gather in or around the bus entrance would have frustrated the effort to ensure clear paths for emergency vehicles to enter and exit the rally area.  *Id.*

The plaintiffs in this case are two individuals who stopped and stood immediately adjacent to the bus entrance on the day of the rally.  *Id.* at 181-83, 210, 252-53.[2]  Plaintiff Nelson was wearing a campaign button no more than two inches in diameter; plaintiff McCabe was carrying an 8½- by 11-inch sign mounted on a wooden stake.  *Id.* at 166, 168, 234-35.[3]  Parker, who had been stationed

---

[2]    Based on the record, the individual federal defendants have concluded that the plaintiffs are the two women arrested for refusing to move from the bus entrance.  App. at 21, 26, 31.  However, the individual federal defendants do not know the plaintiffs by name, *see id.*, and McCabe and Nelson can neither name nor describe (except in vague terms) the plainclothes officers who approached them, *see id.* at 170, 172-73, 223-24.

[3]    The plaintiffs' testimony on where McCabe stood is inconsistent.  McCabe testified that she stood *east* of the bus entrance.  App. at 183, 185, 252.  Nelson testified that McCabe stood *west* of the bus entrance.  *Id.* at 210-11.  Regardless, it is undisputed that both plaintiffs stopped and stood immediately adjacent to the bus entrance, where security restrictions required that the general public
(continued...)

at the bus entrance, approached one of the plaintiffs—apparently McCabe[4]—and directed her to move along. *Id.* at 31. McCabe did not move along, but remained in the area immediately adjacent to the bus entrance. *Id.* at 31, 185-86, 252. Because Parker's assigned responsibility was to monitor the area around the bus entrance rather than to become involved in particular situations, he then requested assistance from other law enforcement officers by radio. *Id.* at 31. Parker had no further contact with the plaintiffs. *Id.*

Macaulay, who had been paired with a plainclothes counterpart from a local law enforcement agency and assigned to deal with security issues as they arose, came to the bus entrance in response to Parker's request. *Id.* at 19, 21. Other law enforcement officers, including state and local officers both in plainclothes and in uniform, also arrived on the scene. *Id.* at 18, 69-70, 103. Michael, who

---

[3]     (...continued)
keep moving. *Id.* at 20, 25, 30, 36-37 (explaining that general public was not allowed to stop and stand in and around bus entrance); *id.* at 181-83, 210 (testimony by plaintiffs that they stopped at bus entrance); *id.* at 252-53 (exhibits marked by plaintiffs to indicate where they stopped and stood).

[4]     Because Parker recalls approaching a woman with a sign, *see* App. at 31, the only one of the two plaintiffs he could have approached is McCabe. However, even viewing the evidence in the light most favorable to the plaintiffs, Parker could not have been the plainclothes officer who subsequently approached McCabe or the plainclothes officer who subsequently approached Nelson. Parker's testimony that he did not approach either plaintiff after giving an initial instruction is unrebutted. *Id.* at 31; *see also id.* at 171 (admission by McCabe that she does not know whether plainclothes officer who spoke to her after she moved closer to entrance was the same person who spoke to her previously); *id.* at 214 (admission by Nelson that she does not recall and may not even have seen person who gave McCabe initial instruction to move); *id.* at 223-24 (admission by Nelson that she cannot recall face of plainclothes officer who approached her and can describe him only as taller than uniformed officer and wearing shorts and a shirt). In any event, Parker does not match the description of the plainclothes official who purportedly approached McCabe or the description of the plainclothes officer who purportedly approached Nelson. *Compare id.* at 172-73 (testimony by McCabe describing plainclothes officer who approached her as resembling Jesse Ventura, the bald, mustachioed wrestler-turned-politician); *with id.* at 29 (noting that Parker was clean-shaven with a full head of hair); *compare also id.* at 170 (testimony by McCabe that individual who first approached her was in shorts), *and id.* at 223-24 (testimony by Nelson that plainclothes officer who approached her was in shorts), *with id.* at 29 (unrebutted testimony by Parker that he was wearing trousers on day of rally).

like Macaulay had been paired with a plainclothes counterpart and assigned to deal with security

issues as they arose, arrived after Macaulay and other law enforcement officers. She observed part,

but not all, of the interaction between the plaintiffs and law enforcement. *Id.* at 24, 26.

The only material details of this interaction are undisputed. First, several law enforcement

officers, including Macaulay, gave the plaintiffs multiple orders to move away from the bus entrance.

*Compare id.* at 18, 21-22, 69-70, 103, 243, 247 (accounts by law enforcement officers), *with id.* at

173, 177, 207, 215-16, 230-31 (plaintiffs' testimony confirming that they received multiple orders

to move away). Second, the plaintiffs did not turn and walk away from the bus entrance, but began

to dispute and question the orders. *Compare id.* at 18, 21-22, 70, 104, 243, 247 (accounts by law

enforcement officers); *with id.* at 174, 216 (plaintiffs' testimony confirming that they disputed and

questioned orders). Third, uniformed state troopers arrested the plaintiffs, handcuffed them, and

escorted them away. *See id.* at 71, 29, 95, 115, 243, 247.

The plaintiffs subsequently asserted various claims against federal, state, and local

defendants, including Macaulay, Parker, and Michael. *See McCabe v. Macaulay*, 450 F. Supp. 2d

928 (N.D. Iowa 2006).[5] Macaulay, Parker, and Michael immediately moved for summary judgment

based on qualified immunity and lack of subject matter jurisdiction. *See id.* at 931-32. This Court

---

[5]     The plaintiffs originally filed suit against the Secret Service and other defendants under
various constitutional and statutory theories. *See* Compl. (Docket No. 2). However, the plaintiffs
later conceded that they could not sue the Secret Service and instead filed an amended complaint
naming senior-level federal officials as defendants. *See* Pls.' Br. in Supp. of Resistance to Mot. To
Dismiss by U.S. Secret Service (Docket No. 13-2). Several months later, the plaintiffs further
amended their complaint to name Kevin Walsh, the Secret Service's site agent at the rally, and
Parker. *See* 2d Am. Compl. (Docket No. 23). In early 2006, this Court dismissed the plaintiffs'
claims against the senior-level officials for want of personal jurisdiction. *McCabe v. Basham*, 450
F. Supp. 2d 916 (N.D. Iowa 2006). Walsh and Parker then moved for summary judgment, and the
plaintiffs filed a Third Amended Complaint that dropped Walsh as a defendant and added Michael
and Macaulay in his stead. *See* 3d Am. Compl. (Docket No. 57).

granted the individual federal defendants summary judgment on the plaintiffs' state constitutional claims, the plaintiffs' substantive due process claim, and a portion of the plaintiffs' claim under § 1985(3). *See id.* at 938-49. Although the Court allowed discovery to proceed with respect to the remaining claims, discovery was limited to the issue of qualified immunity, and the individual defendants were granted leave to refile their motion for summary judgment "after December 1, 2006." *Id.* at 938.

