# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

ALICE MCCABE and CHRISTINE NELSON,

        Plaintiffs,

vs.

BRUCE MACAULAY, MICHAEL PARKER, HOLLY MICHAEL, THE IOWA STATE PATROL, TROY BAILEY, RICK BUSCH, LINN COUNTY, IOWA, and MICHELLE MAIS,

        Defendants.

No. 05-CV-73-LRR

**ORDER**

———————————

### TABLE OF CONTENTS

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
II.    **RELEVANT PRIOR PROCEEDINGS** . . . . . . . . . . . . . . . . . . . . . **3**
    A.    *Third Amended Complaint* . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
    B.    *Motion for Summary Judgment* . . . . . . . . . . . . . . . . . . . . . . **3**
    C.    *Fourth Amended Complaint* . . . . . . . . . . . . . . . . . . . . . . . . **4**
    D.    *Renewed Motion for Summary Judgment* . . . . . . . . . . . . . . . **4**
III.   **LEGAL STANDARD FOR SUMMARY JUDGMENT** . . . . . . . . . . . . . . **4**
IV.   **FACTUAL FINDINGS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
    A.    *The Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
    B.    *Noelridge Park* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
    C.    *The Rally* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
        1.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
        2.    *Security measures* . . . . . . . . . . . . . . . . . . . . . . . **8**
            a.    *Physical barriers* . . . . . . . . . . . . . . . . . . . . . **8**
            b.    *Restrictions on entry* . . . . . . . . . . . . . . . . . . . **8**
            c.    *Restrictions on adjoining rights-of-way* . . . . . . . . . **9**
                i.    *Vehicular traffic* . . . . . . . . . . . . . . . . . . **9**
                ii.    *Pedestrian traffic* . . . . . . . . . . . . . . . . . . **9**
            d.    *Stationing of law enforcement officers* . . . . . . . . . . **11**

|     |     | 3.  | *Briefings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *12* |
|     |     |     | a.  | *Individual Federal Defendants' briefing* . . . . . . . . | *12* |
|     |     |     | b.  | *Iowa State Patrol Troopers' briefing* . . . . . . . . . | *13* |
|     |     | 4.  | *Invitations to protest* . . . . . . . . . . . . . . . . . . . . | *13* |
|     |     | 5.  | *Plaintiffs' arrests* . . . . . . . . . . . . . . . . . . . . . | *15* |
|     |     |     | a.  | *Plaintiffs walk to the Bus Entrance* . . . . . . . . . . | *15* |
|     |     |     | b.  | *Parker confronts Plaintiffs* . . . . . . . . . . . . . . | *16* |
|     |     |     | c.  | *Macaulay approaches McCabe* . . . . . . . . . . . . . | *17* |
|     |     |     | d.  | *Macaulay orders Plaintiffs' arrests* . . . . . . . . . . | *18* |
|     |     |     | e.  | *Michael's actions* . . . . . . . . . . . . . . . . . . . | *18* |
|     |     |     | f.  | *Troopers Bailey and Busch arrest Plaintiffs* . . . . . | *19* |
|     |     | 6.  | *Detention at the poolhouse* . . . . . . . . . . . . . . . . . | *19* |
|     |     | 7.  | *Cavity inspections* . . . . . . . . . . . . . . . . . . . . . | *20* |
|     |     | 8.  | *All charges dropped* . . . . . . . . . . . . . . . . . . . . | *21* |

**V.**   **THE ARGUMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

**VI.**   **QUALIFIED IMMUNITY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

**VII.**   **PARKER AND MICHAEL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

**VIII.**   **FIRST AMENDMENT CLAIMS** . . . . . . . . . . . . . . . . . . . . . . . . **25**

|     | A.  | *Violation of First Amendment Rights* . . . . . . . . . . . . . . . . | *25* |
|     |     | 1.  | *Overview of First Amendment law* . . . . . . . . . . . . . . | *25* |
|     |     | 2.  | *No facial challenge* . . . . . . . . . . . . . . . . . . . . . | *28* |
|     |     | 3.  | *Analysis: as-applied challenge* . . . . . . . . . . . . . . . | *29* |
|     | B.  | *Clearly Established* . . . . . . . . . . . . . . . . . . . . . . . . . | *36* |
|     | C.  | *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *37* |

**IX.**   **FOURTH AMENDMENT CLAIMS** . . . . . . . . . . . . . . . . . . . . . . **37**

|     | A.  | *Violation of Fourth Amendment Rights* . . . . . . . . . . . . . . . | *37* |
|     |     | 1.  | *Overview of Fourth Amendment law* . . . . . . . . . . . . . | *37* |
|     |     | 2.  | *Search-related rights* . . . . . . . . . . . . . . . . . . . . | *37* |
|     |     | 3.  | *Seizure-related rights* . . . . . . . . . . . . . . . . . . . . | *38* |
|     |     |     | a.  | *Unreasonable warrantless seizures* . . . . . . . . . . . | *38* |
|     |     |     | b.  | *No arguable probable cause* . . . . . . . . . . . . . . | *39* |
|     |     |     |     | i.  | *Iowa Code § 719.1(1)* . . . . . . . . . . . . . . | *39* |
|     |     |     |     | ii. | *18 U.S.C. § 3056(d)* . . . . . . . . . . . . . | *40* |
|     |     |     |     | iii.| *18 U.S.C. § 1752* . . . . . . . . . . . . . . . | *41* |
|     | B.  | *Clearly Established* . . . . . . . . . . . . . . . . . . . . . . . . . | *42* |
|     | C.  | *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *43* |

**X.**   **EQUAL PROTECTION CLAIMS** . . . . . . . . . . . . . . . . . . . . . . . **43**

**XI.**   **42 U.S.C. § 1985(3) CLAIMS** . . . . . . . . . . . . . . . . . . . . . . . . . **44**

**XII.**   **DISPOSITION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **45**

# I. INTRODUCTION

The matter before the court is the Renewed Motion for Summary Judgment (docket no. 103) ("Renewed Motion"), filed by Defendants Bruce Macaulay, Michael Parker and Holly Michael ("Individual Federal Defendants").

## II. RELEVANT PRIOR PROCEEDINGS

### A. Third Amended Complaint

On April 7, 2006, Plaintiffs Alice McCabe and Christine Nelson filed a six-count Third Amended and Substituted Complaint and Jury Demand ("Third Amended Complaint"). In the first five counts of the Third Amended Complaint, Plaintiffs alleged that the Individual Federal Defendants violated five fundamental rights provided to Plaintiffs by the United States Constitution and the Iowa Constitution. Specifically, Plaintiffs alleged that the Individual Federal Defendants infringed upon their (1) rights to freedom of speech, (2) rights to freedom of assembly, (3) rights against unreasonable searches and seizures, (4) rights to equal protection and (5) rights to substantive due process. *See* U.S. Const. amends. I (speech and assembly), IV (search and seizure) and XIV (equal protection and due process); Iowa Const. art. I, §§ 6 (equal protection), 7 (speech), 8 (searches and seizures), 9 (due process) and 20 (assembly). In the sixth count of the Third Amended Complaint, Plaintiffs claimed that the Individual Federal Defendants conspired to violate their constitutional rights, in violation of 42 U.S.C. § 1985(3).

### B. Motion for Summary Judgment

On June 19, 2006, the Individual Federal Defendants filed a motion for summary judgment. On September 1, 2006, the court granted in part and denied in part the motion for summary judgment. The court (1) substituted the United States as the defendant in place of the Individual Federal Defendants as to Plaintiffs' state law claims; (2) dismissed the state law claims against the United States without prejudice; (3) dismissed Plaintiffs' substantive due process claims with prejudice as to the Individual Federal Defendants; and

(4) dismissed the portion of Plaintiffs' § 1985(3) claims that alleged that the Individual Federal Defendants violated the equal protection provision of such statute. *See* Order (docket no. 82), at 37-38. Pursuant to Federal Rule of Civil Procedure 56(f), the court denied the remainder of the motion for summary judgment with leave to refile after Plaintiffs had an opportunity to conduct limited discovery on the threshold issue of qualified immunity. *Id.* at 37.

### C. Fourth Amended Complaint

On September 5, 2006, Plaintiffs filed a Motion for Leave to File [a] Fourth Amended and Substituted Complaint and Jury Demand ("Motion for Leave"). The Plaintiffs represented to the court that the proposed Fourth Amended and Substituted Complaint and Jury Demand ("Fourth Amended Complaint") "only adds Michelle Mais as a Defendant and [does] not substantively change the prior pleading filed by the Plaintiffs." Motion for Leave (docket no. 83-1), at 2. Plaintiffs stated that they "underst[ood] that the recent Order filed by the Court, ruling on the [Individual] Federal Defendants' Summary Judgment Motion, [would] apply to the allegations against those Defendants set out in [the proposed Fourth Amended Complaint]." *Id.* The Individual Federal Defendants did not resist the Motion for Leave. On September 8, 2006, the court granted the Motion for Leave, and the Clerk of Court docketed the Fourth Amended Complaint.

### D. Renewed Motion for Summary Judgment

On January 10, 2007, the Individual Federal Defendants filed the instant Renewed Motion. On March 5, 7 and 8, 2007, Plaintiffs filed a Resistance. On April 9, 2007, the Individual Federal Defendants filed a Reply. The Renewed Motion is fully submitted and ready for decision. *See* LR 7.1.c.

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows "there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it is a fact that "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)); *see also Scott v. Harris*, 127 S. Ct. 1769, 1775 (2007) (restating same principles and remarking that "[i]n qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts"). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 127 S. Ct. at 1776.

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see, e.g., Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for

5

the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## IV. FACTUAL FINDINGS

When viewed in the light most favorable to Plaintiffs and affording them all reasonable inferences, the facts are these:

### A. The Players

Plaintiffs are two Iowa residents who disagree with the policies of President George W. Bush. Specifically, they are two schoolteachers in their fifties who oppose the war in Iraq. The Individual Federal Defendants are Special Agents with the United States Secret Service ("Secret Service").

