**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | | |
|---|---|---|
| ALICE MCCABE and CHRISTINE NELSON, | | |
| Plaintiffs, | | No. 05-CV-73-LRR |
| vs. | | **ORDER** |
| BRUCE MACAULAY, TROY BAILEY, RICK BUSCH, THE IOWA STATE PATROL, MICHELLE MAIS and LINN COUNTY, IOWA, | | |
| Defendants. | | |

---

### *TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**
II.    **RELEVANT PRIOR PROCEEDINGS** . . . . . . . . . . . . . . . . . . . . . . . . **1**
     A.    *Fourth Amended Complaint* . . . . . . . . . . . . . . . . . . . . . . . . . . **1**
     B.    *Motion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
III.   **LEGAL STANDARD FOR SUMMARY JUDGMENT** . . . . . . . . . . . . . . **4**
IV.   **FACTUAL FINDINGS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
     A.    *The Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
     B.    *Noelridge Park* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
     C.    *The Rally* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
          *1.*    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
               *a.*    *Physical barriers* . . . . . . . . . . . . . . . . . . . . . . . **7**
               *b.*    *Restrictions on entry* . . . . . . . . . . . . . . . . . . . . **7**
               *c.*    *Restrictions on pedestrian traffic* . . . . . . . . . . . . . . **9**
               *d.*    *Stationing of law enforcement officers* . . . . . . . . . . **9**
          *2.*    *Invitations to protest* . . . . . . . . . . . . . . . . . . . . . . . . . **9**
          *3.*    *Plaintiffs' arrests* . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
               *a.*    *Plaintiffs walk to the Bus Entrance* . . . . . . . . . . . **10**
               *b.*    *Troopers Bailey and Busch confront Plaintiffs* . . . . . **11**
          *4.*    *Detention at the poolhouse* . . . . . . . . . . . . . . . . . . . . **13**
          *5.*    *Cavity inspections* . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
          *6.*    *All charges dropped* . . . . . . . . . . . . . . . . . . . . . . . . . **14**

V.      THE ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15
VI.     THE IOWA STATE PATROL . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15
VII.    STATE CONSTITUTIONAL CLAIMS . . . . . . . . . . . . . . . . . . . . .   17
        A.    *Iowa Analogue to* Bivens  . . . . . . . . . . . . . . . . . . . . . . . . . .   18
        B.    Failure to Exhaust Administrative Remedies . . . . . . . . . . . . . .   20
VIII.   GENERAL PRINCIPLES OF QUALIFIED IMMUNITY . . . . . . . . . .   21
IX.     FIRST AMENDMENT CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . .   22
        A.    Were Plaintiffs' First Amendment Rights Violated? . . . . . . . . .   23
              1.    Overview of First Amendment law . . . . . . . . . . . . . . .   23
              2.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25
        B.    Were Plaintiffs' First Amendment Rights Clearly Established? . .   31
        C.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32
X.      FOURTH AMENDMENT CLAIMS . . . . . . . . . . . . . . . . . . . . . . . .   32
        A.    Were Plaintiffs' Fourth Amendment Rights Violated? . . . . . . . .   32
              1.    Overview of Fourth Amendment law . . . . . . . . . . . . . . .   32
              2.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
                    a.    Search-related rights . . . . . . . . . . . . . . . . . . . . .   33
                    b.    Seizure-related rights . . . . . . . . . . . . . . . . . . . . .   33
                          i.     Iowa Code § 321.229 . . . . . . . . . . . . . . . . . .   34
                          ii.    Iowa Code § 719.1(1)  . . . . . . . . . . . . . . . .   35
                          iii.   Iowa Code § 716.8  . . . . . . . . . . . . . . . . . .   36
                          iv.    Iowa Code § 723.4  . . . . . . . . . . . . . . . . . .   36
        B.    Were Plaintiffs' Fourth Amendment Rights Clearly Established? .   37
        C.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38
XI.     FOURTEENTH AMENDMENT AND
        42 U.S.C. § 1985(3) "SUPPORT OR ADVOCACY" CLAIMS . . . . . . .   38
XII.    REMAINING CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39
XIII.   DISPOSITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

Case 1:05-cv-00073-LRR   Document 162   Filed 10/01/07   Page 2 of 40

# I. INTRODUCTION

The matter before the court is the Motion for Summary Judgment (docket no. 136) ("Motion"), filed by Defendants Troy Bailey ("Trooper Bailey"), Rick Busch ("Trooper Busch") and The Iowa State Patrol (collectively "State Defendants").

# II. RELEVANT PRIOR PROCEEDINGS

## A. Fourth Amended Complaint

On September 5, 2006, Plaintiffs Alice McCabe and Christine Nelson filed a six-count Fourth Amended and Substituted Complaint and Jury Demand ("Fourth Amended Complaint"). In the first five counts of the Fourth Amended Complaint, Plaintiffs allege that the State Defendants infringed upon Plaintiffs' federal and state constitutional (1) rights to freedom of speech, (2) rights to freedom of assembly, (3) rights against unreasonable searches and seizures, (4) rights to equal protection and (5) rights to substantive due process. *See* U.S. Const. amends. I (speech and assembly), IV (search and seizure) and XIV (equal protection and due process); Iowa Const. art. I, §§ 6 (equal protection), 7 (speech), 8 (searches and seizures), 9 (due process) and 20 (assembly). In the sixth count of the Fourth Amended Complaint, Plaintiffs claim that the State Defendants conspired to violate such rights, in violation of 42 U.S.C. § 1985(3). Trooper Busch and Trooper Bailey are sued in their individual capacities, not their official capacities.[1]

---

[1] The Fourth Amended Complaint states that Trooper Bailey "is sued both individually and in his official capacity." Fourth Amended Complaint at ¶ 11. The Supreme Court has recognized that, whereas "official-capacity suits 'generally represent only another way of pleading an action against an entity of which the officer is an agent' . . . . [and] should be treated as suits against the State," *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)), "[p]ersonal-capacity suits . . . seek to impose individual liability upon a government officer for actions taken under color of state law," *id.* In the Motion, the State Defendants marshal a number of arguments against the Fourth Amended Complaint to the extent that it raises official-

(continued...)

3

### B.  Motion

On March 30, 2007, the State Defendants filed the Motion.  On April 23, 2007, Plaintiffs filed a Resistance.  The Motion is fully submitted and ready for decision.  *See* LR 7.1.c.

### III.  LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is material when it is a fact that "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248.  The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)); *see also Scott v. Harris*, 127 S. Ct. 1769, 1775 (2007) (restating same principles and remarking that "[i]n qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts").  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 127 S. Ct. at 1776.

------------------------

[1](…continued)
capacity claims.  In their Resistance, Plaintiffs concede that all claims against Troopers Bailey and Busch are personal-capacity claims only.  *See, e.g.*, Pl.'s Brief in Support of Resistance (docket no. 146-4), at 8 ("Plaintiffs' claim is a personal capacity lawsuit seeking to impose individual liability on government officers for actions taken under color of state law.").

4

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see, e.g., Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## IV. FACTUAL FINDINGS

When viewed in the light most favorable to Plaintiffs and affording them all reasonable inferences, the material facts are these:[2]

### A. The Players

Plaintiffs are two Iowa residents who disagree with the policies of President George

_____

[2] The relevant appendices for the Motion are (1) "Appendix (Corrected) to Plaintiffs' Resistance to Federal Defendants' Renewed Motion for Summary Judgment (filed non-electronically on March 6 and 8, 2007); (2) "Supplemental Appendix to Plaintiffs' Resistance to State Defendants' Motion for Summary Judgment" (docket no. 146); and (3) "Appendix in Support of Resistance to Plaintiffs' Motion for Summary Judgment and Cross Motion for Summary Judgment on Behalf of [State Defendants]" (filed non-electronically on March 29, 2007). A more elaborate version of the facts may be found in the court's recent Order (docket no. 152), in which the court granted in part and denied in part a motion for summary judgment filed by other defendants in the case.

5

W. Bush and oppose the Iraq War. Troy Bailey and Rick Busch are Troopers with the Iowa State Patrol. The Iowa State Patrol is a division of the Iowa Department of Public Safety, the State of Iowa's chief law enforcement agency. The Iowa State Patrol has employed Trooper Bailey since 1995 and Trooper Busch since 1992.

### B. Noelridge Park

Noelridge Park ("Park") is a public park in the City of Cedar Rapids, Iowa ("City"). The Park is bounded on its south side by 42nd Street NE and on its west side by Council Street NE.

In the southwest corner of the Park, there is a large parking lot. Two driveways provide access to the parking lot from 42nd Street NE. A pool house, an aquatics center and tennis courts are located east of the parking lot.

