**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

ALICE MCCABE and CHRISTINE
NELSON,

        Plaintiffs,

vs.

MICHELLE MAIS,

        Defendant.

No. 05-CV-73-LRR

**ORDER**

---

### TABLE OF CONTENTS

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **RELEVANT PRIOR PROCEEDINGS** . . . . . . . . . . . . . . . . . . . . . **2**

III.   **RELEVANT TRIAL EVIDENCE** . . . . . . . . . . . . . . . . . . . . . . . **4**
    A.    *Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
    B.    *Jail* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
        1.   *Composition* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
        2.   *Intake process for pre-arraignment detainees* . . . . . . . . . . . **5**
            a.   *Pat-down searches* . . . . . . . . . . . . . . . . . . . . . . **5**
            b.   *Enforcement of the policy* . . . . . . . . . . . . . . . . . . **5**
            c.   *Booking* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
    C.    *The Events of September 3, 2004* . . . . . . . . . . . . . . . . . . . . **8**
        1.   *Plaintiffs' arrests* . . . . . . . . . . . . . . . . . . . . . . . . . **8**
        2.   *Plaintiffs complete the intake process at the Jail* . . . . . . . . **10**
        3.   *Bail* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
    D.    *All Charges Dropped* . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

IV.   **RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW** . . . . . **11**
    A.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
    B.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
    C.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
        1.   *Holding* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
        2.   *Alternate holding* . . . . . . . . . . . . . . . . . . . . . . . . **14**
            a.   *First prong* . . . . . . . . . . . . . . . . . . . . . . . . . **14**
            b.   *Second prong* . . . . . . . . . . . . . . . . . . . . . . . . **15**

|  |  | c. | *Third prong* | . . . . . . . . . . . . . . . . . . . . . . . . . . | *15* |
|  |  | 3. | *Conclusion* | . . . . . . . . . . . . . . . . . . . . . . . . . . | *20* |
| V. | **MOTION FOR NEW TRIAL** |  |  | . . . . . . . . . . . . . . . . . . . . . . . . . . | *20* |
|  | A. | *Legal Standard* |  | . . . . . . . . . . . . . . . . . . . . . . . . . . | *20* |
|  |  | 1. | *Remittitur* | . . . . . . . . . . . . . . . . . . . . . . . . . . | *20* |
|  |  | 2. | *Partial new trial* | . . . . . . . . . . . . . . . . . . . . . . . . . . | *21* |
|  | B. | *Analysis* |  | . . . . . . . . . . . . . . . . . . . . . . . . . . | *23* |
|  | C. | *Conclusion* |  | . . . . . . . . . . . . . . . . . . . . . . . . . . | *34* |
| VI. | **DISPOSITION** |  |  | . . . . . . . . . . . . . . . . . . . . . . . . . . | *34* |

## I. INTRODUCTION

The matters before the court are Defendant Michelle Mais's Renewed Motion for Judgment as a Matter of Law ("Renewed Motion") (docket no. 285) and Motion for New Trial ("Motion") (docket no. 284) (collectively, "Motions").

## II. RELEVANT PRIOR PROCEEDINGS

From May 27, 2008 to June 4, 2008, the court held a jury trial on the remaining claims in the Fifth Amended & Substituted Complaint ("Fifth Amended Complaint") (docket no. 165). Attorneys David A. O'Brien and Matthew J. Reilly represented Plaintiffs Alice McCabe and Christine Nelson. Attorneys Zachary C. Richter and Megan L. Rose represented Defendant Bruce Macaulay. Assistant Linn County Attorney Todd D. Tripp represented Defendant Michelle Mais.

The court submitted two categories of claims to the jury: (1) Plaintiffs' First and Fourth Amendment claims against Defendant Macaulay, *see* Fifth Amended Complaint at ¶¶ 39-50, and (2) Plaintiffs' Fourth Amendment claims against Defendant Mais, *see id.* at ¶¶ 47-50. Plaintiffs had sued Defendant Macaulay, in accordance with *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), on the theory that he had illegally arrested Plaintiffs because they were protesting President George W. Bush and his policies. Plaintiffs had sued Defendant Mais, under 42 U.S.C.

§ 1983, on the theory that Defendant Mais had conducted illegal strip searches and visual body cavity searches ("VBC searches") of Plaintiffs' vaginas and anuses.

Consistent with *Peterson v. City of Plymouth*, 60 F.3d 469, 475-76 (8th Cir. 1995), and in recognition that Defendant Mais had conceded liability to Plaintiffs, the court asked the jury a series of factual questions in lieu of general verdicts on Plaintiffs' claims. In response to such questions, the jury found: (1) in light of the information available to Defendant Macaulay at the time of Plaintiffs' arrests, Defendant Macaulay had a reasonable basis to conclude that Plaintiffs had disobeyed a law enforcement officer's order to move; (2) Defendant Macaulay caused Plaintiffs' arrests; (3) Defendant Macaulay's decision to cause Plaintiffs' arrests was not motivated by their protest of President George W. Bush or his policies; (4) Plaintiffs did not suffer any damages as a direct result of Defendant Macaulay's decision to cause their arrests; and (5) as a direct result of Defendant Mais's strip searches and VBC searches, Plaintiff McCabe suffered $250,000 in damages and Plaintiff Nelson suffered $500,000 in damages.

On June 4, 2008, the court entered an Order ("Judgment Order") (docket no. 279), in which it applied the law to the jury's factual findings. With respect to Plaintiffs' First and Fourth Amendment claims against Defendant Macaulay, the court held that such claims failed on at least four alternative grounds: (1) such claims failed as a matter of law for want of proof; (2) Defendant Macaulay had probable cause to arrest Plaintiffs; (3) Defendant Macaulay had arguable probable cause to arrest Plaintiffs and thus was entitled to qualified immunity; and (4) Plaintiffs failed to prove they incurred any damages as a direct result of Defendant Macaulay's conduct. With respect to Plaintiffs' Fourth Amendment claims against Defendant Mais, the court ordered Defendant Mais to pay a combined $750,000 to Plaintiffs—$250,000 to Plaintiff McCabe and $500,000 to Plaintiff Nelson.

On June 10, 2008, Defendant Mais filed the Motions, pursuant to Federal Rules of

Civil Procedure 50(b) and 59(a). On June 20, 2008, Plaintiffs filed a Resistance (docket no. 290) to the Renewed Motion. On June 27, 2008, Plaintiffs filed a Resistance (docket no. 291) to the Motion. Defendant Mais did not reply.

Neither party requests oral argument on the Motions, and the court finds oral argument is not appropriate. The Motions are fully submitted and ready for decision.

## III. RELEVANT TRIAL EVIDENCE

The relevant facts are undisputed. At trial, Defendant Mais conceded that she violated Plaintiffs' Fourth Amendment rights when she strip searched and VBC searched Plaintiffs at the Linn County Jail ("Jail"). The only issue was the amount of Plaintiffs' damages. The parties presented the following facts at trial:

### A. Players

At the time of their arrests, Plaintiffs were two Iowa residents who disagreed with President George W. Bush's policies. Specifically, they were two retired schoolteachers who opposed the war in Iraq.

Defendant Mais was a Linn County Deputy Sheriff. Defendant Mais worked at the Jail from September of 2003 to October of 2004.

Mr. Michael J. Carr was the Administrator of the Jail. Administrator Carr developed and enforced the Jail's policies. He was also responsible for its day-to-day operations and budget.

### B. Jail

#### 1. Composition

In September of 2004, the Jail held 380 persons: (1) pre-arraignment detainees; (2) post-arraignment, pre-trial detainees; (3) inmates serving sentences pursuant to an order of a state court; and (4) persons held for various reasons on behalf of other jurisdictions, including the federal government. The persons held in the Jail were accused or convicted of having committed a wide range of offenses, from traffic offenses to murder. On

average, ten to fifteen percent of the Jail's population was female.

Annually, approximately fourteen thousand persons entered the Jail for purposes of detention. At any given time, nine Linn County Deputy Sheriffs were working at the Jail. Administrator Carr developed policies and procedures to ensure the safety of all persons at the Jail, including the Jail's employees. At issue at trial was the Jail's intake process for pre-arraignment detainees.