The parties then engaged in discovery, during which the individual federal defendants were made available for depositions on two separate occasions. On both occasions, the plaintiffs declined to depose them. In addition, the two other Secret Service agents who have offered testimony in this case were made available for deposition. The plaintiffs declined to depose these individuals as well. Thus, despite having insisted to this Court that they must be allowed to take "the depositions of every individual supplying a declaration in support of [the individual federal defendants'] Motion [for Summary Judgment]," Pls.' Rule 56(f) Mot. at 2-3 (Docket No. 70), the plaintiffs have not deposed any agent of the Secret Service at all.

The period of limited discovery having ended, Macaulay, Michael and Parker now renew their motion for summary judgment and request dismissal of the plaintiffs' remaining claims against them, which have been reduced by this Court to claims under the First Amendment, Fourth Amendment, equal protection component of the Fifth Amendment, and the "support and advocacy" clause of § 1985(3).

## DISCUSSION

The plaintiffs have sued Macaulay, Parker, and Michael in their individual capacities and seek to recover damages not from the resources of the federal government, but from the personal

resources of each individual federal employee.[6]  In suits against government officials in their individual capacities, "[q]ualified immunity shields [those] officials from civil liability where 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *McVay ex rel. Estate of McVay v. Sisters of Mercy Health Sys.*, 399 F.3d 904, 907 (8th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Individual capacity suits "can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  Qualified immunity guards against these costs by "allow[ing] public officers to carry out their duties as they believe are correct and consistent with good public policy, rather than acting out of fear for their own personal financial well being."  *Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002).  As "generously construed" by the Supreme Court, the defense "shield[s] 'all but the plainly incompetent or those who knowingly violate the law.'"  *Littrell v. Franklin*, 388 F.3d 578, 582 (8th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Qualified immunity requires a two-step analysis.  *Samuelson v. City of New Ulm*, 455 F.3d 871, 875 (8th Cir. 2006).[7]  First, the court asks whether the defendant's conduct violated a constitutional right.  *Id.*  If the court finds no constitutional violation, the inquiry ends, and the court

---

[6]    Although the plaintiffs persist in asserting official-capacity claims against Macaulay, Parker, and Michael, *see* 4th Am. Compl. ¶¶ 7-9, these claims have been abandoned or dismissed.  A claim pleaded against a federal employee in his official capacity is treated as a claim against the United States.  *See Robb v. Hungerbeeler*, 370 F.3d 735, 739 (8th Cir. 2004).  The plaintiffs have conceded that they cannot maintain damages claims against the United States or its agencies for alleged violations of the federal Constitution or § 1985(3), *see* Pls.' Br. in Supp. of Resistance to Mot. To Dismiss by U.S. Secret Service at 2, and this Court has dismissed the plaintiffs' claims against the United States for alleged violations of the Iowa Constitution, *see McCabe v. Macaulay*, 450 F. Supp. 2d at 943.

[7]    This two-step analysis is identical whether the suit is brought pursuant to *Bivens* or 42 U.S.C. § 1983.  *See Wilson v. Layne*, 526 U.S. 603, 609 (1999).

should enter summary judgment for the officer. *See McVay*, 399 F.3d at 908. If, however, those facts would establish a constitutional violation, the court must also address the "next, sequential step"—whether the right was clearly established in the situation the officer confronted. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). For a right to be clearly established, the precedent "must be sufficiently analogous to put a reasonable officer on notice that his conduct was unconstitutional." *Hill v. McKinley*, 311 F.3d 899, 904 (8th Cir. 2002). This second step precludes liability for "bad guesses in gray areas," *Littrell*, 388 F.3d at 582 (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)), and thus provides "ample room for mistaken judgments," *Frye v. Kans. City Mo. Police Dep't*, 375 F.3d 785, 789 (8th Cir. 2004) (quoting *Habinger v. City of Fargo*, 80 F.3d 289, 296 (8th Cir. 1996)).

When a defendant asserts qualified immunity in a properly supported summary judgment motion under Federal Rule of Civil Procedure 56(b), the plaintiff has the burden to show that a material fact or question of law precludes summary judgment. *Yellow Horse v. Pennington County*, 225 F.3d 923, 927 (8th Cir. 2000); *Radloff v. City of Oelwein*, 284 F. Supp. 2d 1145, 1150 (N.D. Iowa 2003). The plaintiff must not only assert a violation of a constitutional right by the defendant official, but also show that the alleged right was clearly established at the time of the alleged violation and establish that no genuine issue of material fact exists as to whether a reasonable official could have believed her conduct to be lawful. *See Plemmons v. Roberts*, 439 F.3d 818, 822 (8th Cir. 2006); *Kukla v. Hulm*, 310 F.3d 1046, 1048-49 (8th Cir. 2002); *Yellow Horse*, 225 F.3d at 927. Not just any factual dispute will suffice; rather, "there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." *Webb v. Lawrence County*, 144 F.3d 1131, 1134-35 (8th Cir. 1998).

Discovery in this case has uncovered no factual dispute that could affect the dispositive

defense of qualified immunity. The record shows no conduct by Macaulay, Parker, or Michael that violated any of the plaintiffs' constitutional rights, and in any event none of the three defendants took any action that a reasonable official could not have believed was lawful. Therefore, qualified immunity shields Macaulay, Parker, and Michael from suit.

## I.  QUALIFIED IMMUNITY BARS THE PLAINTIFFS' FIRST AMENDMENT CLAIMS.

The plaintiffs' First Amendment claims fail at both steps of qualified immunity. The claims against Parker and Michael cannot surmount the first step of qualified immunity because the record does not show conduct by Parker or Michael that affected the plaintiffs' expression at all, much less conduct that violated the First Amendment. Moreover, qualified immunity shields all of the individual federal defendants because no First Amendment violation occurred; the restrictions the plaintiffs challenge were permissible limitations on the time, place, and manner of their expression. Even if this Court were to find a genuine issue as to whether the First Amendment was violated, qualified immunity would still shield the individual federal defendants because all of them acted reasonably in the situation he or she confronted.