### B. Noelridge Park

Noelridge Park ("Park") is a public park in the City of Cedar Rapids, Iowa ("City"). Figure 1, which is appended to the instant Order, is an aerial photograph of the Park.

The Park is bounded on its south side by 42nd Street NE and on its west side by Council Street NE. The southwest corner of the Park (i.e., near the northeastern corner of 42nd Street NE and Council Street NE) is situated by a residential neighborhood.

In the southwest corner of the Park, there is a large parking lot. Two driveways provide access to the parking lot from 42nd Street NE. A pool house, an aquatics center and tennis courts are located east of the parking lot.

Directly north of the parking lot is a large open space. This open space is bounded on its north side by a small access road, on its south side by the parking lot, on its west side by Council Street NE and on its east side by the aquatics center and pool house, some trees and a playground.

6

### C.   The Rally

#### 1.      Background

On September 3, 2004, the Republican National Committee ("RNC") paid for a "Victory 2004" rally ("Rally") at the Park.[1]   The purpose of the Rally was to express support for the re-election of President Bush and other Republican candidates for federal and state offices in the November of 2004 elections.   No organization or person obtained permission from the City to hold the Rally in the Park or on adjacent public streets or sidewalks for the exclusive use of President Bush's re-election campaign.[2]

President Bush personally appeared at the Rally.   He spoke from a temporary stage that was erected in the northeast corner of the open space of the Park.   Figure 2, which is appended to the instant Order, is an aerial photograph that shows the approximate location of the stage in the Park.

Thousands of people attended the Rally.   The Rally was open only to ticket holders, and Victory 2004 reserved the right to refuse a ticket to any person.   At least one

---

[1] According to Caleb Hunter, then-Regional Field Director of the Republican Party of Iowa, Victory 2004 was "a project administered by the Republican Party of Iowa." I.F.D. App. at 14.   "Victory 2004 sponsored the [R]ally, and the [RNC] paid for various expenses associated with the [R]ally." *Id.* at 15.   Government funds were not used to pay for the Rally.

[2] In Iowa, "public ways and grounds may be temporarily closed by resolution." Iowa Code § 364.12(2)(*a*) (2003).   Ann Ollinger, the City's Clerk, testified in an affidavit that employees of her office reviewed the records of the City's Council and "found no . . . resolution or other action approving the use of Noelridge Park, and/or the adjacent 42nd Street right-of-way, for the Bush re-election campaign on September 3, 2004." Pl. App. at 14.   Prior to the Rally, unknown individuals approached the City's Parks Commissioner, Wade Wagner, and attempted to obtain such permission.   Wagner told the individuals that he believed it was "not a good idea."   *Id.* at 16.   Wagner did not believe that he "individually had the authority to allow a private group or entity to use a public park for its own private purposes."   *Id.* at 17.   Hunter insists that "Victory 2004 secured from the [City] exclusive use of [the Park] for purposes of the [R]ally on September 3, 2004." I.F.D. App. at 14.

registered Democrat, Douglas Kelly, was denied a ticket to the Rally because of his political affiliation.

### 2. Security measures

Before the Rally, representatives from the Secret Service conferred with state and local law enforcement officials to determine what security measures would be necessary to ensure the safety of President Bush and the Rally's attendees. Cooperation among federal, state and local officials was essential, because the Secret Service has limited personnel and must rely on state and local law enforcement to ensure security at large events.

After considering the relative elevation of the stage area and the stage's proximity to portions of Council Street NE, 42nd Street NE and the adjoining sidewalks and rights-of-way, representatives of the Secret Service, in cooperation with state and local law enforcement officials, implemented a wide variety of security measures. Such measures included (1) constructing physical barriers between the Park and adjoining rights-of-way, (2) imposing restrictions upon entry to the Park and (3) imposing restrictions on vehicular and pedestrian use of adjoining rights-of way.

### a. Physical barriers

Law enforcement officers set up physical barriers between the Park and adjoining rights-of-way. Large trucks and other heavy equipment were placed along the east side of Council Street NE and the north side of 42nd Street NE between Council Street NE and the eastern driveway to the parking lot. Portable toilets were placed within the Park, and snow fences were constructed around the Park. These physical barriers mitigated the effectiveness of a variety of weapons, blocked sight lines into the Park and established set-off distances between the Park and adjoining rights-of-way.

### b. Restrictions on entry

Law enforcement officers imposed restrictions on entry to the Park. Although Rally

8

attendees were permitted to enter the Park by shuttle bus or on foot, the eastern driveway to the parking lot was designated as the sole access point to the Rally. Magnetometers were placed in the parking lot to screen attendees for weapons.

Attendees arriving by shuttle bus parked at remote lots and rode to the Rally. The Park's parking lot was converted into an unloading zone for such attendees. Shuttle buses periodically approached the Park on 42nd Street NE, entered the parking lot at its eastern driveway ("Bus Entrance"), dropped off attendees and then exited the parking lot through the western driveway. The attendees presented their tickets as they stepped off the shuttle buses and then passed through the magnetometers to be screened for weapons. Attendees arriving on foot entered the Rally via the Bus Entrance, presented their tickets to event volunteers and passed through the magnetometers.

### c.      *Restrictions on adjoining rights-of-way*

Law enforcement officers also imposed restrictions on vehicular and pedestrian use of adjoining rights-of way. These restrictions were designed to ensure that law enforcement could effectively monitor sensitive areas and clear paths for emergency vehicles to enter and to exit the Rally area.

### i.      *Vehicular traffic*

Vehicular traffic was prohibited on Council Street NE and 42nd Street NE, with the exception of authorized shuttle buses and law enforcement vehicles.

### ii.      *Pedestrian traffic*

Pedestrian traffic on the roadways and sidewalks adjacent to the Park was limited to *moving* pedestrians.[3] That is, pedestrians were not allowed to stand or congregate. The

---

[3] In most situations, the Secret Service would have preferred closing 42nd Street NE entirely. However, closing 42nd Street NE entirely would have caused serious problems. Nearby residents would have been unable to enter or leave their homes. Further, many attendees would have had to walk almost an additional mile to attend the

(continued…)

9

specific restrictions upon pedestrian traffic were as follows:

- only authorized personnel were allowed on the eastern sidewalk of Council Street NE and the north sidewalk of 42nd Street NE between the intersection with Council Street NE and a point ten feet west of the Bus Entrance;

- members of the general public with tickets could enter the Rally at the Bus Entrance, but they were required to approach the Bus Entrance from the east along the north sidewalk of 42nd Street NE;

- members of the general public were not allowed to stop and stand in or around the Bus Entrance or east of the Bus Entrance on the north sidewalk of 42nd Street NE, because they had to be moving into or away from the Rally at all times;[4] and

---

[3] (…continued)
Rally.

[4] In most of their sworn statements, the Individual Federal Defendants imply that pedestrians were permitted to stand in some places on the north sidewalk east of the Bus Entrance. *See, e.g.*, Declaration of Macaulay, I.F.D. App. at 20 ("[M]embers of the general public were not allowed to stop and stand in and around the [B]us [E]ntrance[.]"); Declaration of Michael, *id.* at 25 (same); Macaulay's Response to Interrogatories, Pl. App. at 30 ("On the north side of 42nd Street west of the eastern driveway, pedestrians were allowed, but those pedestrians within a certain distance of the entrance were required to keep moving."); Michael's Response to Interrogatories, *id.* at 34 (same); Parker's Response to Interrogatories, *id.* at 38 (same). In other sworn statements, Parker and Kevin Walsh, the Secret Service's Site Agent, state that members of the general public were not allowed to stop and stand east of the Bus Entrance on the north sidewalk of 42nd Street NE. *See, e.g.*, Declaration of Parker, I.F.D. App. at 30 ("East of my position and at the entrance to the driveway, pedestrians were allowed. However, no one was allowed to stop and stand in this area; everyone was required to keep moving."); First Declaration of Kevin Walsh, Pl. App. at 22 (stating that the north sidewalk east of the Bus Entrance was "designated for moving pedestrians only"); Second Declaration of Kevin Walsh, I.F.D. App. at 37 (same). The court adopts the latter version of the facts for purposes of the instant Order, because it is more favorable to Plaintiffs. *See Baer Gallery*, 450 F.3d at

(continued…)

- only moving pedestrians were allowed on the south sidewalk
of 42nd Street NE.

These restrictions on pedestrian traffic were neither posted for public view nor part of a formal statute or regulation.

These restrictions against standing or congregating pedestrians were necessary to ensure the safety of all concerned. For example, a group on the sidewalk, especially in the immediate vicinity of the Bus Entrance, could have (1) disrupted the flow of buses and pedestrians into the Rally, (2) impeded emergency evacuation or (3) made it more difficult for law enforcement to monitor the crowd for potential threats.

The security restrictions did not require that protestors be confined to any particular area. Rather, individuals were free to protest so long as their conduct was consistent with security restrictions. Further, the southwest corner of Council Street NE and 42nd Street NE was made available as a place for protestors to gather. Indeed, a group of protestors, including then-candidate and future Congressman David Loebsack, gathered at such corner. The corner was within sight and earshot of most arriving attendees.

### d.    Stationing of law enforcement officers

Federal, state and local law enforcement officers, some in uniform and some in plainclothes, were assigned to monitor areas that were designated as sensitive for security reasons. They were also posted around the Park and adjoining areas to make sure that the public observed the established security restrictions. For example, law enforcement officers directed persons entering or walking by the Rally to keep moving through areas designated for moving pedestrians only. If law enforcement had been unable to enforce restrictions requiring pedestrians to keep moving in these areas, the Rally would not have been sufficiently secure.

---

[4](…continued)
820.

Case 1:05-cv-00073-LRR    Document 152    Filed 09/04/07    Page 11 of 49

The Individual Federal Defendants were assigned to assist with protective functions at the Rally.  Macaulay and Michael were paired with state or local law enforcement officers and assigned to deal with various security matters around the Rally as they arose. Parker was posted at the Bus Entrance, where he monitored the immediate area for security risks, informed the general public of security restrictions and ensured that the public complied with those restrictions.  The Individual Federal Defendants and their partners were in plainclothes.