Directly north of the parking lot is a large open space. This open space is bounded on its north side by a small access road, on its south side by the parking lot, on its west side by Council Street NE and on its east side by the aquatics center and pool house, some trees and a playground.

### C. The Rally

#### 1. Background

The Iowa State Patrol assigned Troopers Bailey and Busch to provide dignitary protection and security at a rally ("Rally") for President Bush at the Park on September 3, 2004. Upon arriving at the Park on September 3, 2004, Troopers Bailey and Busch attended a briefing. United States Secret Service ("Secret Service") agents and local law enforcement officers presided over the briefing. They told Troopers Bailey and Busch that the Park was rented for the day and was to be treated as private property. They also told Troopers Bailey and Busch that there were security measures in place around the Park. Such measures included (1) constructing physical barriers between the Park and adjoining rights-of-way, (2) imposing restrictions upon entry to the Park and (3) imposing

restrictions on pedestrian traffic on adjoining rights-of-way.

### a.    *Physical barriers*

Law enforcement officers set up physical barriers between the Park and adjoining rights-of-way.  Large trucks and other heavy equipment were placed along the east side of Council Street NE and the north side of 42nd Street NE between Council Street NE and the eastern driveway to the parking lot.  Portable toilets were placed within the Park, and snow fences were constructed around the Park.

### b.    *Restrictions on entry*

Law enforcement officers imposed restrictions on entry to the Park.  Although Rally attendees were permitted to enter the Park by shuttle bus or on foot, the eastern driveway to the parking lot was designated as the sole access point to the Rally.  Magnetometers were placed in the parking lot to screen attendees for weapons.

Attendees arriving by shuttle bus parked at remote lots and rode to the Rally.  The Park's parking lot was converted into an unloading zone for such attendees.  Shuttle buses periodically approached the Park on 42nd Street NE, entered the parking lot at its eastern driveway ("Bus Entrance"), dropped off attendees and then exited the parking lot through the western driveway.  The attendees presented their tickets as they stepped off the shuttle buses and then passed through the magnetometers to be screened for weapons.  Attendees arriving on foot entered the Rally via the Bus Entrance, presented their tickets to event volunteers and passed through the magnetometers.

### c.    *Restrictions on pedestrian traffic*

Pedestrian traffic on the roadways and sidewalks adjacent to the Park was limited to *moving* pedestrians.  That is, pedestrians were not allowed to stand or congregate.  The specific restrictions upon pedestrian traffic were as follows:

> • only authorized personnel were allowed on the eastern sidewalk of Council Street NE and the north sidewalk of 42nd Street NE between the intersection with Council Street NE and

Case 1:05-cv-00073-LRR   Document 162   Filed 10/01/07   Page 7 of 40

a point ten feet west of the Bus Entrance;

- members of the general public with tickets could enter the Rally at the Bus Entrance, but they were required to approach the Bus Entrance from the east along the north sidewalk of 42nd Street NE;

- members of the general public were not allowed to stop and stand in or around the Bus Entrance or east of the Bus Entrance on the north sidewalk of 42nd Street NE, because they had to be moving into or away from the Rally at all times;[3] and

- only moving pedestrians were allowed on the south sidewalk of 42nd Street NE.

These restrictions on pedestrian traffic were neither posted for public view nor part of a formal statute or regulation.

These restrictions against standing or congregating pedestrians were necessary to

---

[3] In most of their sworn statements, the law enforcement officers in this case have implied that pedestrians were permitted to stand in some places on the north sidewalk east of the Bus Entrance. *See, e.g.*, Declaration of Macaulay, State Def. App. at 18 ("[M]embers of the general public were not allowed to stand in and around the [B]us [E]ntrance[.]"); Declaration of Michael, *id.* at 23 (same); Macaulay's Response to Interrogatories, Pl. App. at 30 ("On the north side of 42nd Street west of the eastern driveway, pedestrians were allowed, but those pedestrians within a certain distance of the entrance were required to keep moving."); Michael's Response to Interrogatories, *id.* at 34 (same); Parker's Response to Interrogatories, *id.* at 38 (same). In other sworn statements, law enforcement officers state that members of the general public were not allowed to stop and stand east of the Bus Entrance on the north sidewalk of 42nd Street NE. *See, e.g.*, Declaration of Parker, State Def. App. at 28 ("East of my position and at the entrance to the driveway, pedestrians were allowed. However, no one was allowed to stop and stand in this area; everyone was required to keep moving."); First Declaration of Kevin Walsh, Pl. App. at 22 (stating that the north sidewalk east of the Bus Entrance was "designated for moving pedestrians only"); Second Declaration of Kevin Walsh, State Def. App. at 35 (same). The court adopts the latter version of the facts for purposes of the instant Order, because it is more favorable to Plaintiffs. *See Baer Gallery*, 450 F.3d at 820.

8

ensure the safety of all. For example, a group on the sidewalk, especially in the immediate vicinity of the Bus Entrance, could have (1) disrupted the flow of buses and pedestrians into the Rally, (2) impeded emergency evacuation or (3) made it more difficult for law enforcement to monitor the crowd for potential threats.

The security restrictions did not require that protestors be confined to any particular area. Rather, individuals were free to protest so long as their conduct was consistent with security restrictions. Further, the southwest corner of Council Street NE and 42nd Street NE was made available as a place for protestors to gather. The corner was within sight and earshot of most arriving attendees.

### d.   *Stationing of law enforcement officers*

Federal, state and local law enforcement officers, some in uniform and some in plainclothes, were assigned to monitor areas that were designated as sensitive for security reasons. They were also posted around the Park and adjoining areas to make sure that the public observed the established security restrictions. If law enforcement had been unable to enforce restrictions requiring pedestrians to keep moving in these areas, the Rally would not have been sufficiently secure. The Iowa State Patrol stationed Troopers Bailey and Busch in the south side of the Park.

### 2.   *Invitations to protest*

On September 1, 2004, Joel Miller, Chairman of the Linn County Democratic Party, obtained permission from Cedar Rapids Police Department Officer Steven M. O'Konek to hold a protest at the pool house. Miller sent an email to various registered Democrats in Eastern Iowa. The email, entitled "PEACEFUL PROTESTORS WANTED AND WELCOME!," Pl. App. at 65 (emphasis in original), invited the Democrats to gather "at the Noelridge Park Pool (aka Noelridge Aquatic Center)" on September 3 to protest President Bush's visit, *id.* It encouraged protestors to make a protest sign and bring it or, "[b]etter yet, make two and bring one to share with another protestor." *Id.*

9

The next morning, Miller forwarded the email to Officer O'Konek, as a courtesy.

Around the same time, a liberal political action group sent a similar email to Nelson. The email invited Nelson to protest the Iraq war at the pool house on September 3, 2004, the date of the Rally. Nelson decided to protest. In her own words, she wanted to "stand[] on the sidelines" and "be[] a quiet reminder that there was another point of view." *Id.* at 100.

Nelson invited McCabe, one of her friends, to protest with her. McCabe agreed. McCabe then invited one of her friends, Barb Hannon, to protest, too. Hannon agreed to protest. The three women decided to meet fellow protestors near the pool house on September 3, 2004.

On September 2, 2004, at approximately 4 p.m., Officer O'Konek sent Miller an email. Officer O'Konek informed Miller that the plans had changed and "[t]he pool house will be designated as being in the secure area." *Id.* at 65. Further, Officer O'Konek told Miller that "[t]he entire park has now been designated a secure area." *Id.* He stated, however, that "[t]here will be plenty of law enforcement [officers] to direct demonstrators to a location suitable for demonstrators," *id.*, and "[t]here will be a location for your demonstration," *id.* Plaintiffs and Hannon did not learn about this change in plans.

### 3. Plaintiffs' arrests

#### a. Plaintiffs walk to the Bus Entrance

On September 3, 2004, Plaintiffs and Hannon arrived in the vicinity of the Park on foot. McCabe carried an 8½" x 11" piece of paper that was affixed to a small yard sign. The phrase "Bad War No More" and a "W" with a slash through it were visible on the piece of paper. Nelson wore a small "Kerry-Edwards" button. Hannon wore a small "Kerry" button.

Plaintiffs and Hannon decided to walk to the pool house to meet other protestors. Plaintiffs and Hannon walked eastward along the south sidewalk of 42nd Street NE. They

10

crossed Council Street NE and continued eastward. At some point southeast of the Bus Entrance, approximately due south of the tennis courts, Plaintiffs and Hannon turned northward and crossed 42nd Street NE. At this point in time, Plaintiffs and Hannon were directly south of the tennis courts.