## 2. *Intake process for pre-arraignment detainees*

Pre-arraignment detainees entered the Jail through a secure sally port and immediately began the intake process. The intake process consisted of three stages: (1) pat-down searches; (2) application of "<u>REVISED</u> DIRECTIVE 02-01" ("Policy") (emphasis in original); and (3) booking.

### a. *Pat-down searches*

When pre-arraignment detainees arrived at the Jail, they were usually already in handcuffs and wearing street clothes. Jail employees immediately conducted pat-down searches of the detainees' persons. A pat-down search is a relatively unintrusive measure designed to ensure that the detainee is not carrying any contraband or weapons. The detainees were then unhandcuffed.

### b. *Enforcement of the Policy*

Administrator Carr did not permit pre-arraignment detainees to wear their personal clothing in the Jail under any circumstances; he required pre-arraignment detainees to exchange all personal clothing for a Jail-issued uniform. This "clothing exchange procedure" served many purposes. A pre-arraignment detainee's personal clothing might be unsanitary. Further, allowing pre-arraignment detainees to wear personal clothing in the Jail might pose a threat to the welfare of all other persons at the Jail, including the Jail's employees; an unknown number of pre-arraignment detainees have tried to smuggle contraband and weapons into the Jail. Allowing pre-arraignment detainees to wear their

personal clothing at the Jail might also increase the incidence of stealing and fighting over clothing.

In July of 2001, Administrator Carr enacted the Policy to govern the Jail's clothing exchange procedure. In relevant part, the Policy stated:

> In order to enhance the security and safety of the [Jail], effective immediately, all inmates, including arraignments [(i.e., pre-arraignment detainees)], will be dressed into jail-issued clothing. However, only those inmates arrested for indictable offenses (serious misdemeanors or greater) will be physically stripped [sic] searched.
>
> Those inmates not arrested for indictable offenses will not be required to remove bottom underclothing or perform any other strip search-related maneuvers while changing them into jail-issued clothing. T-shirts and bras will be taken. Socks will be searched for contraband and then returned.

Joint Ex. 107, at 1 (handwritten portions omitted).[1]

Jail employees enforced the Policy in a small (approximately 8' x 10') room ("Room") in the Jail. A "Dutch door" led to the Room from an adjacent hallway. A Dutch door is a door divided horizontally in such a fashion that the bottom half may remain shut while the top half opens. The Jail's Dutch door was solid metal and divided about waist-high. The Room did not have any windows or cameras.

In practice, a jail employee would stand outside the Room while enforcing the Policy, and the pre-arraignment detainee would stand inside the room. The jail employee would leave the top half of the Dutch door open and the bottom half closed. The jail employee was always the same sex as the pre-arraignment detainee, and the pre-

---

[1] Administrator Carr testified that the handwriting on Joint Exhibit 107 was not part of the Policy at the time of Plaintiffs' arrests. The handwriting was Administrator Carr's "personal notes." Tr. at 926. However, Administrator Carr admitted that some of these handwritten notes later became part of a new, unwritten policy.

arraignment detainee was always alone in the Room.

The jail employee would issue a series of orders to the pre-arraignment detainee. First, the jail employee would order the pre-arraignment detainee to stand two to three feet away from the Dutch door. Second, the jail employee would order the pre-arraignment detainee to strip off all personal clothing, except any panties or underpants, in full view of the jail employee. In other words, in practice the Policy required all pre-arraignment detainees to submit to a strip search.[2] Third, if the pre-arraignment detainee was charged with an indictable misdemeanor or felony under Iowa law (i.e., all pre-arraignment detainees except those charged with simple misdemeanors), the jail employee would order such detainee to take off any panties or underpants, bend over, spread apart the buttocks and display his or her genitalia and anus to the jail employee. In other words, in practice the Policy required all pre-arraignment detainees charged with an indictable misdemeanor or felony under Iowa law to submit to a VBC search.[3]

---

[2] Administrator Carr and counsel for Defendant Mais misleadingly refer to this second order as requiring all pre-arraignment detainees to undergo a "clothing exchange" procedure. The second order effected a strip search, not a clothing exchange procedure. *See Stanley v. Henson*, 337 F.3d 961, 964 (7th Cir. 2003) (holding that when a law enforcement officer orders an inmate to undress in full view of the officer, the officer effects a "search" and not a "clothing exchange"). A strip search is commonly defined as including any visual inspection of the naked body of an inmate without any scrutiny of the inmate's body cavities. *See, e.g., Wood v. Hancock County Sheriff's Dep't*, 354 F.3d 57, 62-63 (1st Cir. 2003); *Roberts v. State of R.I.*, 239 F.3d 107, 108 n.1 (1st Cir. 2001); *Peckham v. Wi. Dep't of Corr.*, 141 F.3d 694, 695 (7th Cir. 1998). A strip search may occur even when the inmate is not fully disrobed. *Wood*, 354 F.3d at 63 n.10; *Amaechi v. West*, 237 F.3d 356, 365 & n.15 (4th Cir. 2001) (citing in part Iowa Code § 702.23 (2001) (defining "strip search" as "having a person remove or arrange some or all of the person's clothing so as to permit an inspection of the . . . female breasts or undergarments of that person . . . .")).

[3] The Policy misleadingly refers to this third order as requiring pre-arraignment detainees to "perform other strip search-related maneuvers" or having the pre-arraignment
(continued…)

### c. Booking

The booking process consisted of routine questioning, fingerprinting and the taking of mugshots. The routine questioning usually took place at one of four "booking stations" in the Jail. At a booking station, a Jail employee would ask the pre-arraignment detainee a series of routine questions, such as "What is your name?" and "What is your date of birth?" The Jail employee would then enter the pre-arraignment detainee's answers into a computer.

A different Jail employee would then take the pre-arraignment detainee's fingerprints and mugshots. The fingerprints and mugshots would complete the booking process, and the pre-arraignment detainee would be placed in a holding cell.

The booking process did not necessarily occur last in the intake process or all at once. For example, some pre-arraignment detainees were strip searched and VBC searched after the routine questioning but before the fingerprinting and taking of mugshots.

## C. The Events of September 3, 2004

### 1. Plaintiffs' arrests

On September 3, 2004, Plaintiffs assembled and protested in a lawfully secured zone outside a re-election rally for President Bush in Cedar Rapids. Iowa State Patrol Troopers Troy Bailey and Rick Busch ("the Troopers") arrested Plaintiffs for simple-misdemeanor Trespass, in violation of Iowa Code §§ 716.7 and 716.8(1) (2003). Simple-

---

[3](...continued)

detainee "physically stripped [sic] searched." Joint Ex. 107, at 1. A VBC search is commonly defined as "a strip search that includes the visual examination of the anal and genital areas." *Roberts v. State of R.I.*, 239 F.3d 107, 108 n.1 (1st Cir. 2001); *see also Franklin v. Lockhart*, 883 F.2d 654, 654-55 (8th Cir. 1989) (carefully distinguishing between "strip searches" and "VBC searches" and stating that, during a VBC search, "[t]he inmates are required to bend over or squat to reveal any object that might be concealed by the buttocks"). Defendant Mais mistakenly conflated "strip searches" and "VBC searches." *See* Court Ex. 1, at 54 ("A strip search, according to what I know, to be inspecting body cavities basically.").

misdemeanor Trespass was punishable by a maximum of thirty days of imprisonment and a $500 fine.  Iowa Code § 903.1(1)(*a*).[4]

The Troopers handcuffed and detained Plaintiffs.  The Troopers also subscribed and swore to criminal complaints against Plaintiffs.  *See* Joint Ex. 105 (Plaintiff McCabe); Joint Ex. 106 (Plaintiff Nelson).  These criminal complaints indicate that the Troopers arrested Plaintiffs for simple-misdemeanor Trespass and not an indictable form of the same offense, such as serious-misdemeanor or aggravated-misdemeanor Trespass.  Trespass is classified as a simple misdemeanor unless there are extenuating circumstances that clearly were not present.  Iowa Code § 716.8(1).[5]  Further, the criminal complaints do not disclose any reason to believe that Plaintiffs might be hiding contraband or weapons underneath their clothing or in their body cavities.