### A.  Qualified immunity bars First Amendment claims against individual federal defendants who did not cause the purported First Amendment violations.

The first step of qualified immunity requires that "*the officer's* conduct violated a constitutional right." *Saucier*, 533 U.S. at 201 (emphasis added). Therefore, a defendant is entitled to qualified immunity unless his or her own actions—as opposed to the actions of others—violated a plaintiff's constitutional rights. *See Grayson v. Ross*, 454 F.3d 802, 810 (8th Cir. 2006) (holding that officer was entitled to qualified immunity because he was not involved in challenged decision to accept a plaintiff into detention); *Wilson v. Northcutt*, 441 F.3d 586, 592 (8th Cir. 2006) (holding that officials were entitled to qualified immunity because the plaintiff submitted no evidence that

officials were involved in challenged action). "Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed." *Wilson*, 441 F.3d at 591-92; *see also Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005) (en banc). A plaintiff must demonstrate with respect to each defendant "a causal link to, and direct responsibility for, the deprivation of rights." *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006) (internal quotation marks omitted).

This requirement of a causal link to and direct responsibility for the alleged deprivation of rights requires dismissal of the plaintiffs' First Amendment claims against Parker and Michael. Parker directed one of the two plaintiffs, most likely McCabe, to comply with the security restrictions, then turned the situation over to other law enforcement officers. App. at 31. This direction did not affect McCabe's expression; she neither moved away from the bus entrance nor abandoned any form of expressive activity. *Id.* at 31, 185-86, 252. Michael's involvement with the plaintiffs was even more limited. She took no action with respect to the plaintiffs other than agreeing, based on the information provided to her by other law enforcement officers, that the plaintiffs would need to comply with security restrictions or be removed from the area. *Id.* at 26. Because none of these actions can form the basis for any claim that Parker or Michael interfered with the plaintiffs' expression, Parker and Michael are entitled to summary judgment based on their lack of involvement in the violations alleged.[8] *See Wilson*, 441 F.3d at 591-92.

### B. Qualified immunity bars the plaintiffs' First Amendment claims because the security measures the plaintiffs were arrested for violating were permissible limits on the time, place, and manner of expression.

In any event, each of the individual defendants is entitled to qualified immunity because no

---

[8] Macaulay does not concede that his interaction with the plaintiffs provides a sufficient basis for First Amendment claims, but he is entitled to qualified immunity in any event for the reasons discussed below, *see infra* Parts I.B., I.C.

First Amendment violation occurred. "[T]he Supreme Court has regularly rejected the assertion that people who wish to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." *Frye*, 375 F.3d at 790 (internal quotation marks omitted). Even in a public forum[9] such as a sidewalk or a public right-of-way, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided [that] the restrictions 'are justified without reference to the content of the related speech, that they are narrowly tailored to serve a significant government interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)); *Bowman v. White*, 444 F.3d 967, 975 (8th Cir. 2006). The restrictions the plaintiffs were directed to observe were content-neutral, were narrowly tailored to serve a significant government interest, and left open ample alternative channels for communication.

### 1. The security restrictions were viewpoint- and content-neutral.

The restrictions put at issue by the plaintiffs had nothing to do with the content of the plaintiffs' expression and everything to do with establishing a secure perimeter and safe flow of traffic in advance of the President's appearance. The "principal inquiry" in determining content or viewpoint neutrality is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791; *Frye*, 375 F.3d at 790. Thus, in *Hill v. Colorado*, 530 U.S. 703 (2000), the Supreme Court upheld as content-neutral a statute that

---

9     The right of a private speaker to use government property depends on the type of property at issue. *See Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761 (1995). Sidewalks and public rights of way are generally considered public fora. *See Olmer v. City of Lincoln*, 192 F.3d 1176, 1179-80 (8th Cir. 1999). The individual federal defendants do not concede that the bus entrance was a public forum on the day of the rally, but assuming for purposes of this motion only that the area was a public forum, the individual federal defendants still did not violate the plaintiffs' First Amendment rights.

restricted protesters' ability to approach passers-by on public sidewalks within 100 feet of the entrance to a health-care facility. The Court held that the statute was content-neutral under the test enunciated in *Ward* for "three independent reasons." *Id.* at 719. First, the statute was not a "regulation of speech" but "a regulation of the places where some speech may occur." *Id.* Second, the statute "was not adopted 'because of disagreement with the message [the speech] convey[ed].'" *Id.* (quoting *Ward* 491 U.S. at 791). Third, the government interests supporting the statute were "unrelated to the content of the demonstrators' speech," and "government regulation of expressive activity is 'content neutral' if it is justified without reference to the content of the regulated speech." *Id.* at 720.

The restrictions challenged by the plaintiffs were content-neutral for the same three reasons. First, none of the restrictions at issue was a "regulation of speech." Rather, the restrictions barred members of the general public from standing and remaining in the immediate vicinity of the bus entrance. App. at 20, 25, 30, 36-37. Pedestrians were free to express any message they wished as they walked along the south side of 42nd Street or the north side of 42nd Street east of the bus entrance. *Id.* at 37, 85, 115. As the record demonstrates, the plaintiffs walked through each of these areas without incident even as they engaged in precisely the same expressive activity (i.e., holding a sign and wearing a button) that they allege caused their arrest; only after they stopped and stood in the immediate vicinity of the bus entrance did any law enforcement officer approach them. *See id.* at 133-35, 163-67, 182, 205-06, 228-29. Second, the restrictions were not adopted because of disagreement with any particular message. *See id.* at 35-38 (testimony by Secret Service site agent explaining reasons for adoption of security restrictions). Rather, those restrictions were designed to prevent the coalescence of a large, stationary group around the bus entrance, which would have disrupted the flow of buses and pedestrians into the event, impeded emergency evacuation, and made

a sensitive area more difficult for law enforcement to monitor. *Id.* at 37, 43-44, 47-48, 51-52. Third, the government interests that necessitated adoption and enforcement of the security restrictions were unrelated to any sort of message; those interests related to the safety of the President and the public. *See id.*

Discovery has not borne out the plaintiffs' assertion that the presence of a handful of individuals assisting with the event in and around the bus entrance amounts to content or viewpoint discrimination. Restrictions applicable to the general public did not apply to individuals assisting with the event itself, such as individuals who were taking tickets, soliciting donations, and handing out items such as yellow ribbons. *Id.* at 30-31, 37-38.[10] Whether or not these individuals supported the President is immaterial to the question of content neutrality, for "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral even if it has an incidental effect on some speakers or messages but not others." *Fraternal Order of Police, N.D. State Lodge v. Stenehjem*, 431 F.3d 591, 596 (8th Cir. 2005) (quoting *Ward*, 491 U.S. at 791). The distinction between individuals taking tickets and soliciting donations was a content- and viewpoint-neutral distinction between persons assisting with the event and the general public, not a distinction between Bush supporters and Bush detractors. App. at 30-31, 37-38.