### 3. Briefings

#### a. Individual Federal Defendants' Briefing

The Individual Federal Defendants did not design the foregoing security measures. Before the Rally, representatives of the Secret Service briefed the Individual Federal Defendants and other Secret Service agents about the restrictions and ordered the Individual Federal Defendants to enforce them.

The Secret Service representatives also told the Individual Federal Defendants that a pool house at the Park was designated as a command center during the Rally and was off-limits to all but authorized personnel.  At no time did anyone inform the Individual Federal Defendants that any person or group had planned to gather near the pool house.  Given the security measures in place, any such gathering would have been impermissible.

In keeping with standard procedure, the Secret Service representatives briefed the Individual Federal Defendants on the Secret Service's policy towards protestors.  It was and remains the policy of the Secret Service to treat protestors the same as members of the general public.  It is the policy of the Secret Service to leave protestors alone unless they fail to comply with security restrictions or otherwise appear to pose a potential threat.[5]

---

[5] The Secret Service's official policy states:

> In the absence of specific fact or observable actions which

(continued…)

Case 1:05-cv-00073-LRR   Document 152   Filed 09/04/07   Page 12 of 49

### b. *Iowa State Patrol Troopers' briefing*

Iowa State Patrol Troopers Troy Bailey and Rick Busch assisted with protective functions at the Rally. Representatives from the Secret Service, as well as a representative of the Cedar Rapids Police Department ("CRPD"), briefed Troopers Bailey and Busch on security measures and restrictions on pedestrian traffic before the Rally began. The Individual Federal Defendants did not attend the Iowa State Patrol Troopers' briefing.[6]

### 4. *Invitations to protest*

On September 1, 2004, Joel Miller, Chairman of the Linn County Democratic

---

[5] (...continued)
>    would indicate a demonstration may pose a risk to a [Secret Service] protectee . . . or to public safety, demonstrators are to be treated as members of the general public. [Secret Service] personnel should not initiate any action to segregate demonstration activity from public areas.
>
>    Only in cases when the [Secret Service] has information that a demonstration poses a potential risk to a [Secret Service] protectee . . . or to the public safety, should [Secret Service] personnel initiate and participate in discussions with the demonstration group, or suggest that the group be segregated from the general public area. Any meeting or contact with the demonstration organizers should include local law enforcement authorities.
>
>    * * *
>
>    Personnel should continue to be diligent in identifying demonstration activity that may pose a risk to the [Secret Service] protective mission and its facilities.

I.F.D. App. at 6.

[6] Trooper Bailey left the Iowa State Patrol Troopers' meeting with the belief that protesters were "not allowed" on the north side of 42nd Street NE. I.F.D. App. at 64. He believed that "people who were attending the event supporting Present Bush" were allowed on the north sidewalk, as long as they kept moving. *Id.*

Party, obtained permission from CRPD Officer Steven M. O'Konek to hold a protest at the pool house. *See* Pl. App. at 96 (testimony that Officer O'Konek telephoned Miller and told him that "the location that we could meet that was outside the secure area was in the vicinity of the pool house"). Miller sent an email to various registered Democrats in Eastern Iowa. The email, entitled "PEACEFUL PROTESTORS WANTED AND WELCOME!," *id.* at 65 (emphasis in original), invited the Democrats to gather "at the Noelridge Park Pool (aka Noelridge Aquatic Center)" on September 3 to protest President Bush's visit, *id.* It encouraged protestors to make a protest sign and bring it or, "[b]etter yet, make two and bring one to share with another protestor." *Id.* The next morning, Miller forwarded the email to Officer O'Konek, as a courtesy.

Around the same time, America Coming Together ("ACT"),[7] a political action group, sent a similar email to Nelson. The email invited Nelson to protest the Iraq war at the pool house on September 3, 2004, the date of the Rally. Nelson decided to protest. In her own words, she wanted to "stand[] on the sidelines," I.F.D. App. at 274, that is, "stand[] with other folks in the area, other folks who might have been Bush supporters, other folks who may have had [R]epublican paraphernalia on or [t]-shirts and just stand[] among them quietly," *id.* at 275.

Nelson invited McCabe, one of her friends, to protest with her. McCabe agreed. McCabe then invited one of her friends, Barb Hannon, to protest, too. Hannon agreed to protest. The three women decided to meet fellow protestors near the pool house on September 3, 2004.

On September 2, 2004, at approximately 4 p.m., Officer O'Konek sent Miller an

---

[7] ACT was "a liberal, political action . . . group dedicated to get-out-the-vote activities." America Coming Together Entry, *available at* http://en.wikipedia.org/wiki/America_Coming_Together (last visited Aug. 28, 2007); *see, e.g., Dorsey v. Barber*, No. 5:04-CV-2151, 2005 WL 2211176, *3 (N.D. Ohio Sept. 9, 2005) (ACT voter registration project).

14

email. Officer O'Konek informed Miller that the plans had changed and "[t]he pool house will be designated as being in the secure area." Pl. App. at 65. Further, Officer O'Konek told Miller that "[t]he entire park has now been designated a secure area." *Id.* He stated, however, that "[t]here will be plenty of law enforcement [officers] to direct demonstrators to a location suitable for demonstrators," *id.*, and "[t]here will be a location for your demonstration," *id.* Plaintiffs and Hannon did not learn about this change in plans.

### 5. *Plaintiffs' arrests*

#### a. *Plaintiffs walk to the Bus Entrance*

On September 3, 2004, Plaintiffs and Hannon arrived in the vicinity of the Park on foot. McCabe, who was dressed in a long sleeve shirt, khaki shorts and tennis shoes, carried an 8½" x 11" piece of paper that was affixed to a small yard sign. The phrase "Bad War No More" and a "W" with a slash through it were visible on the piece of paper. Nelson, who was dressed in a polo shirt, shorts and tennis shoes, wore a small "Kerry-Edwards" button. Hannon wore a small "Kerry" button.

Plaintiffs and Hannon decided to walk to the pool house to meet other protestors. Plaintiffs and Hannon walked eastward along the south sidewalk of 42nd Street NE. They crossed Council Street NE and continued eastward. At some point southeast of the Bus Entrance, approximately due south of the tennis courts, Plaintiffs and Hannon turned northward and crossed 42nd Street NE. At this point in time, Plaintiffs and Hannon were directly south of the tennis courts. The position of Plaintiffs and Hannon is represented by an "X" on Figure 3, a close-up aerial view of 42nd Street NE, the Bus Entrance, the aquatics center and the tennis courts. Figure 3 is appended to the instant Order.

Plaintiffs and Hannon turned to the west and walked westward along the north sidewalk of 42nd Street NE (i.e., in the direction of the Bus Entrance). As the three women were walking, they noticed a number of people standing and sitting along a chain-link fence that separated the aquatics center from the north sidewalk. Plaintiffs and

15

Hannon were looking for their protest group, but they could not find it. Plaintiffs and Hannon assumed that they had arrived too early.

While still walking westward on the sidewalk, Hannon met an acquaintance, Mike Weston. Weston was standing on the sidewalk collecting signatures on behalf of the City's Chamber of Commerce. Weston asked Hannon for her signature, to show her support for changing the City's form of government. Hannon talked with Weston for five to six minutes. McCabe and Nelson did not stop and continued walking to the pool house.

Plaintiffs stopped and stood on the sidewalk at a point immediately adjacent to the Bus Entrance. The position of Plaintiffs is represented by a small "1" on Figure 3. Plaintiffs believed that this was a place where they could meet their fellow protestors, but they did not recognize any protestors nearby.

### b.    *Parker confronts Plaintiffs*

Parker was posted at the Bus Entrance. He saw McCabe and told her to move off of the sidewalk. Parker was not wearing a uniform.

McCabe complied and moved several feet to the southwest onto a narrow strip of grass between the sidewalk and the street. McCabe believed that Parker's request "made sense" and she "did not want to be in anybody's way." I.F.D. App. at 183. McCabe's position after she complied with Parker's order is represented by a small "2" on Figure 3.[8] At this point, she was standing next to a man with a bucket ("Bucket Guy"), who was

---

[8] The Individual Federal Defendants insist that McCabe did not comply with Parker's order, which they often characterize as an order to move out of the area of the Bus Entrance. However, McCabe testified that she was ordered off of the *sidewalk*, and that she complied with such order. *See, e.g.*, I. F.D. App. at 271 ("We were asked to step off the sidewalk, so [we] did."); Pl. App. at 101 (Nelson testified that McCabe received an order "to move from the sidewalk"). This is one of many factual disputes in this case; these factual disputes are explained in more detail in Part VIII *infra*. Again, the court adopts Plaintiffs' version of the facts for purposes of the instant Order, because they are the non-moving parties. *See Baer Gallery*, 450 F.3d at 820.

collecting donations on behalf of Republicans. The position of Bucket Guy is represented by a "B" on Figure 3.

At the same time, Nelson overheard Parker's directions to McCabe, "felt that was reasonable," Pl. App. at 101, and moved off of the sidewalk. Nelson moved to the same strip of grass between the north sidewalk and 42nd Street NE.

Parker had no further contact with Plaintiffs. Instead, he radioed his fellow law enforcement officers. Parker's responsibility was to monitor the area around his assigned post rather than to deal with particular situations.

### c.  *Macaulay approaches McCabe*

Plaintiffs remained on the strip of grass for several minutes. Nelson was "taking in the scenery and looking around," I.F.D. App. at 214, because she "had not been to a presidential rally before and . . . was just interested just to see what goes on," *id*. Nelson saw a number of people sitting or standing in the vicinity: (1) Bucket Guy was standing near her, collecting donations; (2) between ten and twenty people were sitting along the chain-link fence with their backs resting up against the fence, from the pool area to the tennis courts; (3) vendors were standing on both sides of the north sidewalk, selling yellow ribbons and "[R]epublican paraphernalia," *id*. at 221; and (4) people with clipboards were standing "close to where [Nelson] was standing initially," *id*. at 220. Nelson "assumed that [the people with clipboards] had either something like a petition or perhaps they were signing up voters." *Id*.