Plaintiffs and Hannon turned to the west and walked westward along the north sidewalk of 42nd Street NE (i.e., in the direction of the Bus Entrance). As the three women were walking, they noticed a number of people standing and sitting along a chain-link fence that separated the aquatics center from the north sidewalk. Plaintiffs and Hannon were looking for their protest group, but they could not find it. Plaintiffs and Hannon assumed that they had arrived too early.

While still walking westward on the sidewalk, Hannon met an acquaintance, Mike Weston. Weston was standing on the sidewalk collecting signatures on behalf of the City's Chamber of Commerce. Weston asked Hannon for her signature, to show her support for changing the City's form of government. Hannon talked with Weston for five to six minutes. McCabe and Nelson did not stop and continued walking to the pool house.

Plaintiffs stopped and stood on the sidewalk at a point immediately adjacent to the Bus Entrance. Plaintiffs believed that this was a place where they could meet their fellow protestors, but they did not recognize any protestors nearby. Nelson was "taking in the scenery and looking around," State Def. App. at 214, because she "had not been to a presidential rally before and . . . was just interested just to see what goes on," *id.*

###### b. *Troopers Bailey and Busch confront Plaintiffs*

At approximately 3:50 p.m., Troopers Bailey and Busch saw a Secret Service agent talking with Plaintiffs. The Secret Service agent and Plaintiffs were standing near the Bus Entrance. Other people were standing in the vicinity: (1) a man with a bucket was collecting donations on behalf of Republicans; (2) between ten and twenty people were sitting along the chain-link fence with their backs resting up against the fence, from the

Case 1:05-cv-00073-LRR   Document 162   Filed 10/01/07   Page 11 of 40

pool area to the tennis courts; (3) vendors were standing on both sides of the north sidewalk, selling yellow ribbons and "republican paraphernalia," *id.* at 222; and (4) people with clipboards were standing "close to where [Nelson] was standing initially," *id.* at 221. Nelson "assumed that [the people with clipboards] had either something like a petition or perhaps they were signing up voters." *Id.*

As Troopers Bailey and Busch approached Plaintiffs and the Secret Service agent, Trooper Bailey heard the Secret Service agent order McCabe to move. McCabe was "surprised" and "shocked" at Macaulay's request. *Id.* at 171. The Secret Service agent got up in McCabe's face and told her: "We own the park. You can't be here." *Id.* at 175.[4]

The Secret Service agent was not wearing a uniform. McCabe asked him who he was and why he was asking her to move. The Secret Service agent presented McCabe with his identification. McCabe asked the Secret Service agent, "Where am I supposed to go? I can't stand here?," Pl. App. at 91. McCabe then "back[ed] away because [she] felt like [the Secret Service agent] was really in [her] face." *Id.* at 92. McCabe backed up southward into 42nd Street NE. Trooper Bailey approached McCabe, and Trooper Busch approached Nelson.[5] While Troopers Bailey and Busch were approaching

---

[4] The State Defendants insist that McCabe did not comply with various orders to move out of the area of the Bus Entrance. However, Plaintiffs insist that they complied with such orders. This is one of many factual disputes in this case; these factual disputes are explained in more detail in Part IX.A.2 *infra*. Again, the court adopts Plaintiffs' version of the facts for purposes of the instant Order, because they are the non-moving parties. *See Baer Gallery*, 450 F.3d at 820.

[5] The court found for purposes of a prior order that the Secret Service agent ordered Troopers Bailey and Busch to arrest Plaintiffs. *See* Order (docket no. 152), at 18. The State Defendants do not include this factual allegation in their Statement of Material Facts (docket no. 136-2). Further, the State Defendants do not argue in the Motion that they are entitled to qualified immunity simply because they were following a federal agent's orders.

(continued…)

Case 1:05-cv-00073-LRR   Document 162   Filed 10/01/07   Page 12 of 40

Plaintiffs, McCabe was continuing to back away from the Secret Service agent into 42nd Street NE.

Trooper Bailey pursued McCabe. At no time did Trooper Bailey order McCabe to move. When McCabe reached the middle of 42nd Street NE, Trooper Bailey arrested her. Trooper Bailey was wearing his uniform.

Meanwhile, Trooper Busch approached Nelson. Up until this point in time, Nelson had not received any orders to move, although she was in earshot of the Secret Service agent and Trooper Bailey. Trooper Busch told Nelson "they owned the park that day," State Def. App. at 215, "we own this half of the street," *id.* at 216, and she had to move. Trooper Busch was wearing his uniform. Nelson complied and backed up into 42nd Street NE.

As Nelson was continuing to move southward, Trooper Busch repeatedly ordered Nelson to move. While Nelson was continuing to back up, Nelson said, "I'm not hurting anyone. Others are not moving." *Id.* Trooper Busch arrested her. Trooper Busch arrested Nelson on the south side of 42nd Street NE, at a point almost even with the south sidewalk.

### 4. *Detention at the poolhouse*

Trooper Bailey handcuffed McCabe, and Trooper Busch handcuffed Nelson. Both women were charged with Trespass, in violation of Iowa Code section 716.7 (2003). Trespass is classified as a simple misdemeanor under Iowa law when there is no damage to property or other extenuating circumstances. Iowa Code § 716.8(1). Troopers Bailey and Busch then led Plaintiffs north to the pool house, where they were detained.

At some point in time after McCabe's arrest, Hannon asked McCabe "[W]hat's going on?" State Def. App. at 152. Hannon saw a number of people standing within a

---

[5](...continued)
Accordingly, the court need not address this potential issue.

ten-yard radius: people were standing in the street, on the sidewalk and in the parking lot. Some people were selling magnetic, yellow, "Save Our Troops" ribbons; others were selling "G.O.P. t-shirts" and Bush campaign buttons. *Id.* at 153-54. Trooper Bailey "pointed a finger in [Hannon's] face and said do you want to be arrested, too?," *id.* at 152, and Hannon "took off running to the south side of the street," *id.*

### 5. Cavity inspections

While Plaintiffs were detained at the pool house, they were not searched. After a short time, the CRPD transported them to the Linn County Jail. Troopers Bailey and Busch had no authority over the Linn County Jail and had no knowledge of its practices. Troopers Bailey and Busch had no knowledge of what search, if any, might be performed on Plaintiffs.

Plaintiffs were booked into the Linn County Jail on the simple misdemeanor Trespass charges. Linn County Deputy Sheriff Michelle Mais conducted a "full strip search" of Plaintiffs. A "full strip search" includes having detainees bend over and spread their butt cheeks, and having an officer inspect their rectal area. While Nelson was searched, the top half of a door to the room in which she was searched was open.

In September of 2004, the policy of the Linn County Jail was to conduct full strip searches of only inmates charged with serious misdemeanors or higher level offenses, unless extenuating circumstances were present and the jailor received permission from a supervisor. Because Plaintiffs were only charged with simple misdemeanors and extenuating circumstances were not present, it was against Linn County Jail policy to strip search Plaintiffs. Further, Mais did not obtain approval from her supervisor to conduct full strip searches of Plaintiffs.

### 6. All charges dropped

On December 15, 2004, the Linn County Attorney dropped all criminal charges against Plaintiffs. Additional facts are set forth below, as necessary.

## V. THE ARGUMENTS

The State Defendants argue that they are entitled to judgment as a matter of law for four principal reasons.[6] First, The Iowa State Patrol contends that it should be dismissed from this lawsuit, because 42 U.S.C. § 1983 does not provide a remedy against state agencies. Second, Troopers Bailey and Busch argue that all of Plaintiffs' state constitutional claims must be dismissed, because "there [i]s no direct cause of action for alleged violations of the Iowa Constitution," Resistance (docket no. 136-4), at 8, and, in any event, Plaintiffs have failed to exhaust their administrative remedies on such claims. Third, Troopers Bailey and Busch argue that they are entitled to qualified immunity on Plaintiffs' § 1983 claims with respect to the First Amendment, Fourth Amendment, and Fourteenth Amendment, as well as their 42 U.S.C. § 1985(3) "support or advocacy" claims. Fourth, Troopers Bailey and Busch argue that the remaining claims should be dismissed "for the reasons set forth in this [c]ourt's prior decision relating to the Federal Defendants." Resistance (docket no. 136-4), at 5.

Plaintiffs resist some but not all of the State Defendants' grounds for dismissal. The court considers each of the State Defendant's arguments, in turn.

## VI. THE IOWA STATE PATROL

The Iowa State Patrol contends that it "must be dismissed from this action," Brief in Support of Motion (docket no. 136-4), at 6, because 42 U.S.C. § 1983 does not provide a remedy against state agencies. Plaintiffs do not resist this portion of the Motion, even though the State Defendants do not expressly discuss Plaintiffs' 42 U.S.C. § 1985(3) claims.

---

[6] These reasons are presented in a different sequence in the parties' briefs. Further, the court omits all discussion of the State Defendants' arguments against Plaintiffs' now-abandoned official-capacity claims. *See supra* note 1.