The Troopers transferred custody of Plaintiffs to Officer Laura Carpa, n/k/a Laura Faircloth, a member of the Cedar Rapids Police Department.  The Troopers provided Officer Carpa with copies of the criminal complaints.  Officer Carpa placed Plaintiffs in her police cruiser and transported them to the Jail.  As Officer Carpa neared the Jail, she warned Plaintiffs: "Ladies, this isn't going to be nice."  Tr. at 196.

---

[4] Various federal, state and local law enforcement officers testified that Plaintiffs were arrested because they repeatedly refused direct and unequivocal orders to move out of the secure zone.  Plaintiffs testified that they entered the secured zone unwittingly and moved when ordered to do so.  Plaintiffs alleged that the federal and state law enforcement officers, including Defendant Macaulay and the Troopers, hatched a conspiracy with the Secretary of Homeland Security and the Director of the Secret Service to arrest Plaintiffs because of the content of their speech.  The legality of Plaintiffs' arrests is not at issue in the Motions.

[5] If a person trespasses with the intent to commit a hate crime *or* causes injury to another person or more than $200 in damage, such person commits serious-misdemeanor Trespass.  Iowa Code § 716.8(2)-(3).  If a person trespasses with the intent to commit a hate crime *and* causes injury to another person or more than $200 in damage, such person commits aggravated-misdemeanor Trespass.  *Id.* § 716.8(4)

Officer Carpa turned Plaintiffs and the criminal complaints over to Jail employees. Plaintiffs entered the Jail through the secure sally port and began the intake process.

### 2. *Plaintiffs complete the intake process at the Jail*

An unknown Jail employee patted down McCabe and Nelson and did not find any weapons or contraband on either of their persons.[6] Plaintiff McCabe immediately completed the booking process and was turned over to Defendant Mais.

Defendant Mais escorted Plaintiff McCabe to the Room. Defendant Mais subjected Plaintiff McCabe to a strip search and, in violation of the Policy, a VBC search. Specifically, Defendant Mais ordered Plaintiff McCabe to take off all her clothes, including her panties. Plaintiff McCabe complied. Defendant Mais then ordered Plaintiff McCabe to turn around, bend over and "[s]pread your cheeks." Tr. at 198-99. Again, Plaintiff McCabe complied. Plaintiff McCabe donned a jail-issued uniform. Finally, Defendant Mais ordered Plaintiff McCabe to sit in the hallway adjacent to the Room.

Defendant Mais ordered Plaintiff Nelson into the Room. Defendant Mais subjected Plaintiff Nelson to a strip search and, in violation of the Policy, a VBC search. While Defendant Mais conducted these searches, she left the top half of the Dutch door open. Male jail employees walked by the Dutch door as Plaintiff Nelson complied with Defendant Mais's orders. However, none of these male jail employees stopped and watched Plaintiff Nelson.

After Defendant Mais strip searched and VBC searched Plaintiff Nelson, Plaintiff Nelson completed the booking process. Jail employees then placed Plaintiffs together in a holding cell.

---

[6] Although neither McCabe nor Nelson remember whether officers conducted pat-down searches, it is undisputed that pat-down searches are part of the Jail's routine procedure. Defendant Mais does not contend that one of her fellow officers did not pat-down Plaintiffs.

### 3. Bail

One of Plaintiffs' friends and fellow protestors, Ms. Barb Hannon, bailed Plaintiffs out of the Jail. Ms. Hannon testified that, when she arrived at the Jail, Plaintiffs appeared "[i]n shock" and Plaintiff Nelson appeared "traumatized." Tr. at 301. Ms. Hannon drove Plaintiffs to her home, where the three women cried for a couple of hours and talked about the day's events with Ms. Hannon's sister.

## D. All Charges Dropped

In December of 2004, the Linn County Attorney dropped all charges against Plaintiffs.

# IV. RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

## A. Background

At the close of Plaintiffs' case-in-chief and at the close of all the evidence, counsel for Defendant Mais invoked Rule 50(a) and moved for a directed verdict *against* his client ("the Rule 50(a) Motion") as to Plaintiff McCabe's Fourth Amendment claim. Counsel for Defendant Mais asked the court to hold, as a matter of law, that his client violated Plaintiff McCabe's constitutional rights and enter judgment as a matter of law in the amount of $1.[7]

---

[7] Counsel for Defendant Mais admittedly did not heed the Eighth Circuit Court of Appeals's admonition to "avoid aberrant procedures" when he invoked Rule 50(a) in this manner. *Sanders v. Clemco Indus.*, 862 F.2d 161, 168 n.12 (8th Cir. 1988). At one point, counsel for Defendant Mais stated:

> To be perfectly honest, I have not come across anyone doing this before, so I have no authority for the court entering judgment in lieu of the jury's behalf—before the jury makes a finding. I would—I'll be very frank. I don't have any great hope that the Court is going to grant this motion, but as my understanding of Rule 50(a), I've got to make it now if I want to try and renew it at a later time.

(continued...)

Before the court ruled on the Rule 50(a) Motion, both Plaintiffs moved for a partial directed verdict on liability against Defendant Mais. Defendant Mais did not resist Plaintiffs' motion, and the court granted partial judgment in Plaintiffs' favor. The court then overruled the Rule 50(a) motion to the extent Defendant Mais sought an award of nominal damages against herself as to Plaintiff McCabe's Fourth Amendment claim. The court held that the jury was entitled to determine the amount, if any, of the damages Plaintiffs suffered as a result of Defendant Mais's actions.

In the Renewed Motion, Defendant Mais reasserts the argument in the Rule 50(a) Motion. Because the court has already entered judgment in favor of Plaintiff McCabe, however, the only issue is whether the court must reduce the jury's $250,000 verdict in favor of Plaintiff McCabe to $1. As presently framed, Defendant Mais argues that an award of nominal damages in favor of Plaintiff McCabe is required as a matter of law, because Plaintiff McCabe did not present any evidence of damages.[8]

### B. Legal Standard

In relevant part, Rule 50(b) provides:

If the court does not grant a motion for judgment as a matter

---

[7](…continued)
Tr. at 950.

[8] Defendant Mais proceeds on the assumption that an award of nominal damages is appropriate when a party fails to present any evidence of damages. Plaintiff McCabe points out that such assumption is inconsistent with the verdict forms, to which Defendant Mais did not object. *See* Verdict Form 2 (docket no. 275), at 1 (instructing the jury that an award of nominal damages in favor of Plaintiff McCabe would be appropriate only "[i]f you find that [Plaintiff McCabe] suffered damages but that her damages have no monetary value"); *see, e.g.*, 8th Cir. Civil Jury Instr. § 4.50B (2007) (stating that nominal damages are appropriate if the jury finds that the plaintiff suffered damages but such damages do not have any monetary value); *cf. Cowans v. Wyrick*, 862 F.2d 697, 700 (8th Cir. 1988) ("[T]he jury must enter an award of nominal damages if it is unable to place a monetary value on the harm that [the plaintiff] suffered . . . ."). The court need not decide whether Defendant Mais's assumption is valid.

of law made under Rule 50(a) [before the case is submitted to the jury], the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.  No later than 10 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.  In ruling on the renewed motion, the court may:

**(1)**    allow judgment on the verdict, if the jury returned a verdict;

**(2)**    order a new trial; or

**(3)**    direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b) (emphasis in original).

"Judgment as a matter of law is warranted when no 'legally sufficient evidentiary basis' exists for a reasonable jury to have found in favor of a party on an issue on which the party has been fully heard." *Dominum Mgmt. Servs., Inc. v. Nationwide Hous. Group*, 195 F.3d 358, 363 (8th Cir. 1999) (citing Fed. R. Civ. Pro. 50(a)(1)).  The court "must view the evidence in the light most favorable to the nonmoving party while giving that party the benefit of all reasonable inferences." *Id.* (citing *Van Steenburgh v. Rival Co.*, 171 F.3d 1155, 1158 (8th Cir. 1999)).  "Judgment as a matter of law is appropriate only when all the evidence points in one direction and there are no reasonable interpretations that would support the jury's verdict." *Id.* (citing *Mears v. Nationwide Mut. Ins. Co.*, 91 F.3d 1118, 1122 (8th Cir. 1996)).  Although on appeal the court's decision to grant or deny a renewed motion for judgment as a matter of law is not entitled to any deference, *see id.* (reviewing *de novo*), the Eighth Circuit Court of Appeals gives "'great deference to the jury's verdict'" and "'will not set aside a jury verdict unless there is a complete absence of probative facts to support [it].'" *Heaton v. Weitz Co.*, 534 F.3d 882, 887 (8th Cir. 2008) (citations omitted).