Nor has discovery borne out the plaintiffs' theory that the temporary presence of other members of the general public in and around the bus area suggests impermissible discrimination. *Cf. Mahoney v. U.S. Marshals Serv.*, 454 F. Supp. 2d 21, 29, 34 (D.D.C. 2006) (upholding similar restrictions on access to sidewalk despite declaration by plaintiff that others were allowed to "mill about" in restricted area). The record shows that the defendants directed members of the general

---

[10]    The record indicates that Secret Service officials confirmed the status of these individuals with event organizers. *See* App. at 30-31, 37-38.

public, regardless of the message they espoused, to comply with security restrictions around the park. *Id.* at 22-23, 25-27, 31-32, 84-85, 97, 112, 247. Enforcement of the security restrictions was an ongoing, continuous effort, and on numerous occasions, law enforcement officials had to approach people and direct them to keep moving. *Id.* at 20, 25-26, 31-32, 64, 97 (explaining enforcement of restrictions); *see also id.* at 131, 133-39 (testimony by plaintiffs' companion that she was not arrested after she complied promptly with direction to move away from bus entrance); *id.* at 194-95 (testimony by plaintiffs' affiant that law enforcement officer told him to keep moving); *id.* at 207 (testimony by Nelson that she heard people being told to keep entrance clear for rally attendees). Lines ebb and flow, and not every law enforcement officer can respond to every incident at once. That some individuals may have stopped temporarily before being so directed demonstrates the vagaries of crowd control, not viewpoint discrimination.

> **2.** **The security restrictions were narrowly tailored to serve a substantial government interest.**

Although a regulation of the time, place, or manner of speech must be narrowly tailored to serve a substantial government interest, that regulation "need not be the least restrictive or least intrusive means of doing so." *Ward*, 491 U.S. 798-99. A regulation satisfies the requirement of narrow tailoring "'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)); *see also Thorburn v. Austin*, 231 F.3d 1114, 1120 (8th Cir. 2000) (providing that "significant" interest may justify restriction). The government need not justify time, place, and manner restrictions on access to a forum by identifying the problems that would result from granting access to one or two individuals; rather, the government may justify the restriction by reference to the problems that would result from granting access to all similarly situated individuals. *See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 685

(1992); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 653 (1981); *Mahoney*, 454 F. Supp. 2d at 35 (rejecting assertion that restrictions on access to public sidewalk were not narrowly tailored because particular individuals desiring access did not pose threat).

The restrictions imposed on the bus entrance and its surroundings advanced at least two substantial interests that would have been achieved less effectively in the absence of the restrictions. First, the federal government has a "valid, even an overwhelming, interest in protecting the safety of its Chief Executive." *Watts v. United States*, 394 U.S. 705, 707 (1969). Second, the government has a "significant" interest in protecting public safety. *Schenck v. Pro-Choice Network*, 519 U.S. 357, 376 (1997); *United States v. Nenninger*, 351 F.3d 340, 346 (8th Cir. 2003). Allowing members of the general public to stand by the bus entrance would have hindered law enforcement in securing the perimeter of the rally because groups could have congregated along 42nd Street, making it difficult not only to move people into the event, but also to monitor the area, to detect individuals bent on harm, and to evacuate quickly in the event of an emergency. App. at 37; *cf. Mahoney*, 454 F. Supp. 2d at 33-34 (upholding similar restrictions as narrowly tailored). If law enforcement had been unable to impose or enforce restrictions requiring pedestrians to keep moving in these areas, a ban on all pedestrian traffic on 42nd Street—an option plainly more restrictive than the plan adopted—would have been necessary. App. at 37. As implemented, the restrictions allowed the general public, including protesters, more access to express messages in more places than could otherwise have been permitted. *See id.* That law enforcement officers chose this less restrictive option demonstrates that the security restrictions actually imposed were narrowly tailored.

### 3. The security restrictions left open ample alternative channels for expression.

The final requirement of a regulation that might affect speech is the availability of ample alternative avenues for expression. *See Ward*, 491 U.S. at 790. Adequate alternative avenues are

available when, although the government imposes restrictions on one location, it imposes no restrictions on a nearby location. *See Frye*, 375 F.3d at 790 (holding that police officers provided adequate alternative avenues for expression when they ordered protesters away from an intersection but allowed them to display signs further down the road); *United States v. Kistner*, 68 F.3d 218, 222 (8th Cir. 1995) (holding that pamphleteer barred from handing out fliers on park grounds without a permit had adequate alternative avenues because he could distribute his fliers on an adjacent boulevard). As the presence of large numbers of protesters at the corner of 42nd Street and Council demonstrates, the plaintiffs could have stood and expressed their message in locations within sight and earshot of arriving attendees. App. at 20-21, 26, 37, 198-99. The First Amendment did not entitle them to insist on being allowed to stand in a particular location when, only a short distance away, they could have expressed exactly the same message to substantially the same audience.

**C. Qualified immunity bars the plaintiffs' First Amendment claims because the individual federal defendants' conduct was not clearly unconstitutional in the situation they confronted.**

Even if there were a genuine issue of material fact as to whether a First Amendment violation occurred at all, the individual federal defendants would still be entitled to qualified immunity. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201-02 (emphasis added). Qualified immunity therefore hinges on whether the defendant officer could reasonably have believed his or her conduct to be lawful "in light of clearly established law *and the information [that the defendant] possessed*." *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (quoting *Anderson*, 483 U.S. at 641) (alteration in *Smithson*) (emphasis added); *see also Doran*, 409 F.3d at 965 (noting "settled principle that law enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance

is reasonable").