Macaulay was the first Secret Service agent to respond to Parker's request for assistance. When Macaulay arrived, he saw Plaintiffs standing near the Bus Entrance.

Macaulay told McCabe to move.[9]  McCabe was "surprised" and "shocked" at

---

[9]  Although McCabe was unsure whether Parker or Macaulay gave her the second order to move, McCabe testified that Macaulay "was a big guy," a "[h]ulked up guy," a "[b]ig man," a "[b]ig, bulky, beefy kind of guy," who bore some resemblance to Jesse

(continued…)

17

Macaulay's request, *id.* at 173, because (1) she had already moved off of the sidewalk and (2) other people were standing in the vicinity. Macaulay got up in McCabe's face and told her: "We own the park. You can't be here." *Id.* at 177.

Macaulay was not wearing a uniform. McCabe asked Macaulay who he was and why he was asking her to move. Macaulay presented McCabe with his identification. McCabe asked Macaulay, "Where am I supposed to go? I can't stand here?" Pl. App. at 91. McCabe then "back[ed] away because [she] felt like [Macaulay] was really in [her] face." *Id.* at 92. McCabe backed up southward into 42nd Street NE.

### d. *Macaulay orders Plaintiffs' arrests*

Macaulay ordered Troopers Bailey and Busch to arrest Plaintiffs. At the time Macaulay ordered Plaintiffs' arrests, Macaulay had "no authority over the Linn County jail, no knowledge of practices there, and no knowledge of what search, if any, might have been performed on [Plaintiffs]." *Id.* at 23. Trooper Bailey approached McCabe, and Trooper Busch approached Nelson.

### e. *Michael's actions*

Sometime after Macaulay responded to Parker's request for assistance, Michael arrived in the vicinity of the Bus Entrance. Michael had not seen or discussed Plaintiffs before she arrived at the Bus Entrance. Macaulay and Michael conferred, and Michael agreed that "the women could not stand in that location." *Id.* at 22. Macaulay informed Michael that the situation was under control. Michael "did not direct [Macaulay] to take any actions." *Id.* Michael stood back and did not become involved in Plaintiffs' arrests and subsequent detentions.

---

[9](…continued)
"The Body" Ventura, a/k/a James George Janos, the former professional wrestler and bald, mustachioed governor of Minnesota. *See* I.F.D. App. at 172-73. Parker does not meet this description. *See id.* at 29 ("At the time of the [R]ally . . . I was clean-shaven and had a full head of red hair.").

### f.    Troopers Bailey and Busch arrest Plaintiffs

When Macaulay ordered Plaintiffs' arrests, McCabe was continuing to back away into 42nd Street NE.  Trooper Bailey pursued McCabe.  When McCabe reached the middle of 42nd Street NE, Trooper Bailey arrested her.  Trooper Bailey was wearing his uniform.  At no time did Trooper Bailey order McCabe to move.

Meanwhile, Trooper Busch approached Nelson and told her to move.  Up until this time, Nelson had not received any orders to move, although she was in earshot of Macaulay and Trooper Bailey.

Trooper Busch was wearing his uniform.  Trooper Busch told Nelson "they owned the park that day," I.F.D. App. at 215, "we own this half of the street," *id.* at 216, and she had to move.  Nelson complied and backed up into 42nd Street NE.

As Nelson was continuing to move southward, Trooper Busch repeatedly ordered Nelson to move.  While Nelson was continuing to back up,  Nelson said, "I'm not hurting anyone.  Others are not moving." *Id.*  Trooper Busch arrested her.  Trooper Busch arrested Nelson on the south side of 42nd Street NE, at a point almost even with the south sidewalk.

### 6.    Detention at the poolhouse

Trooper Bailey handcuffed McCabe, and Trooper Busch handcuffed Nelson.  Nelson suffered some bruising as a result of being handcuffed.[10]  Both women were charged with Trespass, in violation of Iowa Code section 716.7 (2003).  Trespass is classified as a simple misdemeanor under Iowa law when there is no damage to property or other extenuating circumstances.  Iowa Code § 716.8(1).  Troopers Bailey and Busch then led Plaintiffs north to the pool house, where they were detained.

---

[10] Dr. Larry Helvey, M.D., testified that Nelson suffered bruising from her arrest.  Helvey opined that "the injuries sustained by Plaintiff Nelson . . .  are not consistent with the appropraite and reasonable placement of handcuffs at the time of her arrest."  Pl. App. at 46.

Case 1:05-cv-00073-LRR   Document 152   Filed 09/04/07   Page 19 of 49

At some point in time after McCabe's arrest, Hannon asked McCabe "[W]hat's going on?" I.F.D. App. at 139. Hannon saw a number of people standing within a ten-yard radius: people were standing in the street, on the sidewalk and in the parking lot. Some people were selling magnetic, yellow, "Save Our Troops" ribbons; others were selling "G.O.P. t-shirts" and Bush campaign buttons. *Id.* at 140-41. Trooper Bailey "pointed a finger in [Hannon's] face and said do you want to be arrested, too?," *id.* at 139, and Hannon "took off running to the south side of the street," *id.*

### 7. Cavity inspections

While Plaintiffs were detained at the pool house, they were not searched. After a time, the CRPD transported them to the Linn County Jail. The Individual Federal Defendants had no authority over the Linn County Jail and had no knowledge of its practices. The Individual Federal Defendants had no knowledge of what search, if any, might be performed on Plaintiffs.

Plaintiffs were booked into the Linn County Jail on the simple misdemeanor Trespass charges. Linn County Deputy Sheriff Michelle Mais conducted a "full strip search" of Plaintiffs. A "full strip search" includes having detainees bend over and spread their butt cheeks, and having an officer inspect their rectal area.[11] While Nelson was searched, the top half of a door to the room in which she was searched was open.

In September of 2004, the policy of the Linn County Jail was to conduct full strip searches of only inmates charged with serious misdemeanors or higher level offenses, unless extenuating circumstances were present and the jailor received permission from a supervisor. For example, full strip searches were conducted of those inmates suspected of hiding weapons or contraband, if a supervisor approved. In addition, if a supervisor approved, the jailor could order a female's underwear removed if she was suicidal or

---

[11] Plaintiffs contend that their vaginas were also inspected, but there is no evidence in the record to support this assertion.

wearing a thong. Because Plaintiffs were only charged with simple misdemeanors, were not suspected of hiding weapons or contraband, were not suicidal and were not wearing thongs, it was against Linn County Jail policy to strip search them. In any event, Mais did not obtain approval from her supervisor to conduct full strip searches of Plaintiffs.

### 8. All charges dropped

On December 15, 2004, the Linn County Attorney dropped all criminal charges against Plaintiffs.[12] Additional facts are set forth below, as necessary.

## V. THE ARGUMENTS

The Individual Federal Defendants contend that they are entitled to judgment as a matter of law, because they are entitled to qualified immunity on all of Plaintiffs' claims. As a threshold matter, the Individual Federal Defendants point out that Parker and Michael had minimal involvement with Plaintiffs and conclude that they should be dismissed from the case entirely. On the merits, the Individual Federal Defendants advance a number of alternative arguments, in which they repeatedly invoke qualified immunity.

With respect to Plaintiffs' First Amendment claims, the Individual Federal Defendants argue that qualified immunity shields them from trial, because (1) the security measures in place for the Rally were permissible limits on the time, place and manner of Plaintiffs' expression and, in any event, (2) the conduct of the Individual Federal Defendants was not clearly unconstitutional. With respect to the allegations of illegal seizures in Plaintiffs' Fourth Amendment claims, the Individual Federal Defendants argue that qualified immunity shields them from trial, because Plaintiffs' arrests were supported by at least arguable probable cause. Specifically, the Individual Federal Defendants

---

[12] In Iowa, a person may not be charged with trespassing for "entering upon the right-of-way of a public road or highway." Iowa Code § 716.7(4); *cf. State v. Hutchinson*, 721 N.W.2d 776, 780-83 (Iowa 2006) (affirming protestors' trespass convictions, where there was sufficient evidence in the record for the jury to find that the protestors entered upon a federally owned roadway and private land).

Case 1:05-cv-00073-LRR   Document 152   Filed 09/04/07   Page 21 of 49

contend that a reasonable officer in the shoes of the Individual Federal Defendants could have concluded that Plaintiffs violated Iowa Code section 719.1, 18 U.S.C. § 1752 and/or 18 U.S.C. § 3056(d). With respect to the allegations of illegal searches in Plaintiffs' Fourth Amendment claims, the Individual Federal Defendants argue that they are entitled to qualified immunity, because they neither searched Plaintiffs nor caused them to be searched and, in any event, a cavity inspection was unforseeable to them. Lastly, the Individual Federal Defendants argue that Plaintiffs Equal Protection claims and 42 U.S.C. § 1985(3) claims must fail, because they did not treat Plaintiffs differently from others who were similarly situated.

Plaintiffs resist all of the Individual Federal Defendants' grounds for dismissal. After providing a general overview of the law of qualified immunity, the court considers each argument, in turn.

## VI. *QUALIFIED IMMUNITY*

The court must analyze issues of qualified immunity in two discrete steps. *Wright v. Rolette County*, 417 F.3d 879, 884 (8th Cir. 2005), *cert. denied*, 126 S. Ct. 1338 (2006). The Supreme Court recently stated:

> In resolving questions of qualified immunity, courts are required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If, and only if, the court finds a violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case." [*Id.*]

*Scott*, 127 S. Ct. at 1774 (omission in original).

With respect to the second step in the qualified immunity analysis, a right is "clearly established" if "a 'reasonable officer would understand that what he is doing violates that right.'" *Andrews v. City of W. Branch, Iowa*, 454 F.3d 914, 919 (8th Cir. 2006) (quoting

22

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This second step in the qualified immunity analysis "is a 'fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad proposition.'" *Janis v. Biesheuvel,* 428 F.3d 795, 799 (8th Cir. 2005) (quoting *Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir. 2004)).