15

By its terms, 42 U.S.C. § 1983[7] and 42 U.S.C. § 1985(3)[8] only apply to

[7]  Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

[8]  If two or more persons in any State . . . conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State . . . from giving or securing to all persons within such State . . . the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President . . . ; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising

(continued...)

16

"persons." *Id.* It is settled that state agencies such as the Iowa State Patrol are not "persons" for purposes of § 1983 and § 1985. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 63-71 (1989) (holding state agency was not a "person" for purposes of § 1983); *Brown v. Mo. Dep't of Corr.*, 353 F.3d 1038, 1041 (8th Cir. 2004) (same); *Davis v. State*, No. 1999 WL 972165, *1 (8th Cir. Oct. 20, 1999) (unpublished per curiam decision) ("[W]e conclude the district court correctly dismissed the complaint because the State of Missouri and its agencies are not 'persons' under sections 1983 and 1985(3)."); *Rawlings v. Iowa Dep't of Human Servs.*, 820 F. Supp. 423, 428 (S.D. Iowa 1993) (granting summary judgment to the Iowa Department of Human Services, because it was a state agency and not a "person" for purposes of § 1983), *aff'd*, 16 F.3d 1228 (8th Cir. 1994); *see also Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005) ("Small cannot assert a § 1983 action against [the Illinois Department of Commerce and Community Affairs], for the simple reason that, as a part of the State of Illinois, it is not a 'person' . . . . Any possible claim under § 1985 is doomed for the same reason."). Therefore, all of Plaintiffs' claims against the Iowa State Patrol must be dismissed.

Accordingly, the court shall dismiss the Iowa State Patrol from this lawsuit with prejudice.

## VII.  STATE CONSTITUTIONAL CLAIMS

Troopers Bailey and Busch argue that all of Plaintiffs' state constitutional claims must be dismissed with prejudice, because "there [i]s no direct cause of action for alleged violations of the Iowa Constitution." Resistance (docket no. 136-4), at 8. In the

----

[8](...continued)

> any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

17

alternative, Troopers Bailey and Busch argue that such claims must be dismissed without prejudice, because Plaintiffs have failed to exhaust their administrative remedies.

### A. *Iowa Analogue to* Bivens

Plaintiffs maintain that they should be permitted to bring their state constitutional claims directly against Troopers Bailey and Busch under the common law.[9] Plaintiffs assert an Iowa analogue to a so-called "*Bivens* action." In *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 395 (1971), the Supreme Court recognized a right under the federal common law to recover damages against federal officials who violate certain federal constitutional rights. *Turner v. Holbrook*, 278 F.3d 754, 757 (8th Cir. 2002); *see also Carpenter's Produce v. Arnold*, 189 F.3d 686, 687 (8th Cir. 1999) ("*Bivens* actions are implied causes of action for damages against [federal] government officials for [federal] constitutional violations where Congress has not specifically provided for such a remedy."). Similarly, Plaintiffs imply a cause of action for damages against Iowa government officials for violations of the Iowa Constitution where the Iowa General Assembly has not specifically provided for such a remedy.

Troopers Bailey and Busch argue that the Iowa Supreme Court rejected the possibility of an Iowa analogue to *Bivens* in *Cunha v. City of Algona*, 334 N.W.2d 591

---

[9] It is settled that Plaintiffs may not bring their state constitutional claims against Troopers Bailey and Busch through 42 U.S.C. § 1983. To state a claim under 42 U.S.C. § 1983, Plaintiffs "must allege the violation of a right secured by the Constitution and laws of the United States . . . ." *West v. Atkins*, 487 U.S. 42, 48 (1988) (emphasis added); *see Chambers v. Gilmer*, 221 F.App'x 469, 470 (8th Cir. 2007) (per curiam) (dismissing 42 U.S.C. § 1983 claim that was predicated on a violation of a state statute). Violations of state constitutional rights are not "violation[s] of right[s] secured by the Constitution and laws of the United States." *West*, 487 U.S. at 48; *see, e.g., Edwards v. County of San Diego*, 124 F.App'x 547, 548-49 (9th Cir. 2005) (affirming dismissal of § 1983 claim predicated upon violation of provision of California Constitution, "because § 1983 only allows relief for violations of federal, rather than state, rights"); *Flynn v. Sandahl*, 58 F.3d 283, 290 (7th Cir. 1995) (affirming dismissal of § 1983 claim predicated upon violation of provision of Illinois Constitution).

18

(Iowa 1983). In *Cunha*, a former prisoner sued an Iowa county after a federal district court granted him habeas corpus relief. 334 N.W.2d at 593. The former prisoner alleged that "the acts of the county's law enforcement officers violated [his] right to . . . due process of law guaranteed by the United States and Iowa Constitutions . . . ." *Id.* After discussing *Bivens*, the Iowa Supreme Court held that the former prisoner failed to state a claim upon which relief could be granted. The Iowa Supreme Court reasoned that, although the Supreme Court had recently extended § 1983 liability to local governments in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), "[t]he current trend of opinion . . . appear[ed] to be against the existence of direct municipal liability for constitutional violations." *Cunha*, 334 N.W.2d at 595. The Iowa Supreme Court then quoted extensively from a treatise, whose author concluded that "local government damages liability for Fourteenth Amendment violations cannot be based solely on the Fourteenth Amendment using respondeat superior or any other theory of liability." *Id.*

*Cunha* is distinguishable. At most, *Cunha* rejects a direct cause of action under the due process clause of the Iowa Constitution for monetary damages against a local governmental entity for reasons expressed in *Monell*. It does not address whether there is an Iowa analogue to *Bivens* under the common law when, as here, Iowa government officials are alleged to have violated the Iowa Constitution and the Iowa General Assembly has not specifically provided a statutory remedy for such violations.

When, as here, there are no cases directly on point from the state's highest court, it is the duty of this court "to predict how the state's highest court would resolve that issue." *Continental Cas. Co. v. Advance Terrazzo & Tile Co.*, 462 F.3d 1002, 1007 (8th Cir. 2006). When faced with a novel state constitutional law issue, the Iowa Supreme Court often looks to the decisions of the United States Supreme Court and other state courts of last resort, when such courts have interpreted analogous constitutional provisions. *See, e.g.*, *In re Marriage of Howard*, 661 N.W.2d 183, 187 (Iowa 2003) (stating that

19

Supreme Court decisions were "helpful" but not binding and the decisions of state courts of last resort "could prove helpful"); *see also E.H. Emery & Co. v. Wabash R.R.*, 166 N.W. 600, 603 (Iowa 1918) (relying upon "a number of other state courts of last resort in similar cases" to decide a novel legal question).

As indicated, in *Bivens* the Supreme Court recognized a direct cause of action for violations of the United States Constitution against federal agents in their individual capacities. *Bivens*, 403 U.S. at 397. Similarly, the majority of state courts of last resort have recognized analogous causes of action for violations of state constitutions against state officers in their individual capacities. *Dorwart v. Caraway*, 58 P.3d 128, 133-34 & 133 n.1 (Mont. 2002) (recognizing cause of action for violations of the Montana Constitution and stating that nineteen states have recognized such actions, while seven states have rejected them) (citations omitted); *Binette v. Sabo*, 710 A.2d 688, 693-96 (Conn. 1998) (recognizing a private cause of action under the Connecticut Constitution and stating that "the great majority of state courts that have considered the question have recognized their authority to do so under their state constitutions") (citations omitted). Such recognition is consistent with the Restatement (Second) of Torts, which recognizes the inherent authority of a state court of last resort to create a remedy for violations of the state constitution. *See* Restatement (Second) of Torts § 874A (1979) (recognizing remedy for violations of state constitutional provisions) (cited with approval in *Countryman v. Mt. Pleasant Bank & Trust Co.*, 357 N.W.2d 599, 605 (Iowa 1984)). For all of these reasons, the court predicts that the Iowa Supreme Court would recognize an Iowa analogue to *Bivens*.

Accordingly, the court declines to dismiss all of Plaintiffs state constitutional law claims with prejudice.

### B. Failure to Exhaust Administrative Remedies

Troopers Bailey and Busch rejoin that, even if there is an Iowa analogue to *Bivens*,

any such claims must be dismissed without prejudice. Troopers Bailey and Busch contend that the Iowa Tort Claims Act ("ITCA"), Iowa Code chapter 669, requires Plaintiffs to exhaust their administrative remedies. It is undisputed that Plaintiffs did not exhaust their administrative remedies under the ITCA.