## C. Analysis

### 1. Holding

Defendant Mais tendered two-and-a-half pages of argument in support of the Renewed Motion. She does not, however, cite any legal authority to support her argument. Because Defendant Mais failed to cite any legal authority, the court deems her argument to be waived. *See* LR 7.d (requiring "a brief containing . . . citations to the authorities upon which the moving party relies"); LR 1.f ("A failure to comply with the Local Rules may be sanctioned by the court in any appropriate manner."). Accordingly, the court shall deny the Renewed Motion.

### 2. Alternate holding

Even if the court were to consider the merits of the Renewed Motion, the court would hold that it should be denied. The argument in the Renewed Motion has three prongs. The court considers each prong, in turn.

#### a. First prong

First, Defendant Mais alleges that Plaintiff McCabe has no evidence of damages, because she did not present evidence of "any medical damages, and there is no medical record to support the same." Brief in Support of Renewed Motion ("Brief") (docket no. 285-2), at 3. This first prong to Defendant Mais's argument is based upon a misapprehension of the law. Plaintiff was not required to present evidence of "medical damages" to sustain a verdict for compensatory damages. In the Eighth Circuit, it is settled that "[m]edical or expert testimony is not required to establish mental anguish." *Ledbettter v. Alltel Corporate Servs., Inc.*, 437 F.3d 717, 725 (8th Cir. 2006) (citing *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1065 (8th Cir. 1997)). "[A] plaintiff's own testimony, coupled with the circumstances of the case, can sustain the burden of establishing emotional suffering." *Id.*; *Heaton*, 534 F.3d at 891-92 (same). Here, it was sufficient that Plaintiff relied upon her own testimony and the first-hand observations of her friends to

prove she suffered mental anguish.

### b. Second prong

Second, Defendant Mais alleges that, even if Plaintiff McCabe were not required to offer evidence of "medical damages," Plaintiff McCabe did not present any evidence of psychological injury that Defendant Mais inflicted upon her. For example, Defendant Mais alleges that Plaintiff McCabe only "spoke in terms of the effects . . . of [her] *arrest*, which is distinct from the strip search." Brief at 3 (emphasis in original).

This second prong to Defendant Mais's argument is based upon a misapprehension of the trial evidence. At trial, Plaintiff McCabe specifically testified about the effects of the strip search. She testified:

> It was almost surreal. It was like it was happening to another person, like—like I was almost standing back watching this happen to me, because I just couldn't—I couldn't wrap my brain around what was going on. I was horrified. I felt really small. . . . It wasn't good.

Tr. at 199.

### c. Third prong

Third, Defendant Mais alleges that, even if Plaintiff McCabe presented evidence of psychological injury that Defendant Mais inflicted upon her, "Plaintiff McCabe failed to differentiate between the legal versus illegal parts of the search, and the accordant damages." Brief at 4. Defendant Mais contends Plaintiff McCabe was required to distinguish in her testimony between the emotional distress she suffered as a consequence of the "legal" and "illegal" portions of the search. This contention is based upon an implicit assumption that her search of Plaintiff McCabe at the Jail was "legal" to the extent it complied with the Policy and "illegal" to the extent it did not comply with the Policy. In other words, Defendant Mais frames her liability to Plaintiff McCabe as rising or falling upon the extent to which she complied with the Policy.

This third prong to Defendant Mais's argument is based upon a misapprehension

of the law. Defendant Mais is liable to Plaintiff McCabe for the damages that Plaintiff McCabe suffered as a direct result of Defendant Mais's violation of the Fourth Amendment—not the Policy or any other administrative or state-law provision. *Cf. Davis v. Scherer*, 468 U.S. 183, 194-95 (1984) (reiterating that liability in a § 1983 action turns on whether the defendant violated the plaintiff's federal constitutional rights, not whether the defendant ran afoul of some administrative provision or state law).[9] Clearly, the

---

[9] For example, at the time of Plaintiffs' arrests, Iowa Code § 804.30 provided:

> A person arrested for a scheduled violation or a simple misdemeanor shall not be subjected to a strip search unless there is *probable cause* to believe the person is concealing a weapon or contraband. A strip search pursuant to this section *shall not be conducted except under all of the following conditions*:
>
> 1.  Written authorization of the supervisor on duty is obtained.
> 2.  A search warrant is obtained for the probing of any body cavity other than the mouth, ears or nose.
> 3.  A visual search or probing of any body cavity shall be performed under sanitary conditions. A physical probe of a body cavity other than the mouth, ears or nose shall be performed only by a licensed physician unless voluntarily waived in writing by the arrested person.
> 4.  The search is conducted in a place where it cannot be observed by persons not conducting the search.
> 5.  The search is conducted by a person of the same sex as the arrested person, unless conducted by a physician.
>
> Subsequent to a strip search a written report shall be prepared which includes the written authorization required by subsection 1, the name of the person subjected to the search, the names of the persons conducting the search, the time, date and place of the search and, if required by subsection 2, a copy of the search warrant authorizing the search. A copy of the report shall be provided to the person searched.

(continued…)

Policy is not coterminous with the Fourth Amendment: it is patently unconstitutional to adopt a blanket policy of strip searching and/or VBC searching pre-arraignment detainees without a reasonable suspicion that contraband or weapons will be found as a result. *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 559-560 (1979) (authorizing jail officials to conduct strip searches and VBC searches of inmates with less than probable cause, on the condition that "a balancing of the need for the particular search against the invasion of personal rights that the search entails" is conducted in each case); *Jones v. Edwards*, 770 F.2d 739, 739-42 & n.4 (8th Cir. 1985) (discussing *Bell* and holding that the strip search and VBC search of a pre-arraignment detainee were unconstitutional and jail officials were not entitled to qualified immunity, where officials had no reason to suspect detainee was harboring weapons or contraband on his person); *Bull v. City & County of S.F.*, 539 F.3d 1193, 1199 (9th Cir. 2008) (holding that jail officials violated the constitutional rights of pre-arraignment detainees when they adopted a policy of conducting "blanket strip searches of pre-arraignment detainees regardless of severity of charge and without reasonable suspicion"); *Way v. County of Ventura*, 445 F.3d 1157, 1162 (9th Cir. 2006) ("[T]he Sheriff Department's blanket policy cannot be a proxy for reasonable suspicion. There was no individualized suspicion that Way concealed drugs in a . . . cavity. Therefore, subjecting her to a strip search with visual cavity inspection offended her constitutional right to be free of an unreasonable search."*); Wood v. Hancock County Sheriff's Dep't*, 354 F.3d 57, 62 (1st Cir. 2003) ("Our case law holds that an individual detained on a misdemeanor charge may be strip searched as part of the booking process only if officers

---

[9](…continued)

Iowa Code § 804.30 (emphasis added). "[S]trip search" is broadly defined as "having a person remove or arrange some or all of the person's clothing so as to permit an inspection of the genitalia, buttocks, anus, female breasts or undergarments of that person or a physical probe of any body cavity." *Id.* § 702.23.