None of the individual federal defendants could have understood that his or her conduct was unlawful given the information he or she had and the situation he or she confronted. Law enforcement officers charged with enforcing time, place, and manner restrictions are not expected to perform the delicate balancing test of *Ward* before enforcing those restrictions. *See Lederman v. United States*, 291 F.3d 36, 47 (D.C. Cir. 2002) ("[B]ecause narrow tailoring is not an exact science, a reasonable officer should not be expected to perform that analysis prior to arresting an individual for violating an ostensibly lawful time, place, and manner restriction governing expressive activity in a public forum.") (internal quotation marks omitted). Officers can be liable only if the restriction they enforce is "so grossly and flagrantly unconstitutional that the officers should have recognized its flaws." *Id.* at 47 (internal citation and quotation marks omitted). Thus, in *Paff v. Kaltenbach*, 204 F.3d 425, 433-34 (3d Cir. 2000), the court granted qualified immunity to a law enforcement officer who enforced restrictions on protesters seeking to use a public sidewalk outside a post office. The local postmaster responsible for the sidewalk had informed the officer that the restrictions were necessary in light of the anticipated traffic, thus giving the officer "every reason to believe that the restraint imposed was a constitutionally valid one." *Id.* at 434. Requiring the officer to assess the reasonableness of the restrictions without relying on the "unique knowledge" of the postmaster, the court reasoned, "would strip the [officer's] determination of the very facts essential to its making." *Id.*

The individual federal defendants did not design the security restrictions they were directed to enforce, *see* App. at 19-20, 25, 29-30, and none of those restrictions was unconstitutional at all, much less grossly unconstitutional, *see supra* Part I.B. A reasonable officer in the individual federal defendants' shoes would have concluded that the restrictions were content- and viewpoint-neutral,

for they received no indication that the restrictions were adopted or enforced because of disagreement with any message. *See id.* at 20, 25, 30; *cf. Frye*, 375 F.3d at 790. A reasonable officer would also have concluded that the restrictions were narrowly tailored to achieve a significant government interest, for the government interest in the safety of the President and the public is well-recognized, *Watts*, 394 U.S. at 707; *Schenck*, 519 U.S. at 376, and the restrictions advanced this interest while still allowing access to many areas around the park, *see* App. at 36-37. And a reasonable officer would have concluded that the restrictions allowed adequate alternative avenues for expression—especially given the alternative of closing 42nd Street entirely—since members of the general public were allowed to stand and protest in areas that were near the park and in view of most arriving attendees. *See id.* at 20-21, 26, 37; *cf. Frye*, 375 F.3d at 790.

Moreover, each individual federal defendant would reasonably have understood that the discrete actions he or she took toward enforcement of these restrictions were non-discriminatory. Parker approached one of the plaintiffs, directed her to move along, and called for assistance when she did not do so. App. at 31. To the extent he drew any distinctions between people around the bus entrance, the distinctions he drew were between the general public and persons he understood, based on the information he received, to be assisting with the event. *Id.* at 30-31; *cf. Doran*, 409 F.3d at 965. He could not respond simultaneously to every violation of the security restrictions, for multiple issues occupied his attention; however, he asked any person he observed standing in the immediate area around his post to move along. App. at 31. Consistent with their respective assignments, Macaulay and Michael were called to the bus entrance to deal with a single issue, and they concentrated on the issue they had been summoned to address. *See id.* at 19, 21-22, 24. The cumulative effect of individual decisions by various law enforcement officers is irrelevant, for qualified immunity turns on the conduct of each individual, not the collective conduct of law

enforcement generally. *See Doran*, 409 F.3d at 965 (rejecting imposition of liability based on inadequacies in an "investigation by 'the police'" and insisting on analysis of whether conduct of the particular defendant was constitutionally deficient).[11]  Because each individual federal defendant acted consistently with clearly established First Amendment principles given the situation he or she confronted, the "generously construed" protection of qualified immunity, *Littrell*, 388 F.3d at 582, therefore bars suit.

## II.  QUALIFIED IMMUNITY BARS THE PLAINTIFFS' ARREST-RELATED FOURTH AMENDMENT CLAIMS.

Qualified immunity bars the plaintiffs' Fourth Amendment claims based on their arrest because none of the individual federal defendants caused a violation of the plaintiffs' clearly established Fourth Amendment rights.  At least two of the individual federal defendants, Parker and Michael, were not involved in the arrests in any substantial way.  And in any event, the arrests were supported by probable cause—or, at a minimum, arguable probable cause, which is sufficient for qualified immunity.

### A.  Qualified immunity bars the plaintiffs' arrest-related Fourth Amendment claims against individual federal defendants who did not cause the arrest.

As discussed above, liability in constitutional tort is personal, and a defendant can be liable

---

[11]    Confining the inquiry—as the law requires—to actions by and information available to each individual defendant exposes many of the discovery topics pursued by the plaintiffs to be wholly immaterial to the resolution of qualified immunity.  The plaintiffs, for instance, sought discovery on whether Noelridge Park had been rented.  *See* Aff. of Counsel in Supp. of Pls.' Rule 56(f) Mot. at 1-2 (Docket No. 70).  The rental of the park is irrelevant, however, because qualified immunity saves the agents from having to assess the legal ramifications of municipal park rental procedures; they were entitled to rely on the instructions they received in briefing as to which restrictions applied to which individuals.  *See Paff*, 204 F.3d at 433-34; *cf. Lederman*, 291 F.3d at 47.  Likewise, alleged changes in the security restrictions around the pool house, *see* Aff. of Counsel in Supp. of Pls.' Rule 56(f) Mot. at 3, would have no bearing on qualified immunity, for the information the individual federal defendants received indicated that the pool house was off-limits to the general public, App. at 21, 26, 30.

only for his or her own actions, not the actions of others. *Wilson*, 441 F.3d at 591-92; *Doran*, 409 F.3d at 965. Neither Parker's nor Michael's respective involvement in the plaintiffs' arrests is sufficient to establish the requisite "causal link to, and direct responsibility for" those arrests. *See Mayorga*, 442 F.3d at 1128. Parker spoke to only one of the plaintiffs, and his only actions with respect to her were to ask her to move away from the bus entrance and then to call other law enforcement officers to deal with her after she failed to do so. App. at 31; *see also supra* note 4. He did not participate in the plaintiffs' arrests or even discuss them until after they had occurred. App. at 31. Michael had no interaction with the plaintiffs at all and did not order anyone to arrest them. *Id.* at 26.[12] Because neither Parker nor Michael caused or was directly responsible for the plaintiffs' arrests, qualified immunity requires dismissal of the arrest-related claims against them.[13]

### B. Qualified immunity bars the plaintiffs' arrest-related Fourth Amendment claims because the arrests were supported by at least arguable probable cause.