Qualified immunity is an immunity from suit, not merely a defense to liability. *Scott*, 127 S. Ct. at 1773 n.2. "[T]hose entitled to qualified immunity hold 'an entitlement not to stand trial or face the other burdens of litigation.'" *O'Neil v. City of Iowa City, Iowa*, No. 06-3671, 2007 WL 2279043, *2 (8th Cir. Aug. 10, 2007) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).[13] Qualified immunity should be reviewed at the earliest possible stage in the litigation. *Scott*, 127 S. Ct. at 1773 n.2 As such, an order denying qualified immunity is immediately appealable. *Id.*

### VII. PARKER AND MICHAEL

As indicated, the Individual Federal Defendants point out that Parker and Michael had minimal involvement with Plaintiffs and conclude that they should be dismissed from the case entirely. Plaintiffs respond that Parker and Michael were "'personally involved in' the arrests of the Plaintiffs, the targeting of protestors at the event, and the cover-up of wrongful acts by not truthfully relating the facts surrounding the arrests." Resistance (docket no. 117-5), at 15. Somewhat more specifically, Plaintiffs argue that "Parker set the unconstitutional confrontation in motion," *id.* at 16, and Michael "was an integral part of the team that confronted the Plaintiffs, was involved in unconstitutionally confronting and harassing protestors, [and] participated in providing untruthful testimony regarding the facts of Plaintiffs' arrests . . . .," *id.* at 17.

It is well-settled that "[l]iability for damages for a federal constitutional tort is

---

[13] In a prior order, the court limited the scope of permissible discovery to "only discovery that [was] 'essential' to resolve the Individual Federal Defendants' qualified immunity defenses . . . ." *See* Order (docket no. 82), at 13.

23

personal, so each defendant's conduct must be independently assessed." *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006) (citing *Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005) (en banc)). After all, the first step in the qualified immunity analysis is whether "*the officer's* conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. Law enforcement officers who are not involved in the allegedly unconstitutional actions of their fellow officers have not violated constitutional rights and are entitled to qualified immunity. *See, e.g., Grayson v. Ross*, 454 F.3d 802, 809-10 (8th Cir. 2006) ("Chris Porter was not involved in the decision to accept Grayson at the jail; therefore, he could not have violated Grayson's constitutional rights based on Grayson's intake and is entitled to qualified immunity for the intake.").

Even when viewed in a light most favorable to Plaintiffs and affording them all reasonable inferences, there is no evidence that Parker or Michael infringed upon Plaintiffs' constitutional rights in any way. Plaintiffs' arguments to the contrary are unfounded and, to the extent they are based on allegations of a "cover-up," are purely speculative.

Parker simply asked McCabe to move off of the sidewalk and radioed his fellow officers. Parker was not involved in his fellow law enforcement officers' decisions to pursue, arrest and conduct cavity inspections of Plaintiffs. Although he saw Plaintiffs' arrests from a distance, he did not participate in those arrests, discuss the arrests with anyone before they occurred and at no time gave instructions to any person as to how Plaintiffs should be treated before or after their arrests.

Michael's involvement with Plaintiffs was even more limited: Michael took no action with respect to Plaintiffs whatsoever. At no time did Michael give anyone any instructions as to how Plaintiffs should be treated or addressed. She only agreed with Macaulay that, based on the information Macaulay had provided her, that Plaintiffs "could

not stand in that location." I.F.D. App. at 22.[14] Michael had not seen or discussed Plaintiffs before she arrived at the Bus Entrance, and she did not "direct [Macaulay] to take any actions." *Id.* Michael was Macaulay's coworker, not his supervisor. Like Parker, Michael stood back and did not become involved with Macaulay's efforts to move Plaintiffs out of the vicinity of the Bus Entrance or Plaintiffs' arrests, detentions and cavity inspections.

Accordingly, the court shall dismiss with prejudice all of Plaintiffs' claims against Michael and Parker.

## VIII. FIRST AMENDMENT CLAIMS

The court first considers whether, taken in the light most favorable to Plaintiffs, the facts alleged show Macaulay's conduct violated Plaintiffs' First Amendment rights. *Scott*, 127 S. Ct. at 1774. The court then considers whether such rights were clearly established in light of the specific context of the case. *Id.*

### A. Violation of First Amendment Rights

#### 1. Overview of First Amendment law

In pertinent part, the First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people to peaceably assemble . . . ." U.S. Const. amend. I. "[T]he First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open' . . . ." *Boos v. Barry*, 485 U.S. 312, 318 (1988) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

---

[14] Michael testified that "[o]ther law enforcement officers [told her that Plaintiffs] had refused to move from the location where they were standing despite repeated requests by law enforcement officials that they move." Pl. App. at 56. Michael was entitled to rely on Macaulay's information. *See, e.g., Doran*, 409 F.3d at 965 ("[L]aw enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable.").

Case 1:05-cv-00073-LRR   Document 152   Filed 09/04/07   Page 25 of 49

The Supreme Court has repeatedly emphasized "the central importance of protecting speech on public issues." *Id.*

Of course, "'[e]ven protected speech is not equally permissible in all places and at all times.'" *Frisby v. Shultz*, 487 U.S. 474, 479 (1988) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985)); *see also United States v. Grace*, 461 U.S. 171, 177-78 (1983) ("We have regularly rejected the assertion that people who wish 'to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.'" (quoting *Adderly v. Florida*, 385 U.S. 39, 47-48 (1966)).

> To ascertain what limits, if any, may be placed on protected speech, [the Supreme Court] focuse[s] on the "place" of that speech, considering the nature of the forum the speaker seeks to employ. [The Supreme Court's] cases have recognized that the standards by which limitations on speech must be evaluated "differ depending on the character of the property at issue." *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 44 (1983). Specifically, [the Supreme Court has] identified three types of fora: "the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius*[,] 473 U.S. at 802.

*Frisby*, 487 U.S. at 479-80.

The parties agree that the traditional public forum analysis governs.[15] Whatever the status of the Park on September 3, 2004,[16] the adjacent sidewalks and streets were

---

[15] The Individual Federal Defendants make the concession that the sidewalk was a public forum for purposes of the Renewed Motion only. *See* Brief in Support of Renewed Motion (docket no. 103-3), at 12 n.9.

[16] *See* discussion *supra* n.2. Because it is undisputed that Plaintiffs never entered the Park, the court need not decide whether a governmental entity may temporarily divest a public park of its status as a traditional public forum and remove all persons who disagree with a particular political viewpoint. *See generally* Kevin Francis O'Neill,

(continued...)

26

clearly public fora. *See, e.g., id.* at 480 ("'[T]ime out of mind' public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939) (Roberts, J., concurring))); *Grace*, 461 U.S. at 177 ("'[P]ublic places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.'"). There is no allegation in this case that the north sidewalk or 42nd Street NE was rented out or licensed under state law for the exclusive use of the Rally[17] or demarcated as private property in any way. *See, e.g., Grace*, 461 U.S. at 180 (holding that sidewalks surrounding Supreme Court's building were public fora, because "[t]here is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave").

"Traditional public forum property occupies a special position in terms of First

[16](...continued)
*Privatizing Public Forums to Eliminate Dissent*, 5 First Amend. L. Rev. 201 (2007) (noting that recent presidential campaigns have often rented out public fora, but the constitutionality of the practice has received little judicial scrutiny).

[17] Historically, Iowa has looked with disfavor upon the practice of renting out streets and sidewalks for purely private use. *See, e.g., Cowin v. City of Waterloo*, 21 N.W.2d 705, 707 (Iowa 1946) ("There is no statute in this state authorizing towns to grant to individuals the right to the use of their streets for private purposes. These municipalities hold the streets in trust for the public, and cannot put them to any use inconsistent with street purposes. They have no implied power to grant privileges to use the streets for private purposes." (Citation and internal quotation marks omitted.)); *Mettler v. City of Ottumwa*, 196 N.W. 1000, 1001 (Iowa 1924) ("The fee title to the streets is in the incorporated town or city, and no private person has a vested or inherent right to obstruct the same in the conduct of his private business. The right to use of the streets is given alike to all citizens, and includes the full width and length thereof."); *cf. U.S. Postal Serv. v. Greenbaugh Civic Ass'ns*, 453 U.S. 114, 133 (1981) ("Congress . . . may not by its own *ipse dixit* destroy the 'public forum' status of streets and parks which have historically been public forums . . . .").

Amendment protection . . . ." *Grace*, 461 U.S. at 180. As such, "the government's ability to restrict expressive activity [thereon] 'is very limited.'" *Boos*, 485 U.S. at 318; *see also Bowman v. White*, 444 F.3d 967, 975 (8th Cir. 2006) ("The government's ability to restrict speech is most circumscribed in a traditional public forum.").

> [The Supreme Court's] cases make clear, however, that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). "For the [government] to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45.

## 2. *No facial challenge*

The parties do not dispute that the Secret Service's security restrictions on the streets and sidewalks adjoining the Park were constitutional on their face. *See* Brief in Support of Resistance (docket no. 117-5), at 18 ("Plaintiffs' complaints in this matter stem, not from the specific alleged restrictions that were in place, but from the selective enforcement of those restrictions only against protestors."). The court agrees. As developed by the Secret Service in conjunction with state and local law enforcement, the security regulations (1) were content neutral; (2) were narrowly tailored to serve significant governmental interests; and (3) left open ample alternative channels for communication.

As developed, the security regulations were content neutral, because they were not based upon the content of any speech. *Cf. Chi. Police Dep't v. Mosely*, 408 U.S. 92, 95

(1972) (invalidating ordinance that allowed peaceful labor picketing next to a school but banned all other picketing, because it "describe[d] permissible picketing in terms of its subject matter"). Indeed, it is the official policy of the Secret Service to treat protestors the same as the rest of the general public.