The ITCA provides that "a suit shall not be permitted for a claim under this chapter unless the attorney general has made final disposition of the claim." Iowa Code § 669.5(1) (2007). The ITCA defines a "claim" as:

> Any claim against an employee of the state for money only, on account of damage to or loss of property or on account of personal injury or death, caused by the negligent or wrongful act or omission of any employee of the state while acting within the scope of the employee's office or employment.

*Id.* § 669.2.

Plaintiffs' state constitutional claims are "claims" under the ITCA: Troopers Bailey and Busch are state employees, Plaintiffs seek monetary damages for personal injury caused by the wrongful acts of Troopers Bailey and Busch and Troopers Bailey and Busch were acting within the scope of their employment. *Id.* Therefore, Plaintiffs are required to exhaust their remedies under the ITCA.[10] *Id.* § 669.5(1).

Accordingly, the court shall dismiss Plaintiffs' state constitutional claims without prejudice. *See id.* at § 669.13(2) (providing plaintiffs six months to exhaust their administrative remedies).

## VIII. GENERAL PRINCIPLES OF QUALIFIED IMMUNITY

Troopers Bailey and Busch argue that they are entitled to qualified immunity on

---

[10] Plaintiffs point out that they were not required to exhaust administrative remedies under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, for their federal constitutional claims against the individual federal defendants in this case. *Carlson v. Green*, 446 U.S. 14. This, however, is in part a specific function of the FTCA. *See* 28 U.S.C. § 2679(b)(2)(A) (excluding *Bivens* actions from the FTCA). Plaintiffs do not point the court to any comparable provision in the ITCA.

21

Plaintiffs' § 1983 claims with respect to Plaintiffs' First Amendment, Fourth Amendment, Fourteenth Amendment and 42 U.S.C. § 1985(3) "support or advocacy" claims. The court must analyze issues of qualified immunity in two discrete steps. *Wright v. Rolette County*, 417 F.3d 879, 884 (8th Cir. 2005), *cert. denied*, 126 S. Ct. 1338 (2006).

> In resolving questions of qualified immunity, courts are required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If, and only if, the court finds a violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case." [*Id.*]

*Scott*, 127 S. Ct. at 1774 (omission in original).

With respect to the second step in the qualified immunity analysis, a right is "clearly established" if "a 'reasonable officer would understand that what he is doing violates that right.'" *Andrews v. City of W. Branch, Iowa*, 454 F.3d 914, 919 (8th Cir. 2006) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This second step in the qualified immunity analysis "is a 'fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad proposition.'" *Janis v. Biesheuvel,* 428 F.3d 795, 799 (8th Cir. 2005) (quoting *Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir. 2004)).

Qualified immunity is an immunity from suit, not merely a defense to liability. *Scott*, 127 S. Ct. at 1773 n.2. "[T]hose entitled to qualified immunity hold 'an entitlement not to stand trial or face the other burdens of litigation.'" *O'Neil v. City of Iowa City, Iowa*, No. 06-3671, 2007 WL 2279043, *2 (8th Cir. Aug. 10, 2007) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Qualified immunity should be reviewed at the earliest possible stage in the litigation. *Scott*, 127 S. Ct. at 1773 n.2.

## IX. FIRST AMENDMENT CLAIMS

The court first considers whether, taken in the light most favorable to Plaintiffs, the

facts alleged show that the conduct of Troopers Bailey and Busch violated Plaintiffs' First Amendment rights. *Scott*, 127 S. Ct. at 1774. The court then considers whether such rights were clearly established in light of the specific context of the case. *Id.*

## A. Were Plaintiffs' First Amendment Rights Violated?

### 1. Overview of First Amendment law

In pertinent part, the First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people to peaceably assemble . . . ." U.S. Const. amend. I. "[T]he First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open' . . . ." *Boos v. Barry*, 485 U.S. 312, 318 (1988) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). The Supreme Court has repeatedly emphasized "the central importance of protecting speech on public issues." *Id.*

Of course, "'[e]ven protected speech is not equally permissible in all places and at all times.'" *Frisby v. Shultz*, 487 U.S. 474, 479 (1988) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985)); *see also United States v. Grace*, 461 U.S. 171, 177-78 (1983) ("We have regularly rejected the assertion that people who wish 'to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.'" (quoting *Adderly v. Florida*, 385 U.S. 39, 47-48 (1966)).

> To ascertain what limits, if any, may be placed on protected speech, [the Supreme Court] focuse[s] on the "place" of that speech, considering the nature of the forum the speaker seeks to employ. [The Supreme Court's] cases have recognized that the standards by which limitations on speech must be evaluated "differ depending on the character of the property at issue." *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 44 (1983). Specifically, [the Supreme Court has] identified three types of fora: "the traditional public forum, the

23

> public forum created by government designation, and the
> nonpublic forum." *Cornelius*[,] 473 U.S. at 802.

*Frisby*, 487 U.S. at 479-80.

Traditional public forum analysis governs here. Whatever the status of the Park on September 3, 2004,[11] the adjacent sidewalks and streets were public fora. *See, e.g., id.* at 480 ("'[T]ime out of mind' public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939) (Roberts, J., concurring))); *Grace*, 461 U.S. at 177 ("'[P]ublic places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.'"). There is no allegation in this case that the north sidewalk or 42nd Street NE was rented out or licensed under state law for the exclusive use of the Rally or demarcated as private property in any way. *See, e.g., Grace*, 461 U.S. at 180 (holding that sidewalks surrounding Supreme Court's building were public fora, because "[t]here is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave").

"Traditional public forum property occupies a special position in terms of First Amendment protection . . . ." *Grace*, 461 U.S. at 180. As such, "the government's ability to restrict expressive activity [thereon] 'is very limited.'" *Boos*, 485 U.S. at 318; *see also Bowman v. White*, 444 F.3d 967, 975 (8th Cir. 2006) ("The government's ability to restrict speech is most circumscribed in a traditional public forum.").

> [The Supreme Court's] cases make clear, however, that even
> in a public forum the government may impose reasonable
> restrictions on the time, place, or manner of protected speech,

---

[11] Because it is undisputed that Plaintiffs never entered the Park, the court need not decide its status.

24

provided the restrictions "are justified without reference to the
content of the regulated speech, that they are narrowly tailored
to serve a significant governmental interest, and that they leave
open ample alternative channels for communication of the
information."

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for
Creative Non-Violence*, 468 U.S. 288, 293 (1984)). "For the [government] to enforce a
content-based exclusion it must show that its regulation is necessary to serve a compelling
state interest and that it is narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45.

### 2.    *Analysis*

The parties do not dispute that the Secret Service's security restrictions on the
streets and sidewalks adjoining the Park were constitutional on their face. The parties'
disagreement concerns the implementation (or lack thereof) of the security restrictions on
September 3, 2004. Plaintiffs argue that, as applied, the security restrictions were
viewpoint-based[12] and violated the First Amendment. Troopers Bailey and Busch deny
any First Amendment violations occurred. The parties' disagreement stems from the fact
that there are genuine issues of material fact as to what happened on September 3, 2004.

In support of their argument that the security-restrictions were not viewpoint-based
and did not violate Plaintiffs' First Amendment rights, Troopers Bailey and Busch rely
upon their own testimony and the testimony of their fellow law enforcement officers.
Various law enforcement officers, including Troopers Bailey and Busch, have testified that
(1) Plaintiffs were informed of the security restrictions in place after they arrived at the
Bus Entrance; (2) law enforcement officers identified themselves and repeatedly ordered
Plaintiffs to move away from the vicinity of the Bus Entrance; and (3) Plaintiffs refused

---

[12] Viewpoint-based discrimination is "an egregious form of content discrimination."
*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

Case 1:05-cv-00073-LRR   Document 162   Filed 10/01/07   Page 25 of 40

to comply with such orders.[13]  These same law enforcement also adamantly deny singling out and arresting Plaintiffs solely because they were protestors.  The law enforcement officers do admit (or fail to deny) that some non-protestors were permitted to stand in the restricted areas of 42nd Street NE and its rights-of-way; however, the law enforcement officers testified that such non-protestors received permission to stand in the restricted areas for reasons unrelated to the content of their speech.[14]

---

[13] For example, Secret Service Agent Michael Parker testified that he told McCabe to move, but "[s]he refused and remained standing in the same location."  State Def. App. at 31.  Parker then "radioed for assistance."  *Id.*

Secret Service Agent Bruce Macaulay testified that he approached McCabe, identified himself, informed McCabe that she was standing in a restricted area and directed her multiple times to move.  McCabe "emphatically refused to comply."  *Id.* at 19.  Instead, she repeatedly questioned and disputed Macaulay's orders.