have reasonable suspicion that he is either armed or carrying contraband.")); *Roberts v. State of R.I.*, 239 F.3d 107, 112 (1st Cir. 2001) ("[W]hen the inmate has been charged with only a misdemeanor involving minor offenses or traffic violations, crimes not generally associated with weapons or contraband, courts have required that officers have a reasonable suspicion that the individual inmate is concealing contraband." (Citations omitted.)); *Chapman v. Nichols*, 989 F.2d 393, 395 (10th Cir. 1993) ("[I]t is undisputed that . . . jail officials had no reasonable suspicion that these particular arrestees were likely to be carrying or concealing weapons or drugs, and that plaintiffs were searched solely because the blanket policy required all detainees to be subjected to a strip search. Every circuit court . . . which has considered the above circumstances under the *Wolfish* balancing test has concluded that a search under these circumstances is unconstitutional." (Citations omitted.)); *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986) ("[T]he Fourth Amendment precludes prison officials from performing strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest."); *Mary Beth G. v. City of Chi.*, 723 F.2d 1263, 1273 (7th Cir. 1983) ("[E]nsuring the security needs of the City by strip searching plaintiffs-appellees was unreasonable without a reasonable suspicion by the authorities that either of the twin dangers of concealing weapons or contraband existed."); *Hunt v. Polk County*, 551 F. Supp. 339, 344 (S.D. Iowa 1982) (holding that strip searches of pre-arraignment detainee, who had been charged with minor offenses not normally associated with weapons or contraband, violated the Fourth Amendment to the extent that the officer lacked a reasonable suspicion that the detainee was concealing a weapon or contraband); *cf. Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982) ("[W]e conclude that the Constitution mandates that a reasonable suspicion standard govern strip searches of visitors to penal

institutions.").[10] *But see Powell v. Barrett*, No. 05-16734, 2008 WL 4072800, *3-*16 (11th Cir. 2008) (en banc) (creating circuit-split and holding that blanket policy of strip searching all jail detainees during the booking process did not violate the Fourth Amendment); *Stanley v. Henson*, 337 F.3d 961, 967-68 (7th Cir. 2003) (upholding partial strip search even though officer did not have a reasonable suspicion to suspect that the pre-arraignment detainee was harboring contraband or weapons). Defendant Mais is not liable to Plaintiffs because she violated the Policy; she is liable to Plaintiffs because she violated the Fourth Amendment. For this reason, the court instructed the jury as follows:

> You are instructed that Defendant Mais unreasonably searched Plaintiffs at the Linn County Jail by subjecting each of them to a strip search and a visual body cavity inspection. You must decide the amount of damages, if any, that each Plaintiff suffered as a result of these unreasonable searches.

Final Jury Instruction No. 10 (docket no. 273), at 11. Defendant Mais did not object to this jury instruction, which clearly frames her liability in terms of the Fourth Amendment, *not* the Policy.

Put simply, Defendant Mais is liable to Plaintiffs because there is not a scintilla of evidence in the record that Defendant Mais had a reasonable suspicion that Plaintiffs were hiding contraband or weapons underneath their clothing or in their vaginas or anuses. Indeed, Plaintiffs had just "passed" the pat-down searches immediately prior to enforcement of the Policy. Therefore, Plaintiff McCabe was not required to specifically testify about the emotional suffering she experienced as a direct result of those portions of

---

[10] Nearly twenty years ago, the Iowa Attorney General concluded that policies such as the Policy violate the Fourth Amendment. *See* 1990 Iowa Op. Atty. Gen. 97 (No. 90-12-7), 1990 WL 484920 (Dec. 28, 1990) ("Federal courts have uniformly held that strip searches of persons arrested for scheduled violations or simple misdemeanors are unreasonable under the Fourth Amendment of the United States Constitution absent a reasonable suspicion that the arrestee is harboring contraband or weapons.").

the search that did not comply with the Policy. She only needed to testify that she suffered emotional harm as a direct result of the strip search or the VBC search. As indicated, Plaintiff McCabe so testified at trial.

### 3. Conclusion

Accordingly, even if the court were to consider the merits of the Renewed Motion, the court would hold that it should be denied. Viewing the evidence in the light most favorable to Plaintiff McCabe and affording her all reasonable inferences, a "'legally sufficient evidentiary basis'" exists for a reasonable jury to find that Plaintiff McCabe suffered mental anguish as a direct result of Defendant Mais's unconstitutional actions. *See Dominum Mgmt. Servs.*, 195 F.3d at 363 (citation omitted). In other words, there is not a "'complete absence of probative facts'" to support the jury's decision that Plaintiff was entitled to more than nominal damages. *Heaton*, 534 F.3d at 887 (quoting *Wilson v. Brinker Int'l, Inc.*, 382 F.3d 765, 769 (8th Cir. 2004)).

## V. MOTION FOR NEW TRIAL

In the Motion for New Trial, Defendant Mais argues that the jury's awards of damages as to each Plaintiff are excessive. Defendant Mais asks the court order a remittitur or, in the alternative, a partial new trial on damages.

### A. Legal Standard

### 1. Remittitur

Remittitur is a post-trial process that compels a plaintiff to choose between a reduction in an excessive verdict or a new trial. *See, e.g., United States v. 47.14 Acres of Land, More or Less, Situated in Polk County, State of Iowa*, 674 F.2d 722, 728 (8th Cir. 1982). "A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages." *Corpus v. Bennett*, 430 F.3d 912, 917 (8th Cir. 2005). "The court orders a remittitur when it believes the jury's award is *unreasonable* on the facts." *Id.* (emphasis in original). For example, remittitur may be

appropriate when the jury's verdict is the result of passion and prejudice. *Thorne v. Welke Inv., Inc.*, 197 F.3d 1205, 1210 (8th Cir. 1999) (citation omitted)).

A district court has the duty to grant a remittitur when a jury's verdict is so excessive that "there appears plain injustice or a monstrous or shocking result." *Austin v. Euclid-Memphis Sales*, 434 F.2d 285, 288 (8th Cir. 1970). As one district court observed in a very similar strip-search case:

> Remittitur is proper where "the award is so high as to shock the judicial conscience and constitute a denial of justice." *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990). The doctrine of remittitur recognizes that, although it is within the jury's discretion to compute damages, there is an upper limit, and whether that has been surpassed is a question of law, not fact. *Mazyck v. Long Island R.[R.] Co.*, 896 F. Supp. 1330, 1336 (E.D.N.Y.1995) (citing *Dagnello v. Long Island R.R. Co.*, 289 F.2d 797, 806 (2d Cir. 1961)). A jury "may not abandon analysis for sympathy for a suffering plaintiff and treat and injury as though it were a winning lottery ticket." *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir.1993).

*Kelleher v. N.Y. State Trooper Fearon*, 90 F. Supp. 2d 354, 363 (S.D.N.Y. 2000).

### 2. *Partial new trial*

Rule 59(a) provides: "The court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a)(1)(A). In evaluating a motion for a new trial pursuant to Rule 59(a), "[t]he key question is whether a new trial should have been granted to avoid a miscarriage of justice." *McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1400 (8th Cir. 1994). A new trial is appropriate when the trial, through a verdict against the weight of the evidence or legal errors at trial, resulted in a miscarriage of justice. *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992). A miscarriage of justice also occurs "when there is insufficient evidence to

support the verdict." *Douglas County Bank & Trust Co. v. United Fin. Inc.*, 207 F.3d 473, 478 (8th Cir. 2000) (citation omitted).

Consistent with the plain language of Rule 59(a), it is settled that the court may grant a partial new trial solely on the issue of damages. Fed. R. Civ. P. 59(a)(1)(A); *see, e.g., Powell v. TPI Petro., Inc.*, 510 F.3d 818, 824-25 (8th Cir. 2007) (remanding for partial new trial on damages). "[I]n order to grant a new trial based on excessive damages, the verdict must be 'so large as to shock the judicial conscience.'" *DeFranco v. Valley Forge Ins. Co.*, 754 F.2d 293, 296 (8th Cir. 1985) (quoting *DeWitt v. Brown*, 669 F.2d 516, 524 (8th Cir. 1982)). In other words, "[a] new trial may not be granted on the grounds that a jury's verdict is excessive unless the court concludes that the jury's verdict is a 'plain injustice' or a 'monstrous' or 'shocking' result." *Stafford v. Neurological Med., Inc.*, 811 F.2d 470, 475 (8th Cir. 1987) (citations omitted). "Each case must be reviewed within the framework of its distinctive facts." *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 922 (8th Cir. 1986) (citing *Hollins v. Powell*, 773 F.2d 191, 197 (8th Cir. 1985)).