In any event, the plaintiffs' arrests were proper. A warrantless arrest is reasonable under the Fourth Amendment if the officer has probable cause to believe that a criminal offense has been or is being committed. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest. *Id.* The arresting officer's subjective motivation is irrelevant to the existence of probable cause. *Id.* Therefore, the arrest is lawful "if there was probable cause to

---

[12]    Macaulay does not concede that his involvement in the arrest was sufficient to support a Fourth Amendment claims against him; however, because at least arguable probable cause supported the arrests, this Court need not address that question.

[13]    Plaintiff Nelson has suggested that she was improperly handcuffed. Whatever the validity this allegation, no Fourth Amendment excessive force claim can conceivably lie against the individual federal defendants. *See Mayorga*, 442 F.3d at 1132. Trooper Busch handcuffed Nelson. App. at 95. He received no instructions on how to do so from any representative of the Secret Service. *Id.* at 116.

believe [the arrestee] had violated any applicable statute, even one not contemplated by the officers at the moment of arrest." *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1106 (8th Cir. 2004); *see also Devenpeck*, 543 U.S. at 153 (holding that an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause").

When qualified immunity has been asserted, courts examine the officer's decision with even more deference. *See Audio Odyssey, Ltd. v. Brenton First Nat'l Bank*, 245 F.3d 721, 737-38 (8th Cir. 2001), *considered en banc and reinstated in full*, 286 F.3d 498, 500 (8th Cir. 2002). Qualified immunity "somewhat expands the leeway already afforded by the substantive Fourth Amendment law." *Id.* An officer retains qualified immunity even for an arrest without probable cause "if, in light of clearly established law and the information known to the officers, a reasonable officer *could have believed* that the arrests were supported by probable cause." *Peterson v. City of Plymouth*, 60 F.3d 469, 473-74 (8th Cir. 1995) (emphasis added). Thus, "the issue for [qualified] immunity purposes is not probable cause in fact but arguable probable cause." *Frye*, 375 F.3d at 792 (quoting *Habinger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996)) (alteration in *Frye*). The plaintiffs' conduct provided probable cause to arrest—or, at a minimum, arguable probable cause to arrest—under at least three different statutes.

### 1. At least arguable probable cause supported arresting the plaintiffs for interference with official acts under Iowa law.

Section 719.1(1) of the Iowa Code provides that "[a] person who knowingly resists or obstructs anyone known by the person to be a peace officer . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer . . . commits a simple misdemeanor." The purpose of this statute is "to enable officers to execute their peace-keeping duties calmly, efficiently, and without hindrance." *State v. Buchanan*, 549 N.W.2d 291, 294 (Iowa 1996). The "key question" under section 719.1 is "whether the officer's actions were hindered."

*Lawyer*, 361 F.3d 1099, 1107 (8th Cir. 2004).  A person can "resist" an officer without using any physical force, and the broader term "obstruct" encompasses any action that "put[s] obstacles in the paths of officers completing their duties.'" *Id.* (quoting *State v. Hauan*, 361 N.W.2d 336, 339 (Iowa Ct. App. 1984)).

The plaintiffs' conduct established probable cause to arrest them under section 719.1.  Both plaintiffs were approached by law enforcement officers and directed multiple times to move along. App. at 18, 21-22, 69-70, 103, 173, 177, 215-16, 230-31, 243, 247.  Instead of turning and walking away, the plaintiffs questioned and disputed these instructions.  *Id.* at 18, 21-22, 70, 104, 138, 174, 216, 243, 247.  Every law enforcement officer who has testified about the plaintiffs' conduct during this interaction has uniformly concluded that the plaintiffs were not complying with law enforcement instructions.  *Id.* at 18, 21-22, 70, 104, 243, 247.  And even if the plaintiffs had begun backing away haltingly, *see id.* at 176, they concede they did so only as they were continuing to debate and question the officers' instructions, *see id.* at 174, 216; *see also id.* at 18, 138 (testimony by non-party witnesses).  The plaintiffs' failure to comply promptly and completely was by itself sufficient to establish probable cause, for an arrestee's cessation of criminal activity does not vitiate probable cause to arrest for a crime she has already been observed committing*, see Devenpeck*, 543 U.S. at 152 (explaining that an arrest is reasonable if an officer has "probable cause to believe that a criminal offense *has been* or is being committed") (emphasis added).  Moreover, the plaintiffs failure to comply immediately with the officers' simple and repeated instructions hindered those officers' performance of their duty to enforce lawful security restrictions and unnecessarily distracted them from their other protective functions. App. at 21-22, 27, 72, 76, 106, 111-12.  Therefore, probable cause supported the plaintiffs' arrests for interference with official acts.

Even if no actual probable cause supported the arrest, a reasonable officer in the individual

federal defendants' shoes could have concluded that probable cause did exist. First, given the explicitly recognized "lack of judicial guidance" on section 719.1, *Lawyer*, 361 F.3d at 1108, a reasonable officer could readily have concluded that a wide range of behavior, including the plaintiffs' conduct, fell within that statute. Second, a reasonable officer in the individual federal defendants' shoes would have relied on representations by state and local law enforcement officers that there was probable cause to arrest the plaintiffs under state law. *See* App. at 21-22; *cf. Doran*, 409 F.3d at 965. Many Secret Service agents, including the individual federal defendants, serve in many different localities over the course of an election year and spend only a limited time in each locality. *See* App. at 19, 24, 29. As such, they must rely on the state and local agencies to assist with their protective functions, *see id.* at 34, and are in no position to gainsay the apparently reasonable determinations of state and local officers concerning questions of state and local law.[14] Because the individual federal defendants could reasonably have believed that probable cause supported the plaintiffs' arrests under state law, they are entitled to qualified immunity.

> **2.    At least arguable probable cause supported arresting the plaintiffs for violating 18 U.S.C. § 1752.**

The version of 18 U.S.C. § 1752 in effect in September 2004[15] provided:

> (a) It shall be unlawful for any person or group of persons--
> (1) willfully and knowingly to enter or remain in
>  . . .
> (ii) any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting,

---

[14]    For the same reason, the individual federal defendants were entitled to rely on the state officers' determination that probable cause supported the plaintiffs' arrests on trespass charges.