As developed, the security regulations were narrowly tailored to serve significant governmental interests. The government's interest in protecting the President is more than significant. *See, e.g., Watts v. United States*, 394 U.S. 705, 707 (1969) ("The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive . . . ."); *In re Sealed Case*, 148 F.3d 1073, 1076 (D.C. Cir. 1998) (recognizing "the universally shared understanding that the nation has a profound interest in the security of the President"); *Stigile v. Clinton*, 110 F.3d 801, 803 (D.C. Cir. 1997) (stating that the public interest in protecting the President "is undoubtedly of utmost importance"). "[E]nsuring public safety" and "promoting the free flow of traffic on streets and sidewalks" are also "significant" government interests. *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997). The security regulations were narrowly tailored to further these interests; for example, rather than shutting down 42nd Street NE and the adjoining sidewalks entirely, the regulations permitted moving protestors.

As developed, the security regulations left open ample alternative channels for communication. As indicated, people were permitted to protest near the Rally, so long as they were moving. Further, a designated area for protestors was set up nearby at the intersection of 42nd Street NE and Council Street NE. Indeed, protestors gathered there. *See United States v. Kistner*, 68 F.3d 218, 222 (8th Cir. 1995) (holding that a regulation left open ample alternative channels for pamphleteer's communication, where the record showed that he was allowed to distribute pamphlets on an adjacent boulevard).

### 3. *Analysis: as-applied challenge*

The parties' disagreement concerns the implementation (or lack thereof) of the

security restrictions on September 3, 2004. Plaintiffs argue that, as applied, the security restrictions were viewpoint-based[18] and violated the First Amendment. Macaulay denies any First Amendment violations occurred. The parties' disagreement stems from the fact that there are genuine issues of material fact as to what happened on September 3, 2004.

In support of its argument that the security-restrictions were not viewpoint-based and did not violate Plaintiffs' First Amendment rights, Macaulay relies upon his own testimony and the testimony of his fellow law enforcement officers. Various law enforcement officers, including Macaulay, have testified that (1) Plaintiffs were informed of the security restrictions in place after they arrived at the Bus Entrance; (2) law enforcement officers identified themselves and repeatedly ordered Plaintiffs to move away from the vicinity of the Bus Entrance; and (3) Plaintiffs refused to comply with such orders.[19] These same law enforcement also adamantly deny singling out and arresting

---

[18] Viewpoint-based discrimination is a subset of content-based discrimination. *See, e.g., Hill v. Colorado*, 530 U.S. 703, 723 n.31 (2000) ("'The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.'" (quoting *Carey v. Brown*, 447 U.S. 455, 462, n.6 (1980)). Viewpoint-based discrimination is "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

[19] For example, Parker testified that he told McCabe to move, but "[s]he refused and remained standing in the same location." I.F.D. App. at 31. Parker then "radioed for assistance." *Id.*

Macaulay testified that he approached McCabe, identified himself, informed McCabe that she was standing in a restricted area and directed her multiple times to move. McCabe "emphatically refused to comply." *Id.* at 21. Instead, she repeatedly questioned and disputed Macaulay's orders. When Macaulay offered McCabe tickets to attend the Rally, McCabe refused the tickets. To Macaulay, this act of refusal "raised suspicions because, in [his] experience, avoiding magnetometer screening can be a sign that a person may be concealing an item that the magnetometer will find." *Id.* at 280.

Trooper Busch testified that Macaulay told McCabe to move to the designated area for protestors, but she refused. Trooper Busch also testified that he personally and

(continued…)

30

Plaintiffs solely because they were protestors. The law enforcement officers do admit (or fail to deny) that some non-protestors were permitted to stand in the restricted areas of 42nd Street NE and its rights-of-way; however, the law enforcement officers testified that such non-protestors received permission to stand in the restricted areas for reasons unrelated to the content of their speech.[20]

---

[19](...continued)
repeatedly told Plaintiffs that they needed to move across the street, and they repeatedly refused those orders, as well. Trooper Busch initially testified that Plaintiffs did not move at all before they were arrested, but later stated that Plaintiffs "[m]ay have taken a couple steps one direction or the other . . . ." *Id.* at 103. Trooper Busch testified after the fact that Plaintiffs "simply needed to cross the street," *id.* at 104, and conceded that, "[h]ad [Plaintiffs] complied and walked to [the southern] sidewalk[,] . . . there would have been no arrest made," Pl. App. at 79.

Officer Brent Long, whom the court assumes was the state law enforcement officer paired with Macaulay, testified that Macaulay repeatedly told Plaintiffs to move and they refused, "saying that they did not think they should have to move and that they should be able to go anywhere they wanted." I.F.D. App. at 18. Long testified that the discussion lasted "at least five minutes," in which Plaintiffs "continued to disagree with [Macaulay], to question him, and to ignore him." *Id.* "Over the course of the discussion, [Plaintiffs] stepped back a few feet (less than five), but they did not follow all [of Macaulay's] instructions or move as he was directing them." *Id.*

[20] For example, Parker admitted that ticket-takers and donation-takers were standing around the Bus Entrance. Parker testified that Walsh told him that the ticket-takers were allowed to stand around the Bus Entrance, because they were part of the Rally. Parker also testified that Walsh told him that "event organizers" had approved the presence of the donation-takers. I.F.D. App. at 31. Parker also testified that he saw magnet-sellers standing approximately ten to fifteen yards east of the Bus Entrance, and Walsh approved their presence, too. Parker did not remember any signature-collectors standing in the area of the Rally or any persons sitting against the chain-link fence around the pool.

Macaulay does not remember signature-collectors standing on the north sidewalk or people standing along the chain-link fence north of the sidewalk; he does, however, remember some people lingering in the area of the fence while they were waiting to get into the Rally. He also believed that event staff were authorized to stand in the vicinity of the Bus Entrance and also had permission to collect donations.

(continued...)

31

The problem with Macaulay's argument is that it presupposes a view of the facts that the court cannot adopt at this stage in the proceedings. As indicated, the court must view the record in the light most favorable to Plaintiffs and afford them all reasonable inferences. *Baer Gallery,* 450 F.3d at 820. In other words, at the summary judgment stage, the court adopts Plaintiffs' version of the facts, not the version of the law enforcement officers. *Scott*, 127 S. Ct. at 1775.

The Plaintiffs' version of the events of September 3, 2004 is set forth at length in Part IV of the instant Order and need not be restated here. It suffices to say that, when Plaintiffs are afforded all reasonable inferences, the facts show that Plaintiffs' First Amendment rights were violated. Specifically, a reasonable jury could find that Macaulay ordered the arrests of Plaintiffs simply because he disagreed with their political viewpoints.

If a jury were to believe Plaintiffs and disbelieve the law enforcement officers, a reasonable jury could find that Plaintiffs were silent, respectful and well-mannered at all times and were peacefully protesting President Bush and his policies in a public place, a sidewalk. Where, as here, the sidewalk was not cordoned off and there was no visible

---

[20](...continued)

Walsh confirms the testimony of Parker and Macaulay that the ticket-takers were pre-cleared to stand in the Bus Entrance area. He also testified that, after attendees began arriving but before the Rally, Parker notified him about the donation-takers. Walsh then contacted "event organizers," *id.* at 38, who told Walsh that the donation-takers were cleared. Macaulay then relayed this information to Parker. Walsh does not remember any ribbon-sellers or people sitting or standing on the chain-link fence east of the Bus Entrance. Like Macaulay, Walsh states that, "[t]o the extent that [R]ally attendees paused while in line due to the volume of attendees attempting to access the [R]ally, such temporary pauses would have been consistent with security restrictions so long as the attendees remained in line along the fence." *Id.*

Busch testified that he remembered individuals standing in restricted areas—including security personnel, money-takers and attendees waiting to get into the event. Busch testified that a superior told him that the Secret Service had cleared these individuals.

indication that the sidewalk was a restricted area, Plaintiffs were entirely justified in standing on the sidewalk until Parker ordered them to move. *See, e.g., Grace*, 461 U.S. at 180 (holding that sidewalks surrounding Supreme Court's building were public fora, because "[t]here is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave"). A reasonable jury could also then find that Plaintiffs repeatedly and fully complied with the various law enforcement officers' orders to first move off the sidewalk and then move off of the strip of grass between the north sidewalk and 42nd Street NE once they were informed that such restrictions were in force. The court knows of no law that forbids Plaintiffs from politely requesting the identification of plainclothes officers and then asking why protestors were being asked to move and non-protestors were not. To the contrary, the Supreme Court long ago recognized:

> [T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers . . . . The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.

*City of Houston v. Hill*, 482 U.S. 451, 461, 462-63 (1987).

A reasonable jury would not have to rely solely on Plaintiffs' own testimony to find that Macaulay targeted them on account of their viewpoint. Several third-party witnesses, a number of photographs and a videotape of the immediate aftermath of Plaintiffs' arrests tend to corroborate Plaintiffs' claims and contradict the claims of some of the law enforcement officers.

Steve DeMeulenaere, a local photographer, went to the event and took pictures. He testified that he saw two women standing near the Bus Entrance who, while he was watching them, were not told to move. He took two pictures of these women. He also

33

claims that four persons were sitting or standing near a retaining wall on the south side of 42nd Street NE but were not asked to move.

Julie Eisele, another protestor at the event, testified that she personally observed law enforcement officers singling out protestors while Bush supporters were allowed to do as they pleased. Eisele testified: "The treatment of protestors versus the treatment of individuals supporting President Bush's re-election effort by the law enforcement personnel was so obvious that the law enforcement officials may well have been wearing Bush for President buttons." Pl. App. at 4.

Douglas Kelly, who lived southwest of Noelridge Park on Council Street, testified:

> I [took] the day off of work and sat in a lawn chair outside of my wife's place of business, AAA Travel Agency, which is located on 42nd Street just west of Council Street. From that position, I observed numerous law enforcement officers, including Iowa State Patrol officers and Secret Service agents[,] confront and harass protestors.
>
> &ast; &ast; &ast; &ast;
>
> I did not see any Iowa State Patrol officer or any Secret Service agent harass, intimidate or even require a non-protestor to move out of the street or to the south side of 42nd Street. The State troopers and the Secret Service agents said nothing to the individuals who were there to support the President Bush re-election rally. All of their efforts were focused on harassing people who were identifying themselves as protestors in some way.

*Id.* at 7-8.