Trooper Busch testified that Macaulay told McCabe to move to the designated area for protestors, but she refused.  Trooper Busch also testified that he personally and repeatedly told Plaintiffs that they needed to move across the street, and they repeatedly refused those orders, as well.  Trooper Busch initially testified that Plaintiffs did not move at all before they were arrested, but later stated that Plaintiffs "[m]ay have taken a couple steps one direction or the other . . . ."  *Id.* at 119.  Trooper Busch testified after the fact that Plaintiffs "simply needed to cross the street," *id.* at 120, and conceded that, "[h]ad [Plaintiffs] complied and walked to [the southern] sidewalk[,] . . . there would have been no arrest made,"  Pl. App. at 79.

Cedar Rapids Police Department Lieutenant Brent Long, who was paired with one of the Secret Service agents, testified that the agent repeatedly told Plaintiffs to move and they refused, "saying that they did not think they should have to move and that they should be able to go anywhere they wanted."  State Def. App. at 18.  Lieutenant Long testified that the discussion lasted "at least five minutes," in which Plaintiffs "continued to disagree with [the Secret Service Agent], to question him, and to ignore him."  *Id.*  "Over the course of the discussion, [Plaintiffs] stepped back a few feet (less than five), but they did not follow all [of the Secret Service Agents'] instructions or move as he was directing them."  *Id.*

[14] For example, Parker admitted that ticket-takers and donation-takers were standing around the Bus Entrance.  Parker testified that Walsh told him that the ticket-takers were allowed to stand around the Bus Entrance, because they were part of the Rally.

(continued…)

26

The problem with this argument is that it presupposes a view of the facts that the court cannot adopt at this stage in the proceedings. As indicated, the court must view the record in the light most favorable to Plaintiffs and afford them all reasonable inferences. *Baer Gallery,* 450 F.3d at 820. In other words, at the summary judgment stage, the court adopts Plaintiffs' version of the facts, not the version of the law enforcement officers. *Scott,* 127 S. Ct. at 1775.

The Plaintiffs' version of the events of September 3, 2004 is set forth at length in Part IV of the instant Order and need not be restated here. It suffices to say that, when Plaintiffs are afforded all reasonable inferences, the facts show that Plaintiffs' First

---

[14] (…continued)

Parker also testified that Walsh told him that "event organizers" had approved the presence of the donation-takers. State Def. App. at 29. Parker also testified that he saw magnet-sellers standing approximately ten to fifteen yards east of the Bus Entrance, and Walsh approved their presence, too. Parker did not remember any signature-collectors standing in the area of the Rally or any persons sitting against the chain-link fence around the pool.

Macaulay does not remember signature-collectors standing on the north sidewalk or people standing along the chain-link fence north of the sidewalk; he does, however, remember some people lingering in the area of the fence while they were waiting to get into the Rally. He also believed that event staff were authorized to stand in the vicinity of the Bus Entrance and also had permission to collect donations.

Walsh confirms the testimony of Parker and Macaulay that the ticket-takers were pre-cleared to stand in the Bus Entrance area. He also testified that, after attendees began arriving but before the Rally, Parker notified him about the donation-takers. Walsh then contacted "event organizers," *id.* at 36, who told him that the donation-takers were cleared. Macaulay then relayed this information to Parker. Walsh does not remember any ribbon-sellers or people sitting or standing on the chain-link fence east of the Bus Entrance. Like Macaulay, Walsh states that, "[t]o the extent that [R]ally attendees paused while in line due to the volume of attendees attempting to access the [R]ally, such temporary pauses would have been consistent with security restrictions so long as the attendees remained in line along the fence." *Id.*

Trooper Busch testified that he remembered individuals standing in restricted areas—including security personnel, money-takers and attendees waiting to get into the event. Trooper Busch testified that a superior told him that the Secret Service had cleared these individuals.

Amendment rights were violated. Specifically, a reasonable jury could find that Troopers Busch and Bailey arrested Plaintiffs simply because they disagreed with their political viewpoints.

If a jury were to believe Plaintiffs and disbelieve the law enforcement officers, a reasonable jury could find that Plaintiffs were silent, respectful and well-mannered at all times and were peacefully protesting President Bush and his policies in a public place, a sidewalk. Where, as here, the sidewalk was not cordoned off and there was no visible indication that the sidewalk was a restricted area, Plaintiffs were entirely justified in standing on the sidewalk. *See, e.g., Grace*, 461 U.S. at 180 (holding that sidewalks surrounding Supreme Court's building were public fora, because "[t]here is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave"). A reasonable jury could also then find that Plaintiffs repeatedly and fully complied with the various law enforcement officers' orders to first move off the sidewalk and then move off of the strip of grass between the north sidewalk and 42nd Street NE once they were informed that such restrictions were in force. The court knows of no law that forbids Plaintiffs from politely requesting the identification of plainclothes officers and then asking why protestors were being asked to move and non-protestors were not. To the contrary, the Supreme Court long ago recognized:

> [T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers . . . . The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.

*City of Houston v. Hill*, 482 U.S. 451, 461, 462-63 (1987).

A reasonable jury would not have to rely solely on Plaintiffs' own testimony to find that Troopers Bailey and Busch targeted them on account of their viewpoint. Several third-

party witnesses, a number of photographs and a videotape of the immediate aftermath of Plaintiffs' arrests tend to corroborate Plaintiffs' claims and contradict the claims of some of the law enforcement officers.

Steve DeMeulenaere, a local photographer, went to the event and took pictures. He testified that he saw two women standing near the Bus Entrance who, while he was watching them, were not told to move. He took two pictures of these women. He also claims that four persons were sitting or standing near a retaining wall on the south side of 42nd Street NE but were not asked to move.

Julie Eisele, another protestor at the event, testified that she personally observed law enforcement officers singling out protestors while Bush supporters were allowed to do as they pleased. Eisele testified: "The treatment of protestors versus the treatment of individuals supporting President Bush's re-election effort by the law enforcement personnel was so obvious that the law enforcement officials may well have been wearing Bush for President buttons." Pl. App. at 4.

Douglas Kelly, who lived southwest of Noelridge Park on Council Street, testified:

> I [took] the day off of work and sat in a lawn chair outside of my wife's place of business, AAA Travel Agency, which is located on 42nd Street just west of Council Street. From that position, I observed numerous law enforcement officers, including Iowa State Patrol officers and Secret Service agents[,] confront and harass protestors.
>
> * * * *
>
> I did not see any Iowa State Patrol officer or any Secret Service agent harass, intimidate or even require a non-protestor to move out of the street or to the south side of 42nd Street. The State troopers and the Secret Service agents said nothing to the individuals who were there to support the President Bush re-election rally. All of their efforts were focused on harassing people who were identifying themselves as protestors in some way.

*Id.* at 7-8.

29

Jessica McAninch a/k/a Jessica Mortvedt, a reporter for a local television station, testified that, like Plaintiffs, she had heard that there would be a protest at the pool house. She was told that the sidewalk north of 42nd Street NE was off-limits entirely and that she had to keep moving on the south sidewalk. She walked on the south sidewalk and saw "many people who appeared to be supporters of President Bush standing, talking and/or milling about on the North side of 42nd Street." *Id.* at 10. She then testified:

> I did not see or hear any Secret Service agent or State Trooper order those people to move to the South side of 42nd Street, or threaten those people with arrest if they did not keep moving. I observed Secret Service agents and Iowa State Patrol Troopers seek out and order any one protesting President Bush's visit to move to the South side of 42nd Street, and keep moving, or they would be arrested. My distinct impression and belief, formed at that time by observing the actions of the Secret Service at the scene of the rally, was that agents were specifically seeking out and confronting protestors and leaving Bush supporters alone.

*Id.*

McAninch's cameraman took video of the immediate aftermath of Plaintiffs' arrests. The videotape corroborates Plaintiffs' claims that they were fully compliant and were moving southward when they were arrested.[15] The video shows McCabe handcuffed in the middle of 42nd Street NE and Nelson handcuffed on the far southern side of 42nd Street NE. *See* Pl. App. 27 and 28 (frames of videotape showing a trooper escorting McCabe, as McCabe is in the middle of 42nd Street NE); Pl. App. 26 (frame of videotape showing a trooper holding a handcuffed Nelson by her arm, while Nelson stands on the southernmost side of 42nd Street NE). It is undisputed that Troopers Bailey and Busch moved Plaintiffs directly north after arresting Plaintiffs and did not move them southward. Therefore, it follows that McCabe and Nelson were arrested, at the very least, in the

---

[15] Indeed, the videotape proves that, in some of their testimony, Plaintiffs *underestimated* their southward movement.

middle of 42nd Street NE or at the far southern end of 42nd Street NE, respectively.