"In determining whether or not to grant a new trial, a district judge is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *King v. Davis*, 980 F.2d 1236, 1237 (8th Cir. 1992) (citing *White*, 961 F.2d at 780). "[T]he 'trial judge may not usurp the function of a jury . . . [which] weighs the evidence and credibility of witnesses.'" *White*, 961 F.2d at 780 (quoting *McGee v. S. Pemiscot Sch. Dist.*, 712 F.2d 339, 344 (8th Cir. 1983)). "Instead, a district judge must carefully weigh and balance the evidence and articulate reasons supporting the judge's view that a miscarriage of justice has occurred." *King*, 980 F.2d at 1237.

"The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S.

33, 36 (1980). On the issue of damages, "'excessiveness of a verdict is basically, and should be, a matter for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of witnesses and which knows the community and its standards . . . .'" *Wilmington*, 793 F.2d at 922 (quoting *Solomon Dehydrating Co. v. Guyton*, 294 F.2d 439, 447-48 (8th Cir. 1961))). "[T]he assessment of damages is especially within the jury's sound discretion when the jury must determine how to compensate an individual for an injury not easily calculable in economic terms." *Stafford*, 811 F.2d at 475; *see also EEOC v. Convergys Customer Mgmt. Group, Inc.*, 491 F.3d 790, 798 (8th Cir. 2007) (same). Further, "[t]he final determination of whether a new trial or remittitur is appropriate . . . is committed to the sound discretion of the trial court.'" *Thorne*, 197 F.3d at 1210 (citation omitted)).

## B. Analysis

In the Fifth Amended Complaint, Plaintiffs sought compensatory and punitive damages from Defendant Mais. *See* Fifth Amended Complaint at ¶ 54. Before the case went to the jury, however, Plaintiffs withdrew their request for punitive damages from Defendant Mais. The court thus only submitted Plaintiffs' request for compensatory damages to the jury.

After deliberating,[11] the jury awarded Plaintiffs a combined $750,000 in compensatory damages. Specifically, the jury awarded $250,000 to Plaintiff McCabe and $500,000 to Plaintiff Nelson. When viewed in light of the nature and quality of evidence that Plaintiffs presented at trial, these two jury verdicts shock the conscience. Allowing these two verdicts to stand on the evidence presented at trial would result in a miscarriage

---

[11] During deliberations, the jury asked the court one question: "Can you define some guidelines with regards to establishing monetary compensation." Jury Question/Answer (docket no. 315), at 2. The court answered: "The guidelines are contained in the jury instructions. Please reread the instructions and continue to deliberate." *Id.* at 1.

of justice. The undersigned observed the trial and is convinced that the jury impermissibly acted out of passion and a desire to punish Defendant Mais.

The undersigned does not lightly overturn the jury's verdict. As the court's discussion of the applicable legal standards in Part V.A *supra* makes clear, an order of remittitur or partial new trial is an extraordinary remedy. Further, a jury is presumed to follow a court's instructions. *In re Prempro Prods. Liab. Litig.*, 514 F.3d 825, 832 (8th Cir. 2008) (citing *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)). Here, the court instructed the jury on the issue of damages. First, the court informed the jury that it "must award each Plaintiff such sum as you find from the greater weight of the evidence will fairly and justly compensate her for any damages, if any, you find she sustained and is reasonably certain to sustain in the future as a direct result" of Defendant Mais's illegal actions. Final Jury Instr. No. 13. Second, the court instructed the jury that it "must not award damages . . . by way of punishment or through sympathy." *Id.*; Final Jury Instr. No. 18. Third, the court specified the sorts of damages the jury was permitted to consider in fashioning any damages award: past and future emotional distress damages and—with respect to Plaintiff Nelson only—past and future medical care and supplies. Final Jury Instr. No. 13.[12] The court is especially loathe to reduce or take away the jury's verdicts in this case because the jury was largely asked to calculate compensation for injuries "not easily calculable in economic terms." *Stafford*, 811 F.2d at 475 (citations omitted).

In spite of these weighty legal presumptions against granting the Motion, the court finds that this is one of those very rare cases in which the jury's verdict is so excessive in light of the evidence presented that the law's ordinary presumptions are overborne. Plaintiffs presented very little evidence to prove that they suffered damages as a result of Defendant Mais's strip searches and VBC searches of Plaintiffs' persons. The evidence

---

[12] Plaintiffs did not present any evidence that might justify any other sorts of damages, such as lost wages, loss of consortium or loss of earning capacity.

presented clearly does not justify a combined verdict of $750,000 against Defendant Mais. To let such verdicts stand against her would be manifestly unjust.

As set forth in Part IV.C.2.b *supra*, Plaintiff McCabe's only testimony with respect to the injuries she suffered as a result of the strip search and VBC search is contained in a single paragraph of the trial transcript. Plaintiff McCabe did not testify that she suffered any lingering or continuing effects from the strip search or the VBC search. It is undisputed that Plaintiff McCabe did not suffer any physical injury or seek any assistance from a professional health care worker at any time. In Plaintiff McCabe's own words, "Some things are just kind of 'Suck it up.'" Tr. at 208. Plaintiff McCabe's testimony was not compelling, and the jury's award far exceeded community standards and shocks the conscience. *Cf. Forshee v. Waterloo Indus., Inc.*, 178 F.3d 527, 531 (8th Cir. 1999) (reversing jury's award of approximately $10,000 in emotional distress damages in its entirety, where plaintiff relied upon her own testimony, she "suffered no physical injury, she was not medically treated for any psychological or emotional injury, and no other witness corroborated any outward manifestation of emotional distress"); *Nekolny v. Painter*, 653 F.2d 1164, 1172-73 (7th Cir. 1981) (reversing award of damages of emotional distress and holding that "[a] single statement by a party that he was 'depressed,' 'a little despondent,' or even 'completely humiliated' . . . is not enough to establish injury").

When discussing the emotional distress she suffered as a consequence of Defendant Mais's actions, Plaintiff Nelson likewise testified in an abbreviated and conclusory fashion. Plaintiff Nelson testified: "I was humiliated, and I felt violated. I felt as though I had lost control of my own body. I couldn't imagine many things that would be worse," Tr. at 611-12, and the mere fact of being watched undressing brought on "the sense of humiliation," *id*. at 634. While, unlike Plaintiff McCabe, Plaintiff Nelson also testified that the effects of the strip search and VBC search were continuing, she again offered only

conclusory statements. She testified: "I've kind of pulled into myself. I've been more withdrawn. An I really have trouble warming up to people I don't know. And I'm uncomfortable until I get to know somebody." *Id.* at 629. Plaintiff Nelson's testimony was not compelling, and the jury's award far exceeded community standards and shocks the conscience. *Cf. Forshee*, 178 F.3d at 531; *Nekolny*, 653 F.2d at 1172-73.

It is true that Plaintiff Nelson offered testimony from her primary physician, Dr. John Banks, M.D., partially in an attempt to prove that the strip search and VBC search caused an exacerbation of pre-existing, undiagnosed depression. The expert testimony failed as a matter of law for this purpose. At no time did Dr. Banks link Defendant Mais's actions to Plaintiff Nelson's worsening depression. To the contrary, Dr. Banks only opined that Plaintiff Nelson's *arrest* exacerbated her depression. Indeed, Plaintiff Nelson admitted at trial that she never told Dr. Banks about the strip search and VBC search. Hence Dr. Banks' treating notes only speak of an "arrest" and contain no mention whatsoever of a strip search or a VBC search. At trial, Plaintiff Nelson testified that she did not mention the strip search and VBC search to Dr. Banks, because her experience at the Jail "was humiliating, and it was difficult to talk about . . . even with my physician." Tr. at 621. The fact remains, however, that there is an important gap in proof that Plaintiffs did not bridge: the element of causation. *See, e.g., Carey v. Piphus*, 435 U.S. 247, 264 & n.20 (1978) (holding that plaintiffs in § 1983 cases must prove causation and "competent evidence concerning [emotional] injury"). Proof of causation was necessary and no small matter in this case, because Dr. Banks testified that other stressors in Plaintiff Nelson's life were exacerbating her depression. In addition to depression, it is undisputed that, at the time of her strip search and VBC search, Plaintiff Nelson was suffering from anxiety, migraine headaches, a knee injury, was going through a divorce and was having problems at work.