[15]    Sections 1752 and 3056, two of the federal provisions under which the plantiffs could have been arrested, were recently amended by the USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, §§ 602-05, 120 Stat. 192, 252-56 (2006).

in violation of the regulations governing ingress or egress thereto.[16]

An individual who fails to comply with law enforcement instructions to leave an area restricted for protective purposes by the Secret Service violates this statute. *See United States v. Bursey*, 416 F.3d 301, 304-09 (4th Cir. 2005), *cert. denied*, 126 S. Ct. 1154 (2006).[17]

The plaintiffs' conduct gave the individual federal defendants ample grounds to conclude that the plaintiffs violated § 1752. The plaintiffs stopped and stood in an area that had been restricted by the Secret Service in anticipation of a temporary visit by the President. App. at 14, 33-34; *cf. Bursey*, 416 F.3d at 304. Secret Service agents as well as state law enforcement officers ordered the plaintiffs to move away from that area. App. at 18, 21-22, 69-70, 103-04, 173, 177, 215-16, 230-31, 243, 247; *cf. Bursey*, 416 F.3d at 304. Instead of turning and walking away, both women questioned and disputed the officers' instructions. App. at 18, 21-22, 69-70, 103-04, 173, 177, 215-16, 230-31, 243, 247. Accordingly, probable cause supported the plaintiffs' arrests under § 1752. *Cf. Bursey*, 416 F.3d at 306-09.

Regardless, at least arguable probable cause supported the plaintiffs' arrests under § 1752.

---

[16]     The regulations then in effect authorized access only by invitees, members of the President's family and staff, military and communications personnel, law enforcement personnel, and holders of easements to the property. *See* 31 C.F.R. § 408.3(a) (2005). The plaintiffs were neither invitees or members of any other group authorized by the regulations to enter the area. *See* App. at 162, 204 (admissions by plaintiffs that they did not have or try to get tickets to rally).

[17]     The facts of *Bursey* closely parallel the circumstances at issue in this case. In *Bursey*, the Secret Service established a restricted area that extended up to half a mile from an airplane hangar where the President was slated to appear for a political rally. 416 F.3d at 304. Pedestrians were allowed to travel through the restricted area but could remain within that area only if they were waiting in line to enter the hangar. *Id.* The criminal defendant, who was carrying an anti-war sign, walked to an area near the hangar within the restricted area. *Id.* After being directed to move by a Secret Service agent and a local law enforcement officer, the defendant moved but remained within the restricted area. *Id.* at 304-05. Law enforcement officers again asked the defendant to move, and when he failed to do so, he was arrested by a state law enforcement officer on trespass charges. *Id.* at 305. Although the trespass charge was later dismissed, the Fourth Circuit affirmed the defendant's conviction under § 1752. *Id.* at 305-09.

"[A]n officer on duty in the field is entitled to make a reasonable interpretation of the law he is obligated to enforce." *Frye*, 375 F.3d at 792 (quoting *Habinger*, 80 F.3d at 296). In this instance, no case law would have foreclosed the reasonable conclusion that the plaintiffs were remaining on grounds where the President would be visiting in violation of the regulations governing access to those grounds; indeed, subsequent case law has only confirmed that reasonable interpretation. *See Bursey*, 416 F.3d at 303-08. Because no case would clearly have prohibited the plaintiffs' arrests for violating § 1752, qualified immunity bars suit based on those arrests.

### 3. At least arguable probable cause supported arresting the plaintiffs for violating 18 U.S.C. § 3056.

18 U.S.C. § 3056 authorizes the United States Secret Service to protect the President, *see* § 3056(a)(1), and further provides that "[w]hoever knowingly and willfully obstructs, resists, or interferes with a Federal law enforcement agent engaged in the performance of the protective functions authorized by this section or by section 1752 of this title" shall be subject to criminal penalties, § 3056(d). A person who does not leave a secure area after being directed to do so by a federal law enforcement officer violates this statute. *See United States v. McPherson*, No. 93-6172, 21 F.3d 429, 1994 WL 100261, at *3 (6th Cir. 1994) (per curiam) (unpublished) (attached at App. at 254-56) (upholding conviction under § 3056(d) after criminal defendant did not leave area secured for protection of First Lady as directed).

The plaintiffs' conduct provided probable cause to arrest under § 3056. A reasonable officer would have interpreted the plaintiffs' failure to comply promptly and completely with instructions to move from an area subject to security restrictions as obstructing, resisting, and interfering with protective functions. *See* App. at 21-22, 27, 111-12. A reasonable officer would also have concluded that the plaintiffs knowingly and willfully obstructed, resisted, and interfered with federal law enforcement agents. *Cf. Paff*, 204 F.3d at 437 (explaining that officers may rely on

circumstantial evidence to establish probable cause to arrest for statutes requiring criminal intent). Indeed, both plaintiffs concede that they believed the persons ordering them to move were Secret Service agents. *See* App. at 179-80 (testimony by McCabe that she believed person approaching her was Secret Service agent because he showed her identification); *id.* at 223-25 (testimony by Nelson that she "assumed" person "aligned" with uniformed trooper was Secret Service agent); *id.* at 226-27 (testifying that she believed the same person to be a Secret Service agent at the time of the arrest).

Even if this Court were to determine that actual probable cause would not have supported the plaintiffs' arrests under § 3056, the individual federal defendants would still have had at least arguable probable cause to arrest under that statute. Given the leeway afforded by qualified immunity, *see Audio Odyssey*, 245 F.3d at 721, a reasonable officer could easily conclude that an individual who did not promptly and fully comply with an order to move out of an area subject to security restrictions was not only resisting his authority, but also interfering with his multifarious other protective responsibilities. App. at 21-22, 27, 106, 111-12. Therefore, qualified immunity bars suit.

## III. QUALIFIED IMMUNITY BARS THE PLAINTIFFS' SEARCH-RELATED FOURTH AMENDMENT CLAIMS.

The individual federal defendants are entitled to qualified immunity from the plaintiffs' claim that they were improperly searched because the individual federal defendants neither searched the plaintiffs nor caused the plaintiffs to be searched.[18] *See Mayorga*, 442 F.3d 1128; *Wilson*, 441 F.3d at 591-92. The record is undisputed that none of the individual federal defendants participated in or authorized any search of the plaintiffs. *See* App. at 23, 28, 32, 188, 232-33. The record is equally

---

[18]    Although the plaintiffs have again pled a substantive due process claim in their Fourth Amended Complaint, *see* 4th Am. Compl. ¶¶ 55-58 (Docket No. 85), this Court has already dismissed that claim, *see McCabe v. Macaulay*, 450 F. Supp. 2d at 948-49, and should simply disregard it.

clear that any strip search that occurred would not have been foreseeable to the individual federal defendants. Neither Macaulay, Parker, nor Michael has any authority over the Linn County Jail or knowledge of practices there. *Id.* at 23, 28, 32. Moreover, the policy of the Linn County Jail was to strip search only those inmates arrested for serious misdemeanors or higher-level offenses and those inmates suspected of hiding weapons or contraband. *Id.* at 237. The plaintiffs were arrested for simple misdemeanor trespass, *id.* at 240-43, and there is no evidence that any of the individual federal defendants ever stated to any person that they believed the plaintiffs were carrying weapons or contraband. In fact, documents from Linn County Jail staff indicate that if any strip search of the plaintiffs occurred, such a search resulted from a misinterpretation of the charges against the plaintiffs. App. at 248-49. Because the undisputed record establishes that neither Macaulay, Parker, nor Michael could have caused or have been directly responsible for any strip search that occurred, the individual federal defendants are entitled to qualified immunity from suit on the plaintiffs' search-related Fourth Amendment claims.