Jessica McAninch a/k/a Jessica Mortvedt, a reporter for a local television station, testified that, like Plaintiffs, she had heard that there would be a protest at the pool house. She was told that the sidewalk north of 42nd Street NE was off-limits entirely and that she had to keep moving on the south sidewalk. She walked on the south sidewalk and saw "many people who appeared to be supporters of President Bush standing, talking and/or milling about on the North side of 42nd Street." *Id.* at 10. She then testified:

34

> I did not see or hear any Secret Service agent or State Trooper
> order those people to move to the South side of 42nd Street, or
> threaten those people with arrest if they did not keep moving.
> I observed Secret Service agents and Iowa State Patrol
> Troopers seek out and order any one protesting President
> Bush's visit to move to the South side of 42nd Street, and keep
> moving, or they would be arrested. My distinct impression
> and belief, formed at that time by observing the actions of the
> Secret Service at the scene of the rally, was that agents were
> specifically seeking out and confronting protestors and leaving
> Bush supporters alone.

*Id.*

McAninch's cameraman took video of the immediate aftermath of Plaintiffs' arrests. The videotape corroborates Plaintiffs' claims that they were fully compliant and were moving southward when they were arrested.[21] The video shows McCabe handcuffed in the middle of 42nd Street NE and Nelson handcuffed on the far southern side of 42nd Street NE. *See* Pl. App. 27 and 28 (frames of videotape showing a trooper escorting McCabe, as McCabe is in the middle of 42nd Street NE); Pl. App. 26 (frame of videotape showing a trooper holding a handcuffed Nelson by her arm, while Nelson stands on the southernmost side of 42nd Street NE). It is undisputed that Troopers Bailey and Busch moved Plaintiffs directly north after arresting Plaintiffs and did not move them southward.[22] Therefore, it follows that McCabe and Nelson were arrested, at the very least, in the middle of 42nd Street NE or at the far southern end of 42nd Street NE, respectively.

In sum, the court holds that, when taken in the light most favorable to Plaintiffs, the facts alleged show that Macaulay's conduct violated Plaintiffs' First Amendment rights.

---

[21] Indeed, the videotape proves that, in some of their testimony, McCabe and Nelson *underestimated* their southward movement.

[22] Macaulay and Parker neither admit nor deny that Plaintiffs were "directly escorted" to the pool house. *See* I.F.D. App. at 315-16 (Macaulay), 319 (Parker).

Under Plaintiffs' version of the facts, Plaintiffs were complying with the orders of law enforcement and leaving the vicinity of the Bus Entrance when they were arrested. Such version of the facts suggests that Macaulay ordered Plaintiffs' arrests because he disagreed with the viewpoints they were espousing against President Bush and the Iraq war; other individuals, who were not complying with the security restrictions, were not arrested because they had different, preferred beliefs. Macaulay offers no compelling and narrowly-drawn justification for enforcing a content-based restriction against Plaintiffs, and the court finds none. *See Perry*, 460 U.S. at 45 ("For the [government] to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.").

## B.  Clearly Established

Having found that the facts, when taken in the light most favorable to Plaintiffs, show Macaulay's conduct violated Plaintiffs' First Amendment rights, the court turns to consider whether such rights were clearly established in light of the specific context of the case. *Scott*, 127 S. Ct. at 1774. It was abundantly clear at the time of the Rally that the First Amendment would not tolerate a federal law enforcement officer commanding state law enforcement officers to arrest a person based upon the content of their speech. *See, e.g., R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 391-92 (1992) (forbidding content-based discrimination); *Rank v. Hamm*, No. 2:04-0997, 2007 WL 894565, *8 (D. W. Va. Mar. 21, 2007) (holding that "it was abundantly clear at the time of [a Presidential address on July 4, 2004] that the First Amendment would not tolerate an individual, clothed with the authority of the state, commanding law enforcement to seize and expel a person from a public event based upon the content of that individual's speech") (citing *Colum. Union Coll. v. Clarke*, 159 F.3d 151, 170 (4th Cir. 1998) ("Government must not be permitted to silence one side of a debate . . . while permitting other more favored views to flourish unopposed.")).

Case 1:05-cv-00073-LRR   Document 152   Filed 09/04/07   Page 36 of 49

## C. Conclusion

Accordingly, to the extent Macaulay seeks qualified immunity on Plaintiffs' First Amendment claims, the Renewed Motion is denied.

## IX. FOURTH AMENDMENT CLAIMS

The court first considers whether, taken in the light most favorable to Plaintiffs, the facts alleged show Macaulay's conduct violated Plaintiffs' Fourth Amendment rights. *Scott*, 127 S. Ct. at 1774. The court then considers whether such rights were clearly established in light of the specific context of the case. *Id.*

### A. Violation of Fourth Amendment Rights

#### 1. Overview of Fourth Amendment law

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "The Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the [g]overnment or those acting at their direction." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 613-14 (1989). More specifically, it "protects two types of expectations, one involving 'searches,' the other 'seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Following the parties' lead, the court examines Plaintiffs' search-related and seizure-related rights separately.

#### 2. Search-related rights

Plaintiffs argue that Macaulay violated their search-related Fourth Amendment rights when Mais strip searched them at the Linn County Jail. These claims, however, must fail for the same reason that all of Plaintiffs' claims against Michael and Parker fail:

37

put simply, a law enforcement officer who was not involved in the allegedly unconstitutional actions of his fellow officers has not violated constitutional rights and is entitled to qualified immunity. *See Wilson*, 441 F.3d at 591 ("Liability for a federal constitutional tort is personal, [and] each defendant's conduct must be independently assessed."). It is undisputed that Macaulay did not participate in the strip search and cavity inspections of Plaintiffs and did not authorize such measures. Macaulay had no authority over the Linn County Jail or any knowledge of the practices there. Indeed, it was the policy of the Linn County Jail *not* to strip search persons in Plaintiffs' circumstances; under such circumstances, it was not foreseeable to Macaulay that Mais would strip search Plaintiffs. *See, e.g., Grayson*, 454 F.3d at 809-10.

Accordingly, the court shall dismiss that portion of Plaintiffs' Fourth Amendment claims that allege a search-related violation against Macaulay.

### 3. *Seizure-related rights*

#### a. *Unreasonable warrantless seizures*

Plaintiffs contend Macaulay violated their Fourth Amendment rights when he ordered their arrests. Here, the connection between Macaulay and the alleged conduct of the state law enforcement officers is direct and substantial: Macaulay personally ordered Troopers Bailey and Busch to arrest Plaintiffs. As the court's discussion in Part VIII shows, a reasonable jury could find that Macaulay ordered Plaintiffs' arrests because he disagreed with the viewpoints they were expressing at the Rally. Clearly, effectuating such an arrest is a violation of the Fourth Amendment, as well as the First Amendment; it is plainly unreasonable for a law enforcement officer to effect a warrantless seizure of an individual simply because the law enforcement officer disagrees with the content or viewpoint of the individual's speech. *See, e.g., Barham v. Ramsey,* 434 F.3d 565, 576 (D.C. Cir. 2006) (holding that the First Amendment and Fourth Amendment were coterminous on facts of the case, because "[t]he Fourth Amendment demands nothing

less"); *MacKinney v. Nielsen*, 69 F.3d 1002, 1007 (9th Cir. 1995) ("[P]olice may not exercise 'the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment.'" (quoting *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990)).

### b.    No arguable probable cause

Macaulay rejoins that he is entitled to qualified immunity, because there was "arguable probable cause" that Plaintiffs had violated Iowa Code section 719.1(1), 18 U.S.C. § 1752 and/or 18 U.S.C. § 3056(d). *See Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005) (reiterating that "the governing standard for a Fourth Amendment unlawful arrest claim 'is not probable cause in fact but arguable probable cause . . . that is, whether the officer should have known that the arrest violated plaintiff's clearly established right.'" (quoting *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996)). The court considers each statute, in turn.

### i.    Iowa Code § 719.1(1)

Iowa Code section 719.1(1) provides that "[a] person who knowingly resists or obstructs anyone known by the person to be a peace officer . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer . . . commits a simple misdemeanor." Iowa Code § 719.1(1). Here, Macaulay did not have arguable probable cause to arrest Plaintiffs under such statute, because Plaintiffs did not knowingly resist or obstruct a known peace officer. Plaintiffs insist they were complying with the law enforcement officers' orders and merely asking questions. In other words, Plaintiffs did not "'put obstacles in the paths of officers completing their duties'" or otherwise "hinder[]" their efforts." *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1107 (8th Cir. 2004) (quoting *State v. Hauan*, 361 N.W.2d 336, 339 (Iowa Ct. App. 1984)). Simply "object[ing]" or even passively "failing to cooperate" with law enforcement officers does not provide arguable probable cause under Iowa Code section 719.1(1); the statue requires

Case 1:05-cv-00073-LRR   Document 152   Filed 09/04/07   Page 39 of 49

proof that the defendant "active[ly] interfer[ed]" with the law enforcement officer. *State v. Smithson*, 594 N.W.2d 1, 2 (Iowa 1999) (citation and internal quotation marks omitted); *see, e.g., State v. Holmes*, No. 00-950, 2001 WL 1577584, *2 (Iowa Ct. App. Dec. 12, 2001) (holding no probable cause for arrest under Iowa Code § 719.1(1), where there was no evidence of active interference). Even if Plaintiffs' simple questions towards Parker, Macaulay and Troopers Bailey and Busch could be construed as "verbally harassing," the Iowa Code makes clear that "[t]he terms 'resist' and 'obstruct' . . . do not include verbal harassment unless the verbal harassment is accompanied by a present ability and apparent intention to execute a verbal threat physically." Iowa Code § 719.1(3). Plaintiffs did not demonstrate any such ability or intention.

### ii.    18 U.S.C. § 3056(d)

The same reasoning applies with equal force to Macaulay's argument in support of arguable probable cause under 18 U.S.C. § 3056(d). At the time of Plaintiffs' arrests, § 3056 provided:

> **(d)** Whoever knowingly and willfully obstructs, resists, or interferes with a Federal law enforcement agent engaged in the performance of the protective functions authorized by this section or by section 1752 of this title shall be fined not more than $1,000 or imprisoned not more than one year, or both.