In sum, the court holds that, when taken in the light most favorable to Plaintiffs, the facts alleged show that the conduct of Troopers Bailey and Busch violated Plaintiffs' First Amendment rights. Under Plaintiffs' version of the facts, Plaintiffs were complying with the orders of law enforcement and leaving the vicinity of the Bus Entrance when they were arrested. Such version of the facts suggests that Troopers Bailey and Busch arrested Plaintiffs because they disagreed with the viewpoints Plaintiffs were espousing against President Bush and the Iraq War; other individuals, who were not complying with the security restrictions, were not arrested because they had different, preferred viewpoints. Troopers Bailey and Busch offer no compelling and narrowly-drawn justification for enforcing a content-based restriction against Plaintiffs, and the court finds none. *See Perry*, 460 U.S. at 45 ("For the [government] to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.").

### B. Were Plaintiffs' First Amendment Rights Clearly Established?

Having found that the facts, when taken in the light most favorable to Plaintiffs, show the conduct of Troopers Bailey and Busch violated Plaintiffs' First Amendment rights, the court turns to consider whether such rights were clearly established in light of the specific context of the case. *Scott*, 127 S. Ct. at 1774. It was abundantly clear at the time of the Rally that the First Amendment would not tolerate state law enforcement officers arresting persons based upon the content of their speech. *See, e.g., R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 391-92 (1992) (forbidding content-based discrimination); *Rank v. Hamm*, No. 2:04-0997, 2007 WL 894565, *8 (D. W. Va. Mar. 21, 2007) (holding that "it was abundantly clear at the time of [a Presidential address on July 4, 2004] that the First Amendment would not tolerate an individual, clothed with the authority of the state, commanding law enforcement to seize and expel a person from a

public event based upon the content of that individual's speech") (citing *Colum. Union Coll. v. Clarke*, 159 F.3d 151, 170 (4th Cir. 1998) ("Government must not be permitted to silence one side of a debate . . . while permitting other more favored views to flourish unopposed.")).

### C. Conclusion

Accordingly, to the extent Troopers Bailey and Busch seek qualified immunity on Plaintiffs' First Amendment claims, the Motion shall be denied.

## X.  FOURTH AMENDMENT CLAIMS

The court first considers whether, taken in the light most favorable to Plaintiffs, the facts alleged show that the conduct of Troopers Bailey and Busch violated Plaintiffs' Fourth Amendment rights.  *Scott*, 127 S. Ct. at 1774.  The court then considers whether such rights were clearly established in light of the specific context of the case.  *Id.*

### A.  Were Plaintiffs' Fourth Amendment Rights Violated?

#### 1.    Overview of Fourth Amendment law

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  "The Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the [g]overnment or those acting at their direction."  *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 613-14 (1989).  More specifically, it "protects two types of expectations, one involving 'searches,' the other 'seizures.'"  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  The court examines Plaintiffs' search-related and seizure-related rights separately.

32

### 2. Analysis

#### a. Search-related rights

Plaintiffs argue that Troopers Bailey and Busch violated their search-related Fourth Amendment rights when Mais strip searched them at the Linn County Jail. These claims, however, must fail, because a law enforcement officer who was not involved in the allegedly unconstitutional actions of his fellow officers has not violated constitutional rights and is entitled to qualified immunity. *See Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006) ("Liability for a federal constitutional tort is personal, [and] each defendant's conduct must be independently assessed."). It is undisputed that Troopers Bailey and Busch did not participate in the strip search and cavity inspections of Plaintiffs and did not authorize such measures. Troopers Bailey and Busch had no authority over the Linn County Jail or any knowledge of the practices there. Indeed, it was the policy of the Linn County Jail *not* to strip search persons in Plaintiffs' circumstances; under such circumstances, it was not forseeable to Troopers Bailey and Busch that Mais would strip search Plaintiffs. *See, e.g., Grayson v. Ross*, 454 F.3d 802, 809-10 (8th Cir. 2006).

Accordingly, the court shall dismiss the portion of Plaintiffs' Fourth Amendment claims that allege a search-related violation against Troopers Bailey and Busch.

#### b. Seizure-related rights

Plaintiffs contend Troopers Bailey and Busch violated their seizure-related Fourth Amendment rights when they arrested them. As the court's discussion in Part IX.A.2 of the instant Order shows, a reasonable jury could find that Troopers Bailey and Busch arrested Plaintiffs because they disagreed with the viewpoints they were expressing at the Rally. Clearly, effectuating such an arrest is a violation of the Fourth Amendment, as well as the First Amendment; it is plainly unreasonable for a law enforcement officer to effect a warrantless seizure of an individual simply because the law enforcement officer disagrees with the content or viewpoint of the individual's speech. *See, e.g., Barham v. Ramsey,*

Case 1:05-cv-00073-LRR   Document 162   Filed 10/01/07   Page 33 of 40

434 F.3d 565, 576 (D.C. Cir. 2006) (holding that the First Amendment and Fourth Amendment were coterminous on facts of the case, because "[t]he Fourth Amendment demands nothing less"); *MacKinney v. Nielsen*, 69 F.3d 1002, 1007 (9th Cir. 1995) ("[P]olice may not exercise 'the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment.'" (quoting *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990)).

Troopers Bailey and Busch rejoin that they are entitled to qualified immunity, because there was "arguable probable cause" that Plaintiffs had violated Iowa Code sections 321.229, 719.1(1), 716.8[16] and 723.4 (2003). *See Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005) (reiterating that "the governing standard for a Fourth Amendment unlawful arrest claim 'is not probable cause in fact but arguable probable cause . . . that is, whether the officer should have known that the arrest violated plaintiff's clearly established right.'" (quoting *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996)). The court considers each statute, in turn.

### i. *Iowa Code § 321.229*

Iowa Code section 321.229 provides that "[n]o person shall willfully fail or refuse to comply with any lawful order or direction of any peace officer invested by law with authority to direct, control, or regulate traffic." Iowa Code § 321.229. Here, Troopers Bailey and Busch did not have arguable probable cause to arrest Plaintiffs under such statute, because the disputed facts, taken in the light most favorable to Plaintiffs, show that Plaintiffs did not "wilfully fail or refuse" to comply with any orders. Plaintiffs insist they were complying with the law enforcement officers' orders and merely asking questions.[17]

---

[16] This statute is erroneously cited as "Iowa Code section 716.7" or "Iowa Code section 719.7" in portions of the Motion.

[17] Iowa Code section 321.229 is part of Iowa's traffic code. *See State v. Butler*, 706 N.W.2d 1, 3 (Iowa 2005) (providing general overview of Iowa traffic code). For
(continued...)

34

## ii.   *Iowa Code § 719.1(1)*

Iowa Code section 719.1(1) provides that "[a] person who knowingly resists or obstructs anyone known by the person to be a peace officer . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer . . . commits a simple misdemeanor." Iowa Code § 719.1(1). Here, Troopers Bailey and Busch did not have arguable probable cause to arrest Plaintiffs under such statute, because Plaintiffs did not "knowingly resist[] or obstruct[]" a known peace officer. Again, Plaintiffs insist they were complying with the law enforcement officers' orders and merely asking questions. In other words, Plaintiffs did not "'put obstacles in the paths of officers completing their duties'" or otherwise "hinder[] their efforts." *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1107 (8th Cir. 2004) (quoting *State v. Hauan*, 361 N.W.2d 336, 339 (Iowa Ct. App. 1984)). Simply "object[ing]" or even passively "failing to cooperate" with law enforcement officers does not provide arguable probable cause under Iowa Code section 719.1(1); the statue requires proof that the defendant "active[ly] interfer[ed]" with the law enforcement officer. *State v. Smithson*, 594 N.W.2d 1, 2 (Iowa 1999) (citation and internal quotation marks omitted); *see, e.g., State v. Holmes*, No. 00-950, 2001 WL 1577584, *2 (Iowa Ct. App. Dec. 12, 2001) (holding no probable cause for arrest under Iowa Code section 719.1(1), where there was no evidence of active interference). Even if Plaintiffs' simple questions towards Troopers Bailey and Busch could be construed as "verbally harassing," the Iowa Code makes clear that "[t]he terms 'resist' and 'obstruct' . . . do not include verbal harassment unless the verbal harassment is accompanied by a present ability and apparent intention to execute a verbal threat physically." Iowa Code § 719.1(3). Plaintiffs did not demonstrate any such ability or intention.

---

[17](...continued)

purposes of Iowa Code chapter 321, "traffic" includes pedestrian traffic. Iowa Code § 321.1(84). Violations of Iowa Code section 321.229 are punishable by a scheduled fine of $35. *Id.* § 805.8A(14).