This crucial problem with Dr. Banks's testimony is symptomatic of a larger problem

with Plaintiffs' case. At trial, Plaintiffs focused their efforts *not* upon Defendant Mais, but upon Defendant Macaulay and the damages they allegedly incurred as a result of his decision to order their arrests. Both Plaintiffs intimated through their testimony that Defendant Macaulay's decision to order their arrests—not the strip and VBC searches—were the overriding causes of their emotional distress. For example, Plaintiff Nelson testified that the "worst thing" was

> the fact that as a history teacher and a teacher that emphasizes that this country was founded on the Constitution and the freedom of speech, and now I—I find that's, at least in my case, that's not true. It's—it's as though the last almost twenty-eight years of teaching has been a sham. I continue to teach that, but in my mind, I know there are so many exceptions to that.

Tr. at 630. Nonetheless, the jury found that Defendant Macaulay's decision to cause Plaintiffs' arrests did not cause Plaintiffs to suffer any damages but Defendant Mais's actions caused a combined $750,000 in damages. The inescapable conclusion is that the jury acted out of passion and prejudice and ignored the court's repeated admonitions to treat the liability of Defendants separately. *See, e.g.*, Final Jury Instr. No. 6.

Counsel for Plaintiffs' closing argument encouraged the jury to ignore the court's instructions and repeatedly urged the jury to base its findings on damages on alleged facts outside of the record. Plaintiffs' counsel concluded his closing argument with the following, unfairly prejudicial and improper statement to the jury, which was designed to appeal to the passion, sympathy and prejudices of the jurors and to punish the defendants:

> The Bill of Rights is designed to preserve individual human dignity. What's the value of Chris's human dignity that was taken away from her by Defendant Mais and Defendant Macaulay? What's the value of Alice's human dignity? I suggest to you, it's millions of dollars. Millions of dollars. Think about what we value in society today. Peyton Manning makes $42,000,000 a year. What's Chris' human dignity

worth?  Shaq, [$]33,000,000.  Race car driver Jeff Gordon, [$]23,000,000.  The [r]apper 50 Cent, [$]41,000,000. Simon Cowell, *American Idol* judge, [$]43,000,000.  Larry the Cable Guy, makes $19,000,000. If Larry the Cable Guy makes $19,000,000, what is Alice McCabe's human dignity worth? How many of you Hannah Montana?  Miley Cyrus, she makes a million dollars a week.  A million dollars a week.  In a society that values Hannah Montana's time at a million dollars a week, what is Chris and Alice's human dignity worth?  A wife, a mother, a sister, forced to strip naked in front of a complete stranger, and allow them to inspect their most private parts.  What is the value of that dehumanizing act?  Historical signatures, Jefferson, Washington, worth a hundred thousand dollars. What would Thomas Jefferson think of the idea that his autograph was worth anywhere near, much less more than, the value of the simple human dignity he fought hard to guaranty to all Americans.  Those original fourteen Bill of Rights that I told you about, North Carolina's disappeared after the Civil War.  Some Union soldier took it from the state capital as a war trophy.  It showed up a few years back.  It was valued at [$]20[,000,000] to $30,000,000.  The parchment that the Bill of Rights was written on is valued at [$]20[,000,000] to $30,000,000.  How would our Founding Fathers react to the idea that the parchment that the Bill of Rights was written on is worth more than the loss suffered by American citizens when their rights are violated?  You can give back Chris and Alice their human dignity.  You can do it by awarding damages in a significant amount.  You can do it by providing them damages with a decision that will ring forth from this courtroom across this city, across this state, across this country.  And you can let everyone know that we are not going to let federal agents  come into this area and violate the constitutional rights of our citizens.  And if they dare to do it, they're going to pay the price, the maximum allowed by the judge's instructions. It's an awesome job.  You have to give meaning to the Bill of Rights, 217 years after it was adopted by our founding fathers.  We are confident that you are up to that responsibility.  Thank you.

Tr. at 1028-29.[13]  The transcript does not reflect that counsel for Plaintiffs brought a purported paper copy of the United States Constitution into the courtroom and ripped it in half as he made the aforementioned improper final argument.  Inexplicably, counsel for Defendant Mais did not object to any part of Plaintiffs' closing argument or counsel for Plaintiffs' theatrics.

Plaintiffs have not presented the court with any cases in which a court upheld a $500,000 verdict, or even a $250,000 verdict, in an illegal strip search or VBC search case over a defendant's motion for remittitur.  *See, e.g., Ismail*, 899 F.2d at 187 ("Reference to other awards in similar cases in proper."); *Levka v. City of Chi.*, 748 F.2d 421, 425 (7th Cir. 1984) (stating that a court may consider whether an award "is out of line compared to other awards in similar cases"); *Shaw v. United States*, 741 F.2d 1202, 1209 (9th Cir. 1984) (While "[e]ach case stands on its own facts[,] . . . courts are required to maintain some degree of uniformity in cases involving similar losses."); *Wilson v. Beebe*, 743 F.2d 342, 348 (6th Cir. 1984) ("[A]nalogous cases may be reviewed at the post-trial . . . stage to determine whether a damage award is within a given range."), *vacated on other grounds*, 770 F.2d 578 (6th Cir. 1985).[14]  Undoubtedly, courts have uniformly

---

[13] It is axiomatic that "send a message" arguments, which urge the jury to base its findings on compensatory damages on alleged facts outside of the record and for the purposes of punishment, are improper.  *See Harris v. Steelweld Equip. Co.*, 869 F.2d 396, 406 n.13 (8th Cir. 1989) ("Without pleading punitive damages and proof thereof, the courts have held that it is reversible error for the complaining party's attorney to utilize a "send a message" argument because evidence will not support the argument for an award of punitive damages.").

[14] The court recognizes that the Eighth Circuit Court of Appeals has stated that comparisons to other jury verdicts are often "not particularly helpful."  *Herold v. Burlington N., Inc.*, 761 F.2d 1241, 1248 (8th Cir. 1985).  "Each case must be evaluated on its own merits."  *Id.*  In other words, "[damages] comparisons are not greatly helpful because the case must be evaluated as an individual one, within the framework of its distinctive facts."  *Vanskike v. Union Pacific R.R. Co.*, 725 F.2d 1146, 1150 (8th Cir.

(continued...)

recognized that strip searches and VBC searches are humiliating and degrading. *See, e.g., Goff v. Nix*, 803 F.2d 358, 366 n.10 (8th Cir. 1986) (approving of a district court's characterization of strip searches and VBC searches as "'intrusive, degrading, humiliating, embarrassing, and [as] greatly increas[ing] an inmate's feelings of vulnerability'" (citation omitted); *Thompson v. City of L.A.*, 885 F.2d 1439, 1446 (9th Cir. 1989) ("The feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers for visual inspection is beyond dispute."); *Weber*, 804 F.2d at 803 (describing a VBC search as "'insensitive, demeaning and stupid'" (citation omitted)). However, many of these same courts have held that, in the garden-variety illegal strip search or VBC search case where no aggravating facts are present, victims of illegal strip searches and VBC searches are only entitled to nominal damages. *See, e.g., Hunter v. Auger*, 672 F.2d 668, 677 (8th Cir. 1982) (reversing and remanding for award of nominal damages); *McBean v. City of N.Y.*, 233 F.R.D. 377, 387 (S.D.N.Y. 2006) (approving class-action settlement for illegal strip searches, according to which each class member would generally receive $750 if subjected to a single strip search, and discussing "numerous examples of individual plaintiffs who have, at trial, proven liability on a strip-search claim, only to be awarded nominal damages" (citations omitted)).