## IV. QUALIFIED IMMUNITY BARS THE PLAINTIFFS' EQUAL PROTECTION CLAIMS.

The individual federal defendants did not violate the plaintiffs' clearly established right to equal protection because they did not treat the plaintiffs differently from others similarly situated.[19] The "threshold" hurdle in bringing any equal protection claim is the plaintiff's burden of "establish[ing] that some government action caused her to be treated differently from others similarly situated." *Gilmore v. County of Douglas*, 406 F.3d 935, 937 (8th Cir. 2005). "[D]ifferent treatment

---

[19] Although the plaintiffs continue to assert a violation of the Equal Protection Clause of the Fourteenth Amendment, they presumably mean to assert a violation of the equal protection component of the Due Process Clause of the Fifth Amendment; the Fourteenth Amendment's Equal Protection Clause governs state action, whereas the Fifth Amendment's Due Process Clause governs federal action. *See United States v. Greene*, 995 F.2d 793, 795 (8th Cir. 1993).

of dissimilarly situated persons does not violate the equal protection clause." *Anderson v. Cass County, Mo.*, 367 F.3d 741, 747-48 (8th Cir. 2004).

Although the plaintiffs claim they were treated differently from other people near the rally entrance, the plaintiffs were not similarly situated to those people. *Cf. Hyland v. Metro. Airport Comm'n*, 884 F. Supp. 334, 338 (D. Minn. 1995) (granting defendants summary judgment where plaintiffs' "bald assertion that they . . . [were] similarly-situated" to other carriers serving airport was "simply not accurate"). As discussed in connection with the plaintiffs' First Amendment claims, the plaintiffs were in an area subject to security restrictions and were not complying with those restrictions. *See supra* Part I.B.1. The plaintiffs refused to obey law enforcement instruction that would have brought them in compliance with the security restrictions and were therefore eventually arrested and removed from the area. *See supra* Part II.B. By contrast, others near the bus entrance were assisting with the event itself or otherwise complying with security restrictions. App. at 25-26, 30-32, 37-38, 97. In short, the plaintiffs were not similarly situated to other individuals in and around the bus entrance, and they therefore cannot show a violation of their equal protection rights, much less their clearly established equal protection rights. *See Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 984-85 (8th Cir. 2004) (affirming summary judgment because plaintiff inmate failed to show he was similarly situated to other inmates whose religious practices did not raise comparable security concerns); *Prince v. Endell*, 78 F.3d 397 (8th Cir. 1996) (affirming qualified immunity for prison officials against equal protection claim by male inmates because security concerns at male and female institutions differed). Because the plaintiffs were not treated differently from others similarly situated, the individual federal defendants are entitled to summary judgment on the plaintiffs' Equal Protection claims as well.

# V. QUALIFIED IMMUNITY BARS THE PLAINTIFFS' CLAIMS UNDER 42 U.S.C. § 1985(3).

Finally, the plaintiffs assert a claim under § 1985(3) based on an alleged conspiracy to deprive the plaintiffs of their constitutional rights because of their status as war protesters. *See* 4th Am. Compl. ¶¶ 60-61. Only the support and advocacy clause of § 1985(3) is now relevant to this suit. *See McCabe v. Macaulay*, 450 F. Supp. 2d at 937, 943-48 (dismissing claim under equal protection component of § 1985(3)). That clause forbids

> two or more persons conspir[ing] to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President . . . or to injure any citizen in person or property on account of such support or advocacy.

§ 1985(3); *see Federer v. Gephardt*, 363 F.3d 754, 760 n.5 (8th Cir. 2004). Even assuming that a purported conspiracy directed at war protesters could be characterized as a conspiracy directed at the "support or advocacy" of presidential electors, the individual federal defendants would still be entitled to qualified immunity.[20] The support and advocacy clause protects only the right "to cast a ballot and [to] have it honestly counted" and those rights already protected by the First Amendment. *Gill v. Farm Bureau Life Ins. Co. of Mo.*, 906 F.2d 1265, 1270-71 (8th Cir. 1990); *cf. Federer*, 363 F.3d at 760 (interpreting claim for interference with political candidacy as coterminous with First Amendment claim). In this case, the plaintiffs have never contended that any of the individual federal defendants interfered with the plaintiffs' casting of a ballot. Moreover, as demonstrated above, the plaintiffs have no viable First Amendment claim, *see supra* Part I. This Court should therefore grant Macaulay, Parker, and Michael summary judgment on the plaintiffs'

---

[20] Claims under § 1985(3) are subject to the defense of qualified immunity. *Howard v. Suskie*, 26 F.3d 84-85, 87 (8th Cir. 1994).

claim under the support and advocacy clause of § 1985(3).

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment to Special Agents Bruce Macaulay, Michael Parker, and Holly Michael.

Dated:  January 10, 2006

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

TIMOTHY P. GARREN
Director, Torts Branch


*/s/ Zachary C. Richter*
ZACHARY C. RICHTER
Trial Attorney, Torts Branch
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
P. O. Box 7146
Ben Franklin Station
Washington, D.C.  20044
(202) 616-4199 (voice)
(202) 616-4314 (fax)
Zachary.Richter@usdoj.gov

JEAN M. CUNNINGHAM
Trial Attorney, Torts Branch

CHARLES W. LARSON, SR.
United States Attorney

LAWRENCE D. KUDEJ
Assistant United States Attorney
P. O. Box 74950
Cedar Rapids, Iowa  52407
(319) 363-6333 (voice)
(319) 363-1990 (fax)

ATTORNEYS FOR THE U.S. SECRET SERVICE, BRUCE MACAULAY, MICHAEL PARKER & HOLLY MICHAEL