18 U.S.C. § 3056 (2004) (emphasis in original). Elsewhere, § 3056 expressly authorizes Secret Service agents such as Macaulay to engage in the performance of protective functions. *Id.* 3056(a)(1). However, "[t]he congressional grants of authority to the [S]ecret [S]ervice to protect the president . . . cannot be said to authorize procedures or actions violative of the Constitution." *Sherrill v. Knight*, 569 F.2d 124, 128 n.14 (D.C. Cir. 1977).

If Plaintiffs' version of the facts is accepted as true, Macaulay did not have arguable probable cause to believe Plaintiffs had violated § 3056(d). As indicated, a reasonable jury

could find that Plaintiffs repeatedly and fully complied with the various law enforcement officers' orders to first move off the sidewalk and then move off the strip of grass between the north sidewalk and 42nd Street NE. Section 3056 requires proof that the defendant "knowingly" and "willfully" "obstruct[ed], resist[ed], or interfer[ed] with" a Secret Service agent. Viewed in the light most favorable to Plaintiffs and affording them all reasonable inferences, the facts do not show any such actions on the part of Plaintiffs.

### iii.    18 U.S.C. § 1752

At the time of Plaintiffs arrests, 18 U.S.C. § 1752 provided:

> **§ 1752. Temporary residences and offices of the President and others**
>
> (a) It shall be unlawful for any person or group of persons--
>
> (1) willfully and knowingly to enter or remain in
> . . . .
> (ii) any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting,

18 U.S.C. § 1752 (2004) (emphasis in original). Here, Plaintiffs were not in a posted or cordoned off area when they were standing on the sidewalk near the Bus Entrance. At most, they were unwittingly standing in an "otherwise restricted area of a . . . grounds where the President . . . [would] be temporarily visiting." Id.[23] However, on Plaintiffs' version of the facts, there is no evidence that Plaintiffs willfully and knowingly entered or

---

[23] The court notes that it is presently an open question whether an "otherwise restricted area" "must be physically demarcated." *United States v. Bursey*, 416 F.3d 301, 307 (4th Cir. 2005) (discussing two principles of statutory construction, *noscitur a sociis* and *ejusdem generis*). For purposes of qualified immunity analysis, the court assumes that the "otherwise restricted area" need not be physically demarcated. Macaulay proceeds on the same assumption.

41

remained in such a restricted area. Instead, Plaintiffs fully complied with the law enforcement officers' orders to move, once the law enforcement officers notified them of the security restrictions in place.

Plaintiffs' version of the facts is clearly distinguishable from the seminal reported case sustaining a conviction under § 1752. In *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005), the Secret Service established a restricted area at an airport. 416 F.3d at 304. The defendant, a protestor, entered the restricted area and refused law enforcement officers' orders to move. *Id.* at 305. The Fourth Circuit Court of Appeals affirmed the defendant's conviction, because he refused to leave the restricted area despite the fact that "he knew that the President was visiting the area, that the area was deemed restricted by law enforcement, and that he had been ordered to leave." *Id.* at 309.

Accordingly, the court holds that Macaulay did not have arguable probable cause to arrest Plaintiffs under 18 U.S.C. § 1752.

### B. Clearly Established

Having found that the facts, when taken in the light most favorable to Plaintiffs, show Macaulay's conduct violated Plaintiffs' Fourth Amendment rights, the court turns to consider whether such rights were clearly established in light of the specific context of the case. *Scott*, 127 S. Ct. at 1774. For the most part, Macaulay does not challenge the clearly established nature of Plaintiffs' Fourth Amendment rights on the facts as presented in this order. *See, e.g., Barham,* 434 F.3d at 575-76 (D.C. Cir. 2006); *MacKinney*, 69 F.3d at 1007.

Macaulay does specifically argue that Plaintiffs' Fourth Amendment rights cannot be "clearly established," because there is little existing precedent on some issues under Iowa Code section 719.1(1). *See Lawyer*, 361 F.3d at 1108 (lamenting "lack of detailed judicial guidance on the interplay among the statutory terms 'obstruct,' 'resist,' and 'verbal harassment'" in Iowa Code 719.1(1)). Even if Iowa Code section 719.1(1) is not a model

42

of clarity, however, it was abundantly clear at the time of the Rally that the Fourth Amendment would not tolerate a federal law enforcement officer commanding state law enforcement officers to arrest a person based upon the content of her speech. Macaulay's apparent interpretation of the statute, which would criminalize asking law enforcement officers polite questions, is plainly unconstitutional under the First Amendment and wholly incompatible with precedent. *See Hill*, 482 U.S. at 461-62 (reaffirming the rights of citizens to verbally oppose and challenge police action); *see also State v. Brecunier*, 564 N.W.2d 365, 369 (Iowa 1997) (affirming conviction under Iowa Code § 719.1(1) over constitutional objection, where the defendant was not "merely engaging the officers in a constitutional dialogue concerning [a] warrantless entry," but rather took unlawful actions against them); *State v. Donner*, 243 N.W.2d 850, 854 (Iowa 1976) (finding it sufficient if the defendant engaged in opposition to the officer using actual or constructive force).

## C. Conclusion

To the extent Macaulay seeks qualified immunity on Plaintiffs' Fourth Amendment claims, the Renewed Motion is denied.

## X. EQUAL PROTECTION CLAIMS

In Count IV of their Fourth Amended Complaint, Plaintiffs assert that Macaulay "violated the rights of [Plaintiffs] to equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution . . . ." However, the Equal Protection Clause of the Fourteenth Amendment does not apply to federal actors such as Macaulay. *See, e.g., Kills Crow v. United States*, 451 F.2d 323, 325 (8th Cir. 1971) ("To be noted at the outset is that . . . the Equal Protection Clause of the Fourteenth Amendment does not apply to the federal government . . . ."). Rather, "an action that violates the [F]ourteenth [A]mendment guarantee of equal protection when committed by a state actor violates the due process guarantee of the *[F]ifth [A]mendment* when committed by a federal actor." *United States v. Greene*, 995 F.2d 793, 795 (8th Cir. 1993) (emphasis added).

43

Plaintiffs have already sought and received *four* opportunities to amend their original Complaint. The Individual Federal Defendants pointed out the deficiency in Plaintiffs' pleading with respect to the Equal Protection Clause over a year ago, *see* Motion for Summary Judgment (docket no. 67-6) at 23 n.18, and Plaintiffs have not moved to amend their Fourth Amended Complaint. Accordingly, the court shall dismiss Count IV of the Fourth Amended Complaint with respect to Macaulay. *See Meehan v. United Consumers Club Franchising Corp.*, 312 F.3d 909, 913 (8th Cir. 2002) (quoting *Carlson v. Hyundai Motor Co.*, 164 F.3d 1160, 1162 (8th Cir. 1999)) ("'A district court does not abuse its discretion in failing to invite an amended complaint when plaintiff has not moved to amend and submitted a proposed amended pleading.'").

## XI.  *42 U.S.C. § 1985(3) CLAIMS*

Plaintiffs also assert claims under the so-called "support and advocacy clause" of 42 U.S.C. § 1985(3).[24]  Macaulay seeks summary judgment on qualified immunity grounds with respect to such claims on the assumption that the court would hold that Plaintiffs' First Amendment claims lacked merit. For example, with respect to the § 1985(3) claim, Macaulay reasons:

> The support and advocacy clause protests only the right "to cast a ballot and [to] have it honestly counted" and those rights

---

[24] The "support and advocacy" clause of 1985(3) reads as follows:

> or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy . . . .

42 U.S.C. § 1985(3); *Federer v. Gephardt*, 363 F.3d 754, 760 n.5 (8th Cir. 2004).

44

already protected by the First Amendment." *Gill v. Farm Bureau Life Ins. Co. of Mo.*, 906 F.2d 1265, 1270-71 (8th Cir. 1990); *cf. Federer[ v. Gephardt]*, 363 F.3d [754,] 760 [(8th Cir. 2004)] (interpreting claim for interference with political candidacy as coterminous with First Amendment claim). In this case, [P]laintiffs have never contended that any of the [I]ndividual [F]ederal [D]efendants interfered with [P]laintiffs' casting of a ballot. Moreover, as demonstrated above, [P]laintiffs have no viable First Amendment claim . . . . This [c]ourt should therefore grant Macaulay . . . summary judgment under the support and advocacy clause of § 1985(3).

Brief (docket no. 103-3), at 30.

The court held in Part VIII of the instant Order that Plaintiffs' First Amendment claims survive summary judgment. Accordingly, the court shall also deny the Renewed Motion with respect to Plaintiffs' § 1985(3) claims.

## XII. DISPOSITION

### IT IS THEREFORE ORDERED THAT:

(1)    The Renewed Motion for Summary Judgment (docket no. 103) filed by Defendants Bruce Macaulay, Michael Parker and Holly Michael is **GRANTED IN PART AND DENIED IN PART**;

(2)    Michael Parker and Holly Michael are dismissed from this lawsuit, that is, all of Plaintiffs' remaining claims against Michael Parker and Holly Michael are dismissed;

(3)    Counts I and II of the Fourth Amended Complaint as to Bruce Macaulay remain for trial;

(4)    Count III of the Fourth Amended Complaint, insofar as it alleges violations of Plaintiffs' search-related Fourth Amendment rights against Macaulay, is dismissed;

(5)    Count III of the Fourth Amended Complaint, insofar as it alleges violations

45

of Plaintiffs' seizure-related Fourth Amendment rights against Macaulay, remains for trial;

(6)     Count IV of the Fourth Amended Complaint is dismissed as to Bruce Macaulay; and

(7)     Count VI of the Fourth Amended Complaint as to Bruce Macaulay remains for trial.

**IT IS SO ORDERED.**

**DATED** this 4th day of September, 2007.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA



## FIGURE 1

Noelridge Park with Depiction of Stage Area



Stage Area

FIGURE 2



EXHIBIT
47

11/28/06

**FIGURE 3**