### iii.    Iowa Code § 716.8

In Iowa, "[a]ny person who knowingly trespasses upon the property of another commits a simple misdemeanor." Iowa Code § 716.8. "The term 'property' . . . include[s] any land, dwelling, building, conveyance, vehicle, or other temporary or permanent structure whether publicly or privately owned." *Id.* § 716.7(1). "The term 'trespass'" includes "[e]ntering or remaining upon or in property without justification after being notified or requested to abstain from entering or to remove or vacate therefrom . . . by any peace officer . . . whose duty it is to supervise the use or maintenance of the property. *Id.* § 716.7(2)(b). However, "[t]he term 'trespass' does not mean the entering upon the right-of-way of a public road or highway." *Id.* § 716.7(4). A sidewalk is plainly part of the right of way of a public road. *See, e.g., Kearney v. Ahmann*, 264 N.W.2d 768, 770 (Iowa 1978); *Scott v. McKelvey*, 290 N.W.2d 729, 732-33 (Iowa 1940); *Chi. & N.W. Transp. Co. v. Webster County Bd. of Supervisors*, 880 F. Supp. 1290, 1307 n.11 (N.D. Iowa) ("The sidewalk is a *public* right-of-way." (Emphasis in original.)), *aff'd*, 71 F.3d 265 (8th Cir. 1995); *cf. Grace*, 461 U.S. at 180 (holding that sidewalks surrounding Supreme Court's building were public fora, because "[t]here is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave"); *State v. Hutchinson*, 721 N.W.2d 776, 780-83 (Iowa 2006) (affirming protestors' trespass convictions, where there was sufficient evidence in the record for the jury to find that the protestors entered upon a federally owned roadway and private land). Accordingly, Troopers Bailey and Busch did not have arguable probable cause to arrest Plaintiffs, who were at all relevant times upon the right-of-way of 42nd Street NE.

### iv.    Iowa Code § 723.4

Iowa Code section 723.4 provides that "[a] person commits a simple misdemeanor

36

when . . . . [w]ithout authority or justification, the person obstructs any street, sidewalk, highway, or other public way, with the intent to prevent or hinder its lawful use by others." Iowa Code § 723.4(7). Iowa Code section 723.4 is Iowa's disorderly conduct statute. *State v. Hardin*, 498 N.W.2d 677, 678 (Iowa 1993). Here, Troopers Bailey and Busch did not have arguable probable cause to arrest Plaintiffs under such statute, because Plaintiffs did not have "the intent to prevent or hinder . . . the lawful use by others" of 42nd Street NE or the north sidewalk. Again, Plaintiffs insist they were complying with the law enforcement officers' orders and merely asking questions.

### B. Were Plaintiffs' Fourth Amendment Rights Clearly Established?

Having found that the facts, when taken in the light most favorable to Plaintiffs, show the conduct of Troopers Bailey and Busch violated Plaintiffs' Fourth Amendment rights, the court turns to consider whether such rights were clearly established in light of the specific context of the case. *Scott*, 127 S. Ct. at 1774. For the most part, Troopers Bailey and Busch do not challenge the clearly established nature of Plaintiffs' Fourth Amendment rights on the facts as presented in this order.

Troopers Bailey and Busch specifically argue that Plaintiffs' Fourth Amendment rights cannot be "clearly established," because there is little existing precedent on some issues under Iowa Code section 719.1(1). *See Lawyer*, 361 F.3d at 1108 (lamenting "lack of detailed judicial guidance on the interplay among the statutory terms 'obstruct,' 'resist,' and 'verbal harassment'" in Iowa Code section 719.1(1)). Even if Iowa Code section 719.1(1) is not a model of clarity, however, it was abundantly clear at the time of the Rally that the Fourth Amendment would not tolerate law enforcement officers arresting persons based upon the content of their speech. The apparent interpretation of the statute offered by Troopers Bailey and Busch, which would criminalize asking law enforcement officers polite questions, is plainly unconstitutional under the First Amendment and wholly incompatible with precedent. *See Hill*, 482 U.S. at 461-62 (reaffirming the rights of

37

citizens to verbally oppose and challenge police action); *see also State v. Brecunier*, 564 N.W.2d 365, 369 (Iowa 1997) (affirming conviction under Iowa Code section 719.1(1) over constitutional objection, where the defendant was not "merely engaging the officers in a constitutional dialogue concerning [a] warrantless entry," but rather took unlawful actions against them); *State v. Donner*, 243 N.W.2d 850, 854 (Iowa 1976) (finding it sufficient if the defendant engaged in opposition to the officer using actual or constructive force).

### C. Conclusion

Accordingly, to the extent Troopers Bailey and Busch seek qualified immunity on Plaintiffs' search-related Fourth Amendment claims, the Motion shall be granted. To the extent Troopers Bailey and Busch seek qualified immunity on Plaintiffs' seizure-related Fourth Amendment claims, the Motion shall be denied.

### XI. FOURTEENTH AMENDMENT AND 42 U.S.C. § 1985(3) "SUPPORT OR ADVOCACY" CLAIMS

Troopers Bailey and Busch argue that qualified immunity also bars Plaintiffs' Fourteenth Amendment and 42 U.S.C. § 1985(3) "support or advocacy" claims. The arguments of Troopers Bailey and Busch are predicated upon an assumption that the court would deny their First Amendment claims. For example, with respect to Plaintiffs' 42 U.S.C. § 1985(3) "support or advocacy" claim, Troopers Bailey and Busch reason:

> The support and advocacy clause protests only the right "to case [sic] a ballot and [to] have it honestly counted" and those rights already protected by the First Amendment." *Gill v. Farm Bureau Life Ins. Co. of Mo.*, 906 F.2d 1265, 1270-71 (8th Cir. 1990). In this case, [P]laintiffs have never contended that either Bailey or Busch interfered with [P]laintiffs' casting of a ballot. Moreover, as demonstrated above, [P]laintiffs have no viable First Amendment claim . . . . This [c]ourt should, therefore, grant [Troopers] Bailey and Busch summary judgment on [P]laintiffs' claim [sic] under the support and advocacy clause of § 1985(3).

38

Brief in Support of Motion (docket no. 136-4), at 38.

In Parts IX and X of the instant Order, the court held that Plaintiffs' First Amendment claims survive summary judgment. Accordingly, the court shall also deny the Motion with respect to Plaintiffs' Fourteenth Amendment and 42 U.S.C § 1985(3) "support or advocacy" claims.

## XII. REMAINING CLAIMS

In a prior Order ("Prior Order") (docket no. 82), the court granted in part and denied in part a motion for summary judgment that was filed by Defendant Bruce Macaulay and former defendants Michael Parker and Holly Michael (collectively "Individual Federal Defendants"). In relevant part, the court dismissed Plaintiffs' 42 U.S.C. § 1985(3) "equal protection" claims and Substantive Due Process claims as to the Individual Federal Defendants. The court dismissed Plaintiffs' 42 U.S.C. § 1985(3) "equal protection" claims, because § 1985(3) does not provide a remedy against discriminatory animus directed at a class based on a wholly non-racial political affiliation. Prior Order at 25-35. The court dismissed Plaintiffs' Substantive Due Process claims, because such claims duplicated their Fourth Amendment claims. *Id.* at 35-36.

The reasoning of the Prior Order applies with equal force as to Troopers Bailey and Busch. Accordingly, the court shall dismiss Plaintiffs' 42 U.S.C. § 1985(3) "equal protection" claims and Substantive Due Process claims as to Troopers Bailey and Busch.

## XIII. DISPOSITION

**IT IS THEREFORE ORDERED THAT:**

(1) Based on the foregoing, the Motion (docket no. 136) is **GRANTED IN PART AND DENIED IN PART**;

(2) The Iowa State Patrol is dismissed from this lawsuit, that is, all of Plaintiffs' claims against The Iowa State Patrol are dismissed with prejudice;

(3) All of Plaintiffs' state constitutional claims are dismissed without prejudice;

39

(3)     Counts I and II of the Fourth Amended Complaint as to Troopers Bailey and Busch remain for trial;

(4)     Count III, insofar as it alleges violations of Plaintiffs' search-related Fourth Amendment rights against Troopers Bailey and Busch, is dismissed with prejudice;

(5)     Count III, insofar as it alleges violations of Plaintiffs' seizure-related Fourth Amendment rights against Troopers Bailey and Busch, remains for trial;

(6)     Count IV as to Troopers Bailey and Busch remains for trial;

(7)     Count V as to Troopers Bailey and Busch is dismissed with prejudice;

(8)     Count VI, insofar as it alleges a violation of the "equal protection" provision of 42 U.S.C. § 1985(3) as to Troopers Bailey and Busch, is dismissed with prejudice;

(9)     Count VI, insofar as it alleges a violation of the "support or advocacy" provision of 42 U.S.C. § 1985(3) as to Troopers Bailey and Busch, remains for trial.

**IT IS SO ORDERED.**

**DATED** this 1st day of October, 2007.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

40