*Hunter* is instructive. In *Hunter*, visitors to inmates at Iowa penitentiaries challenged the penitentiaries' policy of strip searching and VBC searching the visitors prior

---

[14](...continued)
1984). Because this case falls into a narrow category of garden-variety illegal strip search and VBC search cases, the court finds that it is somewhat helpful to compare the jury's verdicts with other verdicts in similar cases. The court must take into account inflation, *see, e.g., Virginian Ry. Co. v. Rose*, 267 F.2d 312, 316 (4th Cir. 1959) ("It does not necessarily follow . . . that a verdict deemed excessive ten years ago must be viewed similarly today."), and ensure that each case is evaluated within the framework of its distinctive facts, *see, e.g., Guiterrez-Rodriguez v. Cartagena*, 882 F.2d 553, 579 (1st Cir. 1989) ("[T]he value of any comparison will depend upon the similarities of the injuries, the locations and dates of the trials, and of the evidence presented there.").

to meeting with their loved ones.  672 F.2d at 670.  The district court held the blanket strip search policy was constitutional, even though the officials at the penitentiaries did not have individualized reasonable suspicion that all visitors would be harboring weapons or contraband.  *See id.*  The Eighth Circuit Court of Appeals reversed.  *Id.*  When it came to damages, the court ordered:

> Appellants have requested an award of reasonable damages. After carefully studying the record evidence, we find that there is no showing of facts justifying an award of more than nominal damages. We note that there is no evidence that appellants here were subjected to repeated incidents that intruded on [F]ourth [A]mendment protections. Each complaint is based on one episode.  Moreover, we believe that appellants' [F]ourth [A]mendment rights are fully vindicated here by the grant of declaratory and injunctive relief. Accordingly, we direct the district court, on remand, to allow nominal damages.

672 F.2d at 677.

In many respects, Plaintiffs are in a similar position to the plaintiffs in *Hunter* and other cases in which courts have held that only nominal damages are appropriate. Plaintiffs presented no evidence that they were subjected to repeated violations of their Fourth Amendment rights.  The pertinent allegations in the Complaint are based upon a single episode of conduct.  Further, there is no evidence of any aggravating factors.  For example, there is no evidence Defendant Mais conducted the strip searches and VBC searches in a violent or mocking manner or laughed, touched or took photographs or video of Plaintiffs.  Defendant Mais may have been very poorly trained and careless, if not completely incompetent, but there is no evidence she strip searched and VBC searched Plaintiffs for some improper motive.[15]  Although Defendant Mais left the top half of the

---

[15] Neither Administrator Carr nor anyone else from the Jail provided Defendant
(continued…)

Dutch door open during the strip search and VBC search of Plaintiff Nelson, there is no evidence that Defendant Mais did so with malice or, in any event, that anyone in the adjacent hallway watched Plaintiff Nelson.

Consistent with the court's ruling in Part IV.C.2 *supra*, however, the court does not believe this case is "on all fours" with *Hunter* and therefore some award of compensatory damages is appropriate. Unlike the plaintiffs in *Hunter*, here Plaintiffs testified specifically that they suffered emotional distress as a direct result of the strip searches and VBC searches. Further, Plaintiffs have not sought declaratory and injunctive relief, presumably because they are exceedingly unlikely to ever enter the Jail again. Indeed, counsel for Defendant Mais conceded at trial that there is "no question" that Defendant Mais's illegal action "added to the distress [P]laintiffs already felt." Tr. at 1065. The evidence of emotional distress, however, was not strong for reasons already outlined in this section: Plaintiffs' reliance upon their own conclusory allegations of emotional distress, no medical evidence of injury and the absence of aggravating factors. Only Plaintiff Nelson offered evidence of more than momentary emotional distress. A far lower award bordering upon nominal damages is thus appropriate—especially for Plaintiff McCabe, who did not present any evidence that her emotional distress lasted more than the duration of the searches. The

---

[15](...continued)

Mais with a copy of the Policy or formally trained her on its operation. Indeed, Defendant Mais had never even seen the Policy until her deposition. Further, there is no evidence that either the Iowa Law Enforcement Academy or the Iowa Jail School trained Defendant Mais on the Policy.

In her deposition, Defendant Mais admitted that, as of September 3, 2004, she clearly needed further training in the "strip searching of inmates," Court Ex. 1, at 28, because she "never received the opportunity to have a training officer stand by while I practiced the procedure to learn the procedure," *id*. at 29. To learn how to strip search and VBC search inmates, Defendant Mais "overheard male deputies completing searches on male inmates" and "asked the female correction officer how she did hers." *Id*. at 33. Defendant Mais also believed in an unwritten policy that allowed her to strip search and VBC search inmates accused of simple misdemeanors and seize thong underwear.

jury rightly awarded Plaintiff Nelson more, as she presented some, albeit weak, evidence of continuing emotional distress as a direct result of Defendant Mais's illegal actions.

In many respects, the case at bar is perhaps most similar to *Kelleher v. New York State Trooper Fearon*, 90 F. Supp. 2d 354 (S.D.N.Y. 2000). In *Kelleher*, as here, a jury and court found and held that a trooper lawfully arrested the plaintiff but improperly strip searched and VBC searched him. 90 F. Supp. 2d at 360. Making matters somewhat worse in *Kelleher*, however, the trooper donned surgical gloves, grabbed the plaintiff's buttocks and "'kind of spread [them] a little further.'" *Id.* at 356. The jury awarded the plaintiff $125,000 after a jury trial. *Id.* at 360.

In deciding whether to order remittitur or a partial new trial on damages, the district court in *Kelleher* surveyed other cases involving strip searches and VBC searches and noted that the jury verdict greatly exceeded other damage awards in cases with similar facts. *Id.* at 363-64 (citations omitted). *Compare Kennedy v. L.A. Police Dep't*, 901 F.2d 702, 705 (9th Cir. 1989) (affirming jury's award of $25,000 in compensatory damages in case with no aggravating factors) *and Abshire v. Walls*, 830 F.2d 1277, 1279 (4th Cir. 1987) (affirming two awards of $500 and one award of $1,000 in case with no aggravating factors), *with Ciarolo v. City of N.Y.*, 216 F.3d 236, 237-38 (2d Cir. 2000) (affirming jury's verdict of $19,645 in compensatory damages, where strip search resulted in plaintiff suffering post-traumatic stress disorder, undergoing therapy and taking anti-depressants) *and Joan W. v. City of Chi.*, 771 F.2d 1020, 1023-25 nn.1-9 (7th Cir. 1985) (ordering remittitur of jury's verdict of $112,000 to $75,000, where plaintiff suffered emotional distress and officers conducting strip search threatened plaintiff, used vulgar language and laughed at plaintiff, after noting that jury verdicts in other unlawful strip search cases in the Northern District of Illinois ranged from $3,300 to $60,000 and remarking that "the jury award of $112,000 for damages is flagrantly extravagant and out of line")). The court noted that the plaintiff had presented very little proof of injury beyond his own testimony.

*Kelleher*, 90 F. Supp. 2d at 363. Further, much of the plaintiff's evidence with respect to damages, including his only expert evidence, focused on the arrest, not the strip search and VBC search. *Id.* The court held that, based on the evidence presented, the award shocked the conscience and, if awarded to stand, would result in a miscarriage of justice. *Id.* at 363-64. The district court ordered the plaintiff to accept a remittitur of $25,000 or a partial new trial on damages. *Id.* at 364.[16]

## C. Conclusion

In light of the foregoing, the court shall order a remittitur in the amount of $25,000 with respect to Plaintiff McCabe and $50,000 with respect to Plaintiff Nelson. If either Plaintiff is unwilling to accept a remitted amount, the court shall schedule a new trial on the question of damages for such Plaintiff.

## VI. DISPOSITION

**IT IS THEREFORE ORDERED THAT:**

1.  Defendant Mais's Renewed Motion for Judgment as a Matter of Law (docket no. 285) is **DENIED**;

2.  Defendant Mais's Motion for Remittitur or Partial New Trial (docket no. 284) is **GRANTED**;

3.  The court **VACATES** that portion of the Judgment Order (docket no. 279) that required Defendant Mais to pay Plaintiff McCabe $250,000 and Plaintiff Nelson $500,000;

4.  Within five (5) court days of the date of the instant Order, Plaintiffs shall notify the court in writing whether they accept a remittitur in the amount of $25,000 with respect to Plaintiff McCabe and $50,000 with respect to Plaintiff Nelson; and

---

[16] Although not reflected in the reported opinion, online records reveal that the plaintiff in *Kelleher* later accepted the remittitur.

5.     If the remittitur is not accepted, trial will commence on **October 27, at 9 a.m.**

**IT IS SO ORDERED.**

**DATED** this 2d day of October, 2008